**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 1:08-CV-00333-JTC |
| | ) | |
| v. | ) | UNITED STATES'S MEMORANDUM |
| | ) | OF POINTS AND AUTHORITIES |
| ROBERT P. CORP, | ) | IN SUPPORT OF MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

**PAGE**

**MEMORANDUM OF POINTS AND AUTHORITIES..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. The HUD program harmed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Brylin Hospitals's financial arrangement with Heller Healthcare Finance. . . . . . . . . . . . 3

3. Robert Corp represents to HUD that Brylin's indebtedness was
   $1,350,000; in fact, the debt was much lower . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4. Having been advised by Heller that the balance on the Brylin Loan
   had decreased to $643,247.51, Robert Corp continues to cause false
   statements to be submitted to HUD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5. On the eve of closing, the parties to the Brylin deal create an escrow
   arrangement designed to justify their representations to HUD. . . . . . . . . . . . . . . . . . . 8

6. On June 5, 2001, Robert Corp caused the HUD-insured loan, which
   defaulted in less than three months, to be closed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. Mr. Corp is liable under the FCA because he knowingly overstated
   to HUD the amount of Brylin's debt to Heller and caused
   the loan to be closed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   a. Mr. Corp is liable under 31 U.S.C. § 3729(a)(1)(B) because
      he knowingly made, or caused to be made, to HUD three
      statements which falsely represented that Brylin's debt to
      Heller was $1,350,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1.      False Statement #1: the revised Supplement to
        Project Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2.      False Statement #2: Brylin's payoff letter of May 29, 2001. . . . . . . . . . 15

3.      False Statement #3: the Mortgagor's Certificate of Actual Cost. . . . . . . 18

4.      The three false statements are material to the false claim. . . . . . . . . . . . 18

5.      The parties' escrow agreement, finalized the day before the
        Brylin loan closed and carried out after the closing, did not
        increase Brylin's indebtedness to Heller. . . . . . . . . . . . . . . . . . . . . . . . . 19

B.      Alternatively, Mr. Corp is liable under 31 U.S.C. § 3729(a)(1)
        for the false claim for mortgage insurance presented to HUD
        because he closed the loan knowing that the amount of the
        Heller debt was being overstated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.      Mr. Corp's false statements and fraudulent conduct caused
        HUD to sustain *single* damages of $678,399.38. . . . . . . . . . . . . . . . . . . 22

II.     Alternatively, it is unjust to allow Mr. Corp to retain the profits that he received because
        he made numerous false statements-- even if unknowingly-- which inflated HUD's
        guaranty beyond what was permissible under the agency's directives. . . . . . . . . . . . . . 24

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

# TABLE OF AUTHORITIES

## CASES

*Beth Israel Medical Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.,* 448 F 3d 573 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cook County, Ill. v. United States ex rel. Chandler,* 538 U.S. 119 (2003). . . . . . . . . . . . . . . 12

*Hill v. Waxberg,* 237 F2d 936 (9th Cir. 1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Neder v. United States,* 527 U.S. 1, 22 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Eghbal,* 475 F. Supp. 2d 1008 (C.D. Cal. 2007), *aff'd* 548 F3d 1281. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Ekelman & Assocs.,* 532 F2d 473 (6th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . 12

*United States v. First Nat'l Bank of Cicero,* 957 F2d 1362 (7th Cir. 1992). . . . . . . . . . . . . . . . 24

*United States v. Gaudin,* 515 U.S. 506 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Hibbs,* 568 F2d 347 (3d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Killough,* 848 F2d 1523 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Krizek,* 111 F3d 934 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mackby,* 261 F3d 821 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Mackby,* 339 F3d 1013 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Miller,* 645 F2d 473 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Neifert-White Co.,* 390 U.S. 228 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Raymond & Whitcomb Co.,* 53 F. Supp. 2d 436 (S.D.N.Y. 1999). . . . . . . . . . . 14

*United States v. Rivera,* 55 F3d 703 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

*United States v. TDC Mgmt. Corp.,* 288 F3d 421 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Teeven,* 862 F. Supp. 1200 (D. Del. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Veneziale*, 268 F2d 504 (3d Cir. 1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States ex rel. Asch v. Teller, Levit & Silvertrust, P.C.*,
      00-C-3289, 2004 WL 1093784 (N.D. Ill. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States ex rel. Cantekin v. University of Pittsburgh*, 192 F3d 402 (3d Cir. 1999). . . . . . . 24

*United States ex rel. Compton v. Midwest Specs., Inc.*,
      142 F3d 296 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Securities Group, Inc.*
      370 F. Supp. 2d 18 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States ex rel. Hendow v. University of Phoenix*, 461 F3d 1166 (9th Cir. 2006). . . . . . . 13

*United States ex rel. Longhi v. Lithium Power Techn., Inc.*, 513 F. Supp.
      2d 866 (S.D. Tex. 2007), *aff'd* ___F.3d___ 2009, WL 1959259. . . . . . . . . . . . . . . . . . . 15

United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943). . . . . . . . . . . . . . . . . . . . . . . . 12, 23

*United States ex rel. Taylor v. Gabelli*, 03-cv-872, 2005 WL 2978921
      (S.D.N.Y. Nov. 4, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATUTES

12 U.S.C. § 1715w. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
12. U.S.C. § 1715n. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 2461. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
31 U.S.C. § 3729. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11,13, 14, 18, 21, 23

## RULES & REGULATIONS

Fed. R. Civ. P. 56(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
24 C.F.R. § 232.903. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23, 24
24 C.F.R. § 232.880. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## LEGISLATIVE

Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21,
      enacted on May 20, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**MISCELLANEOUS**

HUD Glossary at http://www.hud.gov/offices/hsg/sfh/buying/glossary.cfm
        (last visited Aug. 19, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Restatement (Second) of Torts § 538 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## MEMORANDUM OF POINTS AND AUTHORITIES

The United States is entitled to Summary Judgment under the False Claims Act (FCA),

31 U.S.C. § 3729, because the undisputed facts show that defendant Robert Corp knowingly

presented, or caused to be presented, to the U.S. Department of Housing and Urban Development

(HUD), false and fraudulent documentation in connection with an application to insure a loan to

refinance the existing indebtedness of Brylin Hospitals, Inc./Linreal Corporation ("Brylin" or

"Brylin Hospitals), the owner-operator of a residential healthcare facility in Buffalo, New York.

By knowingly overstating Brylin's indebtedness to a creditor named Heller Healthcare Finance,

Inc., ("Heller"), Mr. Corp caused HUD to insure a loan that was larger than was permissible

under the rules of the relevant HUD Program.  As a result, the insurance claim that HUD

incurred and paid after the borrower defaulted on the loan was larger than it would have been had

Mr. Corp been truthful.  This action seeks to restore funds to the HUD Program.

## FACTUAL BACKGROUND

1.     The HUD program harmed

HUD is authorized pursuant to sections 232/223(f) of the National Housing Act, as

amended, 12 U.S.C. §§ 1715w, 1715n, to insure lenders against loss on mortgage loans used

to refinance existing healthcare facilities (this program shall be referred to as the "HUD

Program").  The proceeds of any refinancing may be applied only to retire the healthcare

facility's "existing indebtedness."  12 U.S.C. § 1715n(f)(4)(B).  The program's objective is to

increase public access to healthcare.  12 U.S.C. § 1715w.

Refinance loans insured under the HUD Program are eligible for origination under

HUD's Multifamily Accelerated Processing (MAP) guidelines, in which the lender processes and

underwrites the loan, and submits to HUD an application for firm commitment that includes a

full underwriting package.  United States's L.R. 56.1(a) Statement of Undisputed Facts

("USSUF") at ¶ 1.  Paragraph 3.11 of the controlling MAP Guide prohibits borrowers from

receiving any cash proceeds from the refinance of a mortgage under the HUD program.  USSUF

¶ 2.  For the purposes of determining the amount eligible to be refinanced, paragraph 8.9(E) of

the MAP Guide excludes from the definition of "existing indebtedness" any indebtedness

"recently placed against the project to increase the mortgage or circumvent program intent."  *Id*.

Following HUD's review and approval of an application for mortgage insurance under

the HUD Program, HUD issues the lender a firm commitment to insure the loan.  The maximum

mortgage amount that HUD is permitted to insure is based upon the *lowest* of: (i) 85 percent of

the appraised value of the property; (ii) 85 percent of the project's net income available for

making mortgage payments; or (iii) the cost to refinance the borrower's existing debt (including

amounts needed to pay off the borrower's existing indebtedness).  USSUF ¶ 3.  The firm

commitment that HUD issues to the lender under the HUD Program provides a provisional

amount of the mortgage loan that HUD will insure, which is based on the information submitted

to HUD at the time of the initial application for insurance. USSUF ¶ 4.

After HUD issues a firm commitment, the borrower must submit to HUD a certification

detailing the total, actual costs incurred in the refinancing; these certifications are typically

submitted at or around the time of the loan's closing.  USSUF ¶ 5.  On the basis of the final,

certified costs, HUD determines whether any change in the insured mortgage amount (as set forth

in the firm commitment) is necessary and, thereafter, makes a final endorsement of the loan for

insurance.  USSUF ¶ 6. In the event of a borrower's default under the terms of the insured

mortgage, the lender may assign the mortgage to HUD, in which case HUD pays the borrower's

unpaid principal and interest.  *See* 24 C.F.R. §§ 232.880, 232.885.

2.     Brylin Hospitals's financial arrangement with Heller Healthcare Finance

In 1999, Brylin Hospitals entered into a financial relationship with Heller, a Maryland-

based lender, under which Heller would provide Brylin with cash advances, which were secured

by accounts receivable that Brylin sold to Heller at a discount.  USSUF ¶ 7.  After Brylin

defaulted on its debt to Heller in or about August of 2000, Brylin and Heller entered into a

Forbearance Agreement under which Heller agreed to continue making advances to Brylin so

long as Brylin provided what Heller deemed to be adequate security.  USSUF ¶ 8.

The Forbearance Agreement imposed a "purchase cap," which limited the funds available

to Brylin.  The Forbearance Agreement decreased the "purchase cap" to $1,262,500 by March 9,

2001.  USSUF ¶ 8.  Heller did not have an obligation to make loans to Brylin.  Rather, whether to

extend credit to Brylin was solely within Heller's discretion.  In fact, Heller had refused Brylin's

requests for additional advances.  USSUF ¶ 9-10.

3.     Robert Corp represents to HUD that Brylin's indebtedness was $1,350,000; in fact, the
       debt was much lower

From about December of 2000 until about August of 2004, Robert Corp was a principal

in Continental Securities, LLC ("Continental"), a mortgage banking firm in Syracuse, New York.

In 2001, Robert Corp was a HUD-approved MAP underwriter, meaning that he was authorized

by HUD to underwrite loans to be insured by HUD.  USSUF ¶ 11.[1]

---

[1] A mortgage underwriter is a person who evaluates the property and the credit worthiness
of the borrower, and makes an assessment of the risk involved in making a loan.  *HUD Glossary*
at http://www.hud.gov/offices/hsg/sfh/buying/glossary.cfm (last visited Aug. 19, 2009) (definition of "underwriting").]

In February of 2001, Robert Corp submitted to HUD an application with supporting documents to insure a proposed mortgage loan of $7,012,500 under the HUD Program to be used for refinancing the existing indebtedness of Brylin.  USSUF ¶ 12.  Along with the Application for Mortgage Insurance, Robert Corp submitted to HUD a Supplement to Project Analysis (Form HUD 92264-A), which was signed by Robert Corp and dated February 15, 2001.  This document calculates the maximum insurable mortgage based on the existing indebtedness of Brylin Hospitals.  Robert Corp represented Brylin Hospitals's total existing indebtedness to be $5,746,546, which is itemized to include a debt to Heller Financial in the amount of $1,350,000. USSUF ¶ 13.  In support of the Application for Mortgage Insurance, Robert Corp submitted to HUD a letter dated January 31, 2001 and signed by Eric Pleskow, the owner of Brylin Hospitals. The letter represents that Brylin Hospitals had an "existing debt" to "Heller Financial" in the amount of $1,350,000.  USSUF ¶ 14.  On or about April 23, 2001, Robert Corp submitted to HUD a revised Supplement to Project Analysis (HUD Form 92264-A) which again represented that Brylin Hospitals's debt to Heller was $1,350,000.  USSUF ¶ 15.

Mr. Corp's representations that Brylin's indebtedness to Heller stood at $1,350,000 were false.  Brylin's debt to Heller was decreasing from January to June of 2001 and had fallen far below $1,350,000 by April 23, 2001.  USSUF ¶ 16.

- 4 -

The following chart depicts the downward trajectory of the Heller debt:

| February 23, 2001 | $1,000,000 (approx.) | USSUF ¶ 16 |
| March 14, 2001 | $860,436.05 | USSUF ¶ 17 |
| May 23, 2001 | $643,247.51 | USSUF ¶ 27 |
| May 30, 2001 | $604,378.51 | USSUF ¶ 30 |
| June 4, 2001 | $554,991.96 | USSUF ¶ 56 |

After submitting to HUD the initial Supplement to Project Analysis, Robert Corp did not seek any additional information about Brylin's indebtedness to Heller before he submitted to HUD the revised Supplement to Project Analysis, dated April 23, 2001.  Mr. Corp testified during his deposition that he "had no idea what the balance of the Heller debt did between [February 15, 2001 and April 23rd 2001]" and took no steps to ascertain whether the Heller debt changed after January 31, 2001.  USSUF ¶¶ 18-19.

4.   Having been advised by Heller that the balance on the Brylin Loan had decreased to $643,247.51, Robert Corp continues to cause false statements to be submitted to HUD

On May 1, 2001, HUD gave Continental a Firm Commitment to insure a loan not exceeding $7,012,500.  USSUF ¶ 20.  In a memorandum dated May 7, 2001 and addressed to Basil Elmer, with whom Mr. Corp worked on the Brylin loan, Mr. Corp stated "Let's assume that we'll be able to meet a May 29, 2001 closing date. . . The firm commitment was processed with a Heller balance of $1,350,000.  I need to know what the payoff amount of that debt will be on May 29."  USSUF ¶ 21.

Brylin was not permitted to submit documents directly to HUD.  Instead, any documentation provided by Brylin was submitted to HUD through Continental Securities. USSUF ¶ 22.  In late April or early May of 2001, Robert Corp advised Karen Manny, Brylin's

general counsel, that she needed to obtain from Heller a letter documenting Brylin's indebtedness to Heller, which Continental could submit to HUD.  Specifically, Mr. Corp asked Ms. Manny to obtain from Heller a "payoff letter" documenting Brylin's outstanding balance and provided Ms. Manny with a form payoff letter, stating "HELLER LETTERHEAD" at the top of the form, to use.  USSUF ¶ 23.  On May 15, 2001, Karen Manny sent to Heller the form payoff letter that Robert Corp had provided to her and requested that Heller provide a payoff letter documenting the Brylin debt.  USSUF ¶ 24.

In a letter dated May 21, 2001, Robert Corp wrote to HUD to provide a preliminary schedule of the existing indebtedness for the purpose of cost certification; the amount of the Heller debt was left blank.  Robert Corp stated that he was providing all documentation except for the Heller existing indebtedness, for which he expected to have a letter of documentation to give HUD in the next day or two.  He further stated that when he obtains such letter of documentation, "I will have the Cost Certification completed and sent to you along with that letter."  USSUF ¶ 25.  The next day, Heller faxed to Karen Manny and Robert Corp a "draft payoff letter" which accurately represented that Brylin's debt to Heller was approximately $643,247.51 as of May 23, 2001.  USSUF ¶¶ 26-27.  Upon receiving this information, Robert Corp advised Karen Manny that Heller's draft payoff letter (Exhibit SJ17) "would not suffice" for the purposes of the HUD-insured loan.  Specifically, Robert Corp told Karen Manny that she needed to obtain from Heller a payoff letter representing Brylin's debt to Heller as $1,350,000 or else the size of the loan that HUD would agree to insure would be reduced.   Robert Corp asked Karen Manny to obtain from Heller another payoff letter.  USSUF ¶ 28.  Though he had twice represented to HUD that Brylin's debt to Heller was $1,350,000, Mr. Corp did not advise HUD

that Heller had informed him that the debt was $643,247.51 as of May 23, 2001.  USSUF ¶ 29.

On May 30, 2001, Heller faxed to Brylin's CEO Eric Pleskow a "payoff letter" confirming accurately that Brylin's indebtedness to Heller was $604,378.51 as of May 30, 2001. The letter also stated that Brylin desired to increase the debt amount to $1,350,000, so that the amount of the HUD-insured loan for which Brylin had applied would also increase.  USSUF ¶¶ 30-31.  Neither of the payoff letters (Exhibits SJ17 and SJ18), which communicated that Brylin's debt to Heller was far less than $1,350,000, were ever submitted to HUD.  USSUF ¶ 32.

Approximately one week before the June 5, 2001 closing of the Brylin loan, John Brennan, an attorney with the law firm Byrne, Costello, and Pickard, which represented Continental Securities during the Brylin transaction, advised Robert Corp that, for the purposes of the loan closing, Robert Corp would need to obtain from Heller a payoff letter on Heller letterhead which represented Brylin's debt to Heller as $1,350,000.  USSUF ¶ 33.  Within one week of the closing, John Brennan told Mr. Corp that Brylin's debt to Heller was less than $1,350,000 and that Brylin was in the process of trying to get Heller to increase the balance owed to Heller to $1,350,000 so that the HUD-insured refinance loan would not be reduced.  USSUF ¶ 34.  During that same week, Robert Corp, John Brennan, and Karen Manny had a conversation in which Ms. Manny stated that Brylin was having difficulty obtaining a payoff letter from Heller and she expressed that Brylin was attempting to increase the Heller debt to support the assertions that Brylin's debt to Heller was $1,350,000.  USSUF ¶ 35.  At some point between May 22, 2001 and June 5, 2001, John Brennan told Robert Corp that Brylin's debt to Heller was less than $1,350,000 and that, unless the parties were able to document to HUD that the debt was $1,350,000, HUD would require that the loan be reduced.  In response, Mr. Corp expressed that

he was aware that HUD would reduce the loan if the parties could not provide documentation that Brylin's debt to Heller was $1,350,000.  USSUF ¶ 36.

Rather than submitting to HUD any payoff letter created by Heller, Robert Corp gave instructions to Karen Manny in which he asked for Brylin to prepare a letter reflecting Brylin's indebtedness to Heller as $1,350,000.  USSUF ¶ 37.  Following Robert Corp's instruction, Karen Manny drafted a payoff letter on Brylin letterhead dated May 29, 2001 and addressed to Robert Corp.  The letter that Karen Manny drafted states "I am advised that the indebtedness to Heller Healthcare Finance, Inc., as of June 1, 2001, will be $1,350,000."  USSUF ¶ 38.  Eric Pleskow signed the letter and Karen Manny transmitted the letter to Continental, which in turn transmitted the letter to HUD together with a table dated May 29, 2001 that represents Brylin's existing indebtedness to Heller as "$1,350,000."  USSUF ¶¶ 39-40.  Mr. Corp was aware that Brylin caused to be submitted to HUD a "payoff letter," created by Brylin on Brylin's letterhead, rather than a payoff letter created by Heller on Heller's letterhead, as Mr. Corp had initially suggested. USSUF ¶ 41.  On May 30, 2001, Continental Securities faxed to HUD a revised Mortgagor's Certificate of Actual Cost (Form HUD 2205-A), signed on behalf of Brylin by Eric Pleskow. The total existing indebtedness shown in the cost certification-- including $1,350,000 for the Heller debt-- is $5,859,383.  USSUF ¶ 42.

5.    <u>On the eve of closing, the parties to the Brylin deal create an escrow arrangement designed to justify their representations to HUD</u>

During a meeting with Heller employees, Karen Manny and Eric Pleskow asked Heller to extend Brylin's then existing loan balance from $980,000 (the debt as it existed on February 23, 2001) to $1,350,000 at some point shortly before the closing of the HUD-insured loan so that Brylin would be able to cover various expenses, including closing costs.  USSUF ¶¶ 43-44.

- 8 -

Heller Vice President Michael Gardullo, who attended the meeting, declined to make an outright advance, but raised the possibility of putting funds in escrow, such that Brylin would only be able to use the funds in connection with the closing of the HUD-insured loan.  USSF ¶ 45-46.

Without HUD's knowledge or approval, the parties negotiated an agreement with Heller, finalized on June 4, 2001 (the day prior to the closing of the HUD-insured loan) under which; (i) Heller wired $787,136.67 into escrow purportedly as an additional loan advance to increase Brylin's debt (together with a 1% discount charge of $7,871.37) from $554,991.96 (the sum Brylin actually owed) to $1,350,000 (the amount represented to HUD as the existing indebtedness); (ii) upon closing of the HUD-insured loan, Brylin caused a wire transfer to be made to Heller in the amount of $1,350,000 with the HUD-insured loan proceeds; and (iii) the $787,136.67 "advance" held in escrow was distributed to Brylin only after Heller received Brylin's $1,350,000 wire transfer.  USSUF ¶ 47.  Under the terms of the parties' escrow agreement, the $787,136.67 that Heller put into escrow would have reverted back to Heller if Brylin's HUD-insured mortgage loan did not close.  USSUF ¶ 48.  Shortly before the June 5, 2001 closing of the loan, John Brennan told Robert Corp that Heller was putting funds into escrow to be released ultimately to pay Brylin.  USSUF ¶ 49.

At the time of the closing, Robert Corp was aware that section 8.9E of the MAP Guide prohibited the refinance of indebtedness recently placed against the project to increase the mortgage or circumvent program intent.  USSUF ¶¶ 2, 50.  In fact, Robert Corp's Mortgage Credit Analysis of February 15, 2001 specifically references paragraph 8.9E of the MAP Guide and states that "items that may be disallowed during this review that do not meet the

requirements of the MAP Guide Chapter 8, paragraph 8.9E may result in a mortgage reduction."

USSUF ¶ 51.  Before the closing, Karen Manny told Mr. Corp that Heller was unwilling to

advance additional funds and Mr. Gardullo expressed to Mr. Corp that Heller was "reluctant" to

do so.  USSUF ¶¶ 52-55.

6.   On June 5, 2001, Robert Corp caused the HUD-insured loan, which defaulted in less than
      three months, to be closed

Brylin's debt to Heller had declined to $554,991.96 (including payoff fees) as of June 4,

2001. USSUF ¶ 56.  The Brylin loan closed on June 5, 2001 and HUD endorsed for insurance a

mortgage in the amount of $7,012,500.  USSUF ¶ 57.  At the time of closing, Mr. Corp was

aware that HUD had agreed to insure a loan of $7,012,500, the amount sought in the Application

that he submitted in February 2001, and that Brylin's debt to Heller was being represented to

HUD as $1,350,000.  USSUF ¶¶ 58-59.  Nonetheless, while at the closing, Robert Corp caused

the loan to close by executing the Assignment of the Firm Commitment to the funding lender

(GMAC Commercial Mortgage Corporation), without which the Brylin loan would not have

closed.  USSUF ¶ 60.  Continental Securities received $296,270.34 in fees for services rendered

in connection with the Brylin transaction.  USSUF ¶ 61  Robert Corp was entitled to 25% of

Continental Securities's profits.  USSUF ¶ 62.  Additionally, Mr. Corp received a commission of

$21,854 for services rendered on the Brylin transaction.  USSUF ¶ 63.

Brylin's first payment on the HUD-insured loan was due on August 1, 2001; Brylin was

in default by September 1, 2001.  USSUF ¶¶ 64-65.  HUD received a claim for mortgage

insurance benefits on April 8, 2002, which it settled for $6,176,731.67.  USSUF ¶¶ 66-67.  Had

the Heller debt been disclosed to HUD as $554,991.96 instead of $1,350,000, the maximum

insurable mortgage computation under the HUD Program would have been $6,350,300 instead of

- 10 -

the actual $7,012,500.  USSUF ¶ 68.  Had the principal amount of Brylin's insured loan been

$6,350,300, the claim that HUD paid upon default would have been $5,498,332.29 instead of

$6,176,731.67- a savings to HUD of $678,399.38.  USSUF ¶ 69.

## ARGUMENT

Summary judgment is appropriate where, as here, there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P.

56(c).  The courts of appeals have not hesitated to affirm grants of summary judgment to the United

States in FCA cases where the defendant fails to raise a genuine issue of material fact.  *See, e.g., United

States v. TDC Management Corp*., 288 F.3d 421, 429 (D.C. Cir. 2002) (affirming grant of

summary judgment); *United States ex rel. Compton v. Midwest Specialities, Inc*., 142 F.3d 296,

304 (6th Cir. 1998) (same).

## I.  Mr. Corp is liable under the FCA because he knowingly overstated to HUD the amount of Brylin's debt to Heller and caused the loan to be closed.

Under the FCA, civil liability may be imposed upon "any person who knowingly

presents, or causes to be presented, to an officer or employee of the United States Government. . .

a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1).  The FCA also

imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a

false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).[2]  A

---

[2] The Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, enacted on May 20, 2009, amended 31 U.S.C. § 3729(a)(2), which was recodified as § 3729(a)(1)(B), by, among other things, replacing the words "to get" with the words "material to."  *See* FERA, Sec. 4.  Accordingly, 31 U.S.C. § 3729(a)(1)(B), the false statement provision of the FCA, imposes liability upon "any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  This amendment applies retroactively to all False Claims Act cases pending as of June 7, 2008.  FERA, Sec. 4 at (f)(1). Because this amendment applies retroactively, this brief refers to the false statement provision of

person who violates the FCA is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 per violation, plus three times the amount of damages which the Government sustains "because of" the act of that person.  31 U.S.C. § 3729(a).[3]  FCA damages and penalties are mandatory for each claim found to be false and are set by the court as a matter of law.  *Cook County, Ill. v. United States ex. rel Chandler*, 538 U.S. 119, 132 (2003); *United States v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988).

The FCA "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co*., 390 U.S. 228, 232 (1968).  To that end, FCA liability reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government."  *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943).

It is well-established that a lender's claim for payment on a government mortgage insurance obligation is a false claim within the coverage of the FCA, if that obligation was induced by a false or fraudulent application (or supporting documentation) for insurance or guaranty.  *United States v. Eghbal*, 475 F.Supp. 2d 1008, 1014 (C.D. Cal. 2007), *aff'd* 548 F.3d 1281; *United States v. Miller*, 645 F.2d 473, 475 (5th Cir. 1981); *United States v. Ekelman & Associates*, 532 F.2d 545, 552 (6th Cir. 1976); *United States v. Veneziale*, 268 F.2d 504, 505 (3d

the FCA by its new codification, 3729(a)(1)(B).  The United States submits that there is no genuine issue of material fact under either the old or new standard.

[3] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, the civil penalties were adjusted to between $5,500 and $11,000 (replacing between $5,000 and $10,000) for violations of the FCA occurring on or after September 29, 1999.

Cir. 1959); *see also United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170-71 (9th Cir. 2006) ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim").  Consequently, any person whose false statement or fraudulent conduct inflates the amount of a mortgage insurance claim presented to HUD is liable under the FCA even when the submission was made by an innocent third-party lender.  *United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995) ("[a]lthough, from [the lender's] perspective, the claim it presented [to HUD] may not have been 'false or fraudulent,' that claim was inflated by defendants' earlier fraud; and the case law allows the United States, in such circumstances, to sue defendants under the FCA for having 'caused' the filing of a 'false' claim against the government").

The FCA does not require a showing of specific intent to defraud.  31 U.S.C. § 3729(b).  As defined by the Act, the term "knowingly" means that a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information.  *Id*.  Liability attaches when a defendant makes false statements without taking precautions to confirm their factual accuracy.  *See United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (describing the FCA's "knowledge" standard as "a linear extension of gross negligence" and holding that a physician's wife violated the False Claims Act by submitting claims to Medicare without first verifying their factual basis).  "Knowledge" is therefore an objective standard, and a FCA violation may "be established without reference to the subjective intent of the defendant." *Id*. at 942.

Moreover, the "reckless disregard" prong of the Act's "knowledge" element imposes

- 13 -

upon those making statements to the government a duty to undertake "such inquiry as would be reasonable and prudent to conduct under the circumstances to ascertain the true and accurate basis of the claim." *United States ex rel. Ervin and Associates, Inc. v. Hamilton Securities Group, Inc.,* 370 F.Supp. 2d 18, 41 (D.D.C. 2005); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("a failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield False Claims Act liability").

A.   **Mr. Corp is liable under 31 U.S.C. § 3729(a)(1)(B) because he knowingly made, or caused to be made, to HUD three statements which falsely represented that Brylin's debt to Heller was $1,350,000.**

Mr. Corp made, or caused to be made to HUD, three statements which falsely represented that Brylin's debt to Heller was $1,350,000.  First, on April 23, 2001, Robert Corp submitted to HUD a revised Supplement to Project Analysis.  USSUF ¶ 15.  Second, Mr. Corp caused Brylin to create a letter that overstated the Heller debt.  USSUF ¶¶ 38-40.  Third, Mr. Corp caused Continental to submit to HUD a Mortgagor's Certificate of Actual Cost, which he knew to contain false statements about the Heller debt.  USSUF ¶ 42.  As set forth herein, the undisputed facts establish that all statements satisfy each element of liability under 31 U.S.C. § 3729(b)(1)(B): 1) the statements made or caused to be made about Brylin's indebtedness were false; 2) Mr. Corp knew the statements to be false; and 3) the false statements were material to the falsely inflated claim for mortgage insurance benefits that the lender presented to HUD.

1.   Fal se Statement #1: the revised Supplement to Project Analysis

The revised Supplement to Project Analysis that Mr. Corp submitted to HUD on April 23, 2001 stated that Brylin's existing indebtedness to Heller was $1,350,000.  This statement was false because the Heller debt was decreasing from January of 2001 through June of 2001 and had

- 14 -

declined to $860,436.05 by March 14, 2001.  USSUF ¶¶ 15-17.  Hence, there is no genuine issue

of material fact as to the falsity of Mr. Corp's representation.  *See* Fed. R. Civ. P. 56(d) (allowing

courts to grant summary judgment on discrete issues).

Nor is there an issue of fact as to Mr. Corp's knowledge.  Relying on a letter from Brylin

dated January 31, 2001, which represented the Heller indebtedness as $1,350,000, Mr. Corp

submitted to HUD an initial Supplement to Project Analysis dated February 15, 2001, which

stated that the Heller debt was $1,350,000.  USSUF ¶¶ 13-14.  On April 23, 2001, Mr. Corp

submitted a revised Supplement to Project Analysis which again misrepresented the Heller debt

as $1,350,000.  USSUF ¶ 15.  Mr. Corp acted with at least reckless disregard to the truth of the

revised Supplement to Project Analysis because he undertook no effort to ascertain whether the

balance had changed since January 31, 2001 and, indeed, "had no idea" whether the balance had

changed since he submitted the initial Supplement.  USSUF ¶¶ 18-19.  In fact, Brylin's

indebtedness to Heller continued to decline considerably in the interim.  It is the height of

recklessness to make a statement without any knowledge of its veracity.  *Cf. United States ex rel.*

*Longhi v. Lithium Power Technologies, Inc.*, 513 F.Supp. 2d 866, 877 (S.D. Tex. 2007), *aff'd*

__F.3d__ 2009 WL 1959259; *United States ex rel. Asch v. Teller, Levit & Silvertrust, P.C.*, 00-

C-3289, 2004 WL 1093784 (N.D. Ill. 2004) (granting summary judgment against law firm which

failed to investigate when credited funds needed to be credited to payors); *see also Ervin*, 370

F.Supp. 2d at 41.

2.    Brylin False Statement #2: Brylin's payoff letter of May 29, 2001

The second false statement to which liability attaches is a letter dated May 29, 2001 in

which Brylin represented to HUD that the Heller debt was $1,350,000.  USSUF ¶¶ 38.  The

undisputed evidence establishes that Mr. Corp: 1) caused Brylin to create this letter; and 2) Mr. Corp had actual knowledge that Brylin's indebtedness was well below $1,350,000.

In late April or early May of 2001, Robert Corp advised Karen Manny, Brylin's general counsel, that she needed to obtain from Heller a letter documenting Brylin's indebtedness to Heller, which Continental could submit to HUD in support of the cost certification for HUD mortgage insurance. Specifically, Mr. Corp asked Ms. Manny to obtain from Heller a payoff letter documenting Brylin's outstanding balance and provided Ms. Manny with a form payoff letter, to be written on Heller letterhead. USSUF ¶ 23. Although Brylin was tasked with procuring a letter from Heller, any documentation provided to HUD would be transmitted not directly from Brylin but through Mr. Corp and Continental Securities. USSUF ¶ 22. On May 15, 2001, Karen Manny sent to Heller the form payoff letter that Robert Corp had provided to her and requested that Heller provide a payoff letter documenting the Heller debt. USSUF ¶ 24. Up until May 22, 2001, Robert Corp acted, at best, with reckless disregard or deliberate ignorance. But on that day, Mr. Corp obtained actual knowledge of the falsity of his numerous statements to HUD: Heller faxed to Karen Manny and Robert Corp a "draft payoff letter" which accurately stated that Brylin's debt to Heller was "$ approximately 643,247.51" as of May 23, 2001. USSUF ¶¶ 26-27.[4]

Heller's communication of May 22, 2001 put Mr. Corp in a dilemma: he could either 1) advise HUD, which had entrusted him as a MAP-approved underwriter, that the Heller debt was far less than previously represented; or 2) continue to falsely represent that Brylin's debt to

---

[4] Similarly, within a week of the loan closing, both John Brennan and Karen Manny advised Mr. Corp that Brylin's debt to Heller was less than $1,350,000. USSUF ¶¶ 34-36.

Heller was $1,350,000.  The first option was unattractive because Brylin, which Mr. Corp knew

to be in financial straits, was attempting to raise more capital by increasing the size of the HUD-

insured loan and Mr. Corp understood that HUD would reduce the size of the loan if the parties

represented the Heller debt to be less than $1,350,000.  USSUF ¶¶ 34, 35, 54.  Accordingly, even

though he had twice represented the debt as $1,350,000, USSUF ¶¶ 13, 15, Mr. Corp elected not

to tell HUD that he had received a communication from Heller informing him that the balance

was far less.  USSUF ¶ 29.

Instead, Robert Corp advised Karen Manny that Heller's draft payoff letter received on

May 22 "would not suffice" for the purposes of the HUD-insured loan and that HUD would

reduce the size of the loan unless she could convince Heller to prepare a letter corroborating his

assertion that the Brylin debt was $1,350,000.  USSUF ¶ 28.  Mr. Corp asked Ms. Manny to try

again with Heller.  *Id.*  Thereupon, at Ms. Manny's request, Heller faxed to Eric Pleskow on May

30, 2001 another payoff letter stating that Brylin's indebtedness to Heller was $604,378.51 as of

May 30, 2001.  The letter also stated that Brylin desired to increase the debt amount to

$1,350,000 on June 1, 2001, so that the amount of the HUD-insured loan for which Brylin had

applied would also increase.  USSUF ¶ 30.  At the time, Mr. Corp understood that indebtedness

"recently placed against the project to increase the mortgage or circumvent program intent" was

ineligible for refinancing under the HUD Program.  USSUF ¶¶ 2, 50, 51.  Although both of the

Heller payoff letters were created for the express purpose of providing documentation to HUD,

Mr. Corp, who acted as a conduit between Brylin and HUD, did not transmit either payoff letter

to HUD.  USSUF ¶¶ 22, 32.

As the closing approached, Mr. Corp evidently concluded that Heller could not be shaken

- 17 -

from its persistent refusal to overstate the balance on the Brylin loan.  Although he had

previously asked Karen Manny to obtain *from Heller* a payoff letter and had provided her with a

form reflecting that such letter would be on *Heller* letterhead, USSUF ¶ 23, Robert Corp changed

course and told Karen Manny to have *Brylin* prepare a payoff letter reflecting the Heller debt as

$1,350,000.  USSUF ¶ 37.  Following Robert Corp's instruction, Karen Manny drafted a payoff

letter on Brylin letterhead-- signed by Brylin's CEO, addressed to Robert Corp, and dated May

29, 2001-- which represented the Heller debt as $1,350,000.  USSUF ¶¶ 38-39; *see United States

v. Mackby*, 261 F.3d 821, 827-28 (9th Cir. 2001) (doctor who instructed an employee to create a

false record held liable under the FCA).  On May 29, 2001, Continental Securities transmitted

Brylin's letter to HUD, together with a table representing the Heller debt as "$1,350,000."

USSUF ¶ 40.

      3.       <u>False Statement # 3: the Mortgagor's Certificate of Actual Cost</u>

Mr. Corp promised in a letter to HUD employee Diane Rosinski that he would "have the

Cost Certification completed and sent to [HUD]."  USSUF ¶ 25.  Mr. Corp made good on this

promise on May 30, 2001 when he caused the Mortgagor's Certificate of Actual Cost, which

made false statements about the Heller debt, to be submitted to HUD.  USSUF ¶ 42.

      4.       <u>The three false statements are material to the false claim</u>

The three false statements about Brylin's indebtedness to Heller are material because they

necessarily effected the amount of money that HUD was required to pay in response to the

lender's false claim for mortgage insurance benefits.  The FCA defines "material" as "having a

natural tendency to influence, or be capable of influencing, the payment or receipt of money or

property."  31 U.S.C. § 3729(b)(4).  The Supreme Court has held that false statements in HUD

mortgage insurance applications are material if they are capable of influencing HUD's insurance decision, *United States v. Gaudin*, 515 U.S. 506, 509 (1995), and that a statement is material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Neder v. United States*, 527 U.S. 1, 22 n.5 (1999) (quoting Restatement (Second) of Torts § 538 (1977)).

As set forth in 24 C.F.R. § 232.903 and the MAP Guide, the amount of Brylin's indebtedness to Heller directly and necessarily affects the size of the loan that HUD was permitted to insure.  USSUF ¶¶ 3, 68.  And Mr. Corp understood that the size of the loan that HUD would insure would be reduced if the parties represented to HUD that the Heller debt was considerably less than $1,350,000.  USSUF. ¶¶ 28, 34, 36, 51.  Given that the amount of a loan that HUD is permitted to insure is directly linked to the borrower's "existing indebtedness" to be refinanced, Mr. Corp's false statements about Brylin's debt are material to the magnitude of the false claim for mortgage insurance benefits that the lender presented to HUD.

> 5.     The parties' escrow agreement, finalized the day before the Brylin loan
>        closed and carried out after the closing, did not increase Brylin's
>        indebtedness to Heller

Although Heller put $787,136.67 into escrow prior to closing, these funds were released to Brylin *only after* Brylin paid Heller $1,350,000, which was taken from the HUD-insured loan proceeds.  USSUF ¶¶ 47-48.  Rather than receiving an advance of credit to increase its indebtedness to Heller, Brylin and Heller merely traded dollars.[5]  Indeed, the $787,136.67 that

---

[5] If a shopper hands the grocer a $20 bill, and the grocer in turn hands the shopper a $5 bill, how much money did the shopper pay the grocer?

Heller put into escrow would have reverted back to Heller if Brylin's HUD-insured mortgage loan did not close.  USSUF ¶ 48.  These facts show that the parties' escrow arrangement was a sham designed to provide a *post hoc* rationalization for the false statements that the parties made to HUD.  And even if the Court finds that the $787,136.67 that Heller purportedly "advanced" to Brylin increased Brylin's debt, such debt may not properly be refinanced under the HUD Program as "existing indebtedness" because the "advance" did not occur until after the HUD loan closed.  USSUF ¶ 47.  For the purposes of a HUD-insured loan, indebtedness cannot be "existing" if it is not incurred until *after* the loan closes.

Moreover, any debt resulting from the escrow scheme was alternatively ineligible for refinancing under the HUD Program because it does not fit HUD's definition of "existing indebtedness."  First, as discussed above, paragraph 8.9(E) of the controlling MAP Guide excludes from the definition of "existing indebtedness" an indebtedness "recently placed against the project to increase the mortgage or circumvent program intent."  USSUF ¶ 2.  Second, the Mortgagor's Certificate of Actual Cost that Continental submitted to HUD on May 30, 2001 further limits "existing indebtedness" to "the actual cost. . . of labor, materials, and necessary services for the purchase/ or refinancing of the existing property (land and improvements), in connection with the subject loan, *after excluding any kickbacks, rebates, [or] adjustments made or to be made. . . .*"  USSF ¶ 42 (referencing HUD0061) (emphasis added).  Rather than yielding *bonafide* debt, the parties' escrow arrangement was actually a glorified kickback scheme designed to inflate Brylin's refinance costs and to bestow upon Brylin prohibited cash proceeds from the HUD-insured loan.  Brylin wired to Heller $1,350,000, which sum was taken from the proceeds of the HUD-insured loan.  Because Brylin actually owed Heller only $554,992, Heller

*kicked* the difference *back* to Brylin by putting $787,136.67 into escrow.[6]  Heller's payment of

$787,136.67 was ineligible for refinancing under the rules of the HUD Program because it was

actually a kickback or an adjustment.

> **B.    Alternatively, Mr. Corp is liable under 31 U.S.C. § 3729(a)(1) for the false
> claim for mortgage insurance presented to HUD because he closed the loan
> knowing that the amount of the Heller debt was being overstated.**

Even if the Court concludes that there is a genuine issue of material fact regarding Mr.

Corp's liability under section 3729(a)(1)(B) for any of the three false statements described above,

he is alternatively liable under 31 U.S.C. 3729(a)(1) for causing the false claim for mortgage

insurance benefits that the lender presented to HUD because Mr. Corp knew that the loan was

being insured for $7,012,500 on basis of an overstated Heller debt.  Mr. Corp had been advised

by Karen Manny, John Brennan, and Heller itself that the balance of the Heller debt was less than

$1,350,000.  USSUF ¶¶ 26-27, 34-36.  At the time of closing, Mr. Corp knew that the HUD-

insured loan amount had not been reduced from $7,012,500 and naturally that an overstated

Heller debt was the basis upon which the HUD-insured loan amount remained propped up at

$7,012,500.  USSUF ¶¶ 58-59.  Nonetheless, Mr. Corp appeared at the closing and caused the

loan to close by executing the Assignment of the Firm Commitment, without which the loan

would not have closed.  USSUF ¶ 60.  The overstated Heller debt caused HUD to insure a loan

that was larger than was permissible under the HUD Program.  USSUF ¶ 68.  Because the claim

for mortgage insurance benefits that HUD ultimately paid was falsely inflated, it is a false claim

for payment to which liability attaches under the FCA.  Mr. Corp caused this claim by closing

---

[6]  Heller's $787,136.67 "advance," plus a 1% "discount charge" of $7,871.37, is the
difference between the actual amount of the Heller debt as of June 4, 2001 ($554,991.96) and the
Heller debt as falsely represented to HUD ($1,350,000).  USSUF ¶ 47.

what he knew to be an inflated loan. *See Rivera*, 55 F.3d at 707; *cf. United States v. Teeven*, 862 F.Supp. 1200, 1223 (D. Del. 1992) (defendants liable under FCA where their conduct resulted in inflated claims to the government, even though "[d]efendants arguably neither made nor caused to be made any false statements or certifications to the Department of Education").

That Mr. Corp was advised that Heller was reluctant to extend to Brylin additional credit and had in fact declined to do so establishes that he did not in good faith believe that Brylin had received a huge additional and genuine advance from Heller on the eve of closing.  USSUF ¶¶ 52, 53, 55.[7]  Even if the record supported this conclusion-- which it does not-- such a showing is not a defense to liability because Mr. Corp understood that HUD's directives prohibited the inclusion of indebtedness "recently placed against the project to increase the mortgage or circumvent program intent."  USSUF ¶¶ 2, 50-51.  Because John Brennan told Robert Corp within a week of closing that the Heller debt was less than $1,350,000 and that Brylin was trying to enlarge its indebtedness to increase the amount of the HUD-insured mortgage, Mr. Corp knew that the proceeds of any "advance" obtained thereafter were ineligible for refinancing under the HUD program.  USSUF ¶ 34.  Hence, even under the scenario of Mr. Corp's believing (incorrectly) that Heller had truly extended last minute additional credit to Brylin, liability still attaches to the inflated claim for mortgage insurance benefits because Mr. Corp caused a loan to close that refinanced debt which he knew to be "recently placed" and therefore ineligible.

### C.      Mr. Corp's false statements and fraudulent conduct caused HUD to sustain *single* damages of $678,399.38.

False Claims Act damages are "liberally calculated to ensure that they 'afford the

---

[7] To the contrary, Mr. Corp was told that Heller was putting funds into escrow rather than making an outright advance to Brylin.  USSUF ¶ 49.

government complete indemnity for the injuries done it.'" *United States ex rel. Compton v. Midwest Specialities, Inc*., 142 F.3d 296, 304 (6th Cir. 1998) (quoting *Marcus*, 317 U.S. at 549). In FCA cases, the measure of the government's damages is "the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quotation omitted).  In order to collect treble damages, the United States must prove that it sustained damages "because of" the defendant's conduct.  31 U.S.C. § 3729(a).

The undisputed facts demonstrate that Mr. Corp's false statements caused HUD to pay out $678,399.38 more in mortgage insurance claims than it would have paid had Mr. Corp been truthful about the balance of Brylin's debt to Heller.  As set forth in the affidavit of Wayne Willard, the computation of the maximum insurable mortgage under the HUD Program is a matter of plugging numbers into a mathematical formula.  *See* 24 C.F.R. 232.903.  Had the true amount of the Heller debt ($554,992 instead of $1,350,000) been used at the time of cost certification, the maximum insured mortgage would have been $6,350,300 instead of $7,012,500. USSUF ¶ 68.  Had a loan of $6,350,300 resulted in a similar early default, HUD would have paid a claim in the amount of $5,498,332.29 instead of $6,176,731.67- a savings to HUD of $678,399.38.  USSUF ¶ 69.  Given that the amount of the Heller indebtedness necessarily and directly influenced the size of the claim that HUD would have to pay in the event of a default, there is no dispute that HUD was required to pay an additional $678,399.38 "because of" Mr. Corp's false statements and fraudulent conduct.  Trebling this amount and adding three $11,000 penalties (one penalty for each of Mr. Corp's false statements) yields a total liability of $2,068,198.14.  *See* 31 U.S.C. § 3729(a).

- 23 -

It makes no difference that the courts of appeals appear to differ on the precise requirements of the causation element in loan insurance fraud cases. *Compare United States v. First National Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992) (applying a "but for" causation test) *with United States v. Hibbs*, 568 F.2d 347, 351-52 (3d Cir. 1977). Even applying *Hibbs*'s seemingly more restrictive test, which appears to require proof of a connection between the subject matter of the false statement and the government's loss, there is no genuine issue of fact as to damages. This is because, unlike in *Hibbs*, the government here is not seeking as damages the entire amount of the claim it paid but only the amount by which the claim was inflated as a direct result of the subject matter of Mr. Corp's fraud. *Hibbs*, 568 F.2d at 351; *See* 24 C.F.R. 232.903.[8]

II.     **Alternatively, it is unjust to allow Mr. Corp to retain the profits that he received because he made numerous false statements-- even if unknowingly-- which inflated HUD's guaranty beyond what was permissible under the agency's directives.**

To prevail on a claim for unjust enrichment, the plaintiff must establish: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Innocent parties may be unjustly enriched if they "hold property under circumstances that in equity and good conscience [they] ought not to retain. . . ." *United States v. Nagelberg*, 772 F.Supp. 120, 122 (E.D.N.Y. 1991) (quotation omitted).

---

[8] *Hibbs* permits the recovery of damages, similar to those sought here, that were tied directly to the subject matter of the fraud. 568 F.2d at 351 (holding that the government's damage was the decrease in the value of the security that was certified as being available). In any event, for the reasons set forth in *Cicero*, 957 F.2d at 1374, the test applied by *Hibbs* is incompatible with the text of the FCA. *See also United States ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 417 (3d Cir. 1999).

The theory of unjust enrichment allows the United States to recover funds from those who reaped a profit through the abuse of a federal program.  *See United States ex rel. Taylor v. Gabelli*, 03-cv-8762,  2005 WL 2978921 at *3-4  (S.D.N.Y. Nov. 4, 2005).  Proof of scienter is not an element of a claim for unjust enrichment.  *Hill v. Waxberg*, 237 F.2d 936, 939 (9th Cir. 1956).

As a HUD-approved MAP underwriter, Robert Corp owed a duty to HUD to underwrite a sound loan.  Instead, he made false statements that caused HUD to insure a loan that was larger than was permissible and which defaulted in less than three months.  USSUF ¶ 65.  And while the Brylin transaction cost HUD greatly-- the agency paid $6,176,731.67 in mortgage insurance claims-- Mr. Corp turned a handsome profit: a $21,854 commission plus a 25% share of the $296,270.34 in fees that his corporation received in connection with the deal.  USSUF ¶¶ 61-63, 67.  Principles of equity do not allow an underwriter who made numerous false statements (even if unknowingly) to the entity whose interests he was bound to protect to retain $95,921.58 in profits from a deal that defaulted instantaneously and at such a cost to the taxpayers.

## CONCLUSION

Given that Karen Manny, John Brennan, and Heller itself all informed Robert Corp of the true balance of the Heller debt, there is no doubt but that his false statements were made with *at least* reckless disregard of the truth and that, as a matter of law, the United States is entitled to a judgment of $2,068,198.14 on its FCA claims.  Alternatively, Mr. Corp should be required to disgorge the $95,921.58 in profits that he received in connection with the Brylin deal because his abuse of the public trust had such disastrous consequences for the public fisc.

- 25 -

Respectfully submitted,
TONY WEST
Assistant Attorney General

TERRANCE P. FLYNN
United States Attorney

ROBERT G. TRUSIAK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5847
Robert.trusiak@usdoj.gov

By:      /s *Brian R. Young*      
         JOYCE R. BRANDA
         RENÉE BROOKER
         BRIAN R. YOUNG
         U.S. Department of Justice, Civil Division
         Commercial Litigation Branch
         Post Office Box 261
         Ben Franklin Station
         Washington, D.C.  20044
         Telephone: (202) 353-2265
         Fax: (202) 305-4117

         Attorneys for the United States


Of Counsel:
Kenneth Massman
Office of General Counsel
United States Department of Housing and Urban Development

## CERTIFICATE OF SERVICE

      This is to certify that on August 31, 2009, a copy of the foregoing UNITED STATES'S MEMORANDUM OF POINTS AND AUTHORITIES was served via ECF service upon the following individual:

Gabriel M. Nugent
One Park Place
300 South State Street (13202)
Syracuse, New York 132221-4878
(315) 425-2836 (tel)
(315) 703-7361 (fax)

Attorney for Robert C. Corp.

                          /s *Brian R. Young*
                          U.S. Department of Justice