UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:08-CV-00333-JTC |
| ) | |
| ROBERT P. CORP, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## AFFIDAVIT OF WAYNE A. WILLARD

STATE OF NEW YORK   )
                    )  s.s.:
COUNTY OF ERIE      )

Wayne A. Willard, being first duly sworn upon his oath, does depose and say:

1.  My name is Wayne A. Willard. I am the Director, Project Management, with the Buffalo Multifamily Hub of the U.S. Department of Housing and Urban Development ("HUD"), Buffalo, New York. I have supervisory responsibilities for the examination, processing, and approval of applications for mortgage insurance submitted under HUD's various multifamily mortgage insurance programs. I have had these responsibilities since 2004, when I became Supervisory Project Manager for multifamily production. In my present position, held since September 2008, I have additional responsibilities for the management of HUD's existing insured loans. At present, I supervise a staff of twenty employees. I have worked in the multifamily mortgage insurance program area continuously since beginning my career with HUD in 1987, when I joined the Buffalo office as a Construction Analyst.

2. The Buffalo Multifamily Hub is responsible for HUD's multifamily mortgage insurance production and management within 48 counties in upstate New York outside metropolitan New York City. My official duties include accessing files and records of HUD documenting these transactions.

3. Based on my training and experience, I am fully familiar with the statute, directives, and procedures governing HUD's multifamily mortgage insurance programs. These programs are sometimes described with reference to the Federal Housing Administration, or "FHA," a precursor to HUD.

### The HUD Program

4. During the time period addressed in the complaint in this action, the Secretary of HUD was authorized pursuant to sections 232/223(f) of the National Housing Act, as amended, 12 U.S.C. §§ 1715w, 1715n, to insure lenders against loss on mortgage loans used to refinance existing residential healthcare facilities. (I shall refer to this authorization as the "HUD program.") Under the HUD program, the refinance loans also cover various costs relating to the refinancing, including the costs for repairs of facilities that do not require substantial rehabilitation. These loans were eligible for origination under HUD's Multifamily Accelerated Processing ("MAP") guidelines, in which the lender processes and underwrites the loan, and submits an application for HUD's insurance commitment that includes a full underwriting package. As documented in the appended exhibits of HUD's records, which set forth the activities of my office and are established and maintained by HUD in the ordinary and regular course of business, the loan that is the subject of this action, identified as Brylin

Hospitals; Buffalo, NY; FHA Project No. 014-22019 (the "Brylin loan"), was originated and insured under the HUD program and MAP guidelines in 2001.

5. For the Brylin loan, HUD's directives included the MAP Guide (1st version, dated May 17, 2000) (hereinafter "MAP Guide"), and HUD Handbook 4565.1 CHG ("Mortgage Insurance for the Purchase or Refinancing of Existing Multifamily Housing Projects, Section 223(f)," Feb. 1978) (hereinafter "HUD Handbook"). Provisions of the MAP Guide and HUD Handbook, including those that I reference herein, are appended hereto as **Exhibits SJ1 and SJ2**, respectively.

6. The enabling statute for the HUD program, at 12 U.S.C. § 1715n(f)(4)(B), required HUD to prescribe terms and conditions to assure that "the proceeds of any refinancing will be employed only to retire the existing indebtedness and pay the necessary cost of refinancing." The MAP Guide, at paragraph 3.11, stated in part:

> The major requirements for Section 232/223(f) Projects for acquisition or refinancing are as follows: . . .
>
> J. No Equity Take-Out. Borrowers may not receive any cash proceeds from the refinance of the mortgage under Section 232/223(f). The sole purpose for the program is for owners to refinance at lower interest rates, reduce debt service requirements, and make needed repairs.

Paragraph 8.9 of the MAP Guide stated in part:

> E. Determining Existing Indebtedness in a Refinancing Transaction.
>
> Existing indebtedness in a refinancing transaction is defined as:
>
> [1. to 3. describes types of debt that are eligible for refinancing]

        4.  Do not recognize indebtedness:

            a.  Recently placed against the project to increase the mortgage or circumvent program intent.

A similar provision of the HUD Handbook, at paragraph 6-2(d)(3), stated:

> Any recent indebtedness placed against the property whether or not an identity of interest party is involved must be closely investigated. If it appears that any such indebtedness was placed against the project in an effort to increase the mortgage or to circumvent outstanding instructions, then it shall not be considered existing indebtedness for the purpose of determining the maximum insurable mortgage.

    7.     Under the procedures pertaining to the HUD program at the time of the Brylin loan, following HUD's review and approval of the lender's application for mortgage insurance, HUD would issue the lender a firm commitment to insure the loan. In general, the maximum insurable mortgage was based on the *lowest* of: (i) 85 percent of the appraised value of the property; (ii) 85 percent of the project's net income available for making mortgage payments; or (iii) the cost to refinance the existing debt, which included the amounts needed to pay off the existing indebtedness, to pay for the closing costs and other fees related to the new loan, and to pay for required repairs. *See* 24 C.F.R. § 232.903; MAP Guide, ¶¶ 3.11(G)(2), 8.9(B)(2). The firm commitment provided a provisional amount for the mortgage loan that HUD would insure based on the information submitted at the time of the application. Subsequently, at about the time of loan closing, the borrower was required to submit certification to HUD of the total actual costs incurred in the refinancing. On the basis of the final, certified cost amounts, HUD would determine whether any change in the insured mortgage amount was necessary, and, thereafter, would make final endorsement of the loan for insurance. MAP Guide, ¶¶ 12.4.6(C), 14.2, 14.4, 14.11, 14.20, 14.21. In general, in the event of a borrower's default under the terms

of the insured mortgage, the lender could assign the mortgage to HUD in exchange for HUD's payment of insurance benefits, which included, after adjustments, components for unpaid principal and interest. *See* 24 C.F.R. §§ 232.880, 232.885.

### The Brylin Loan

8.  In February 2001, the lender Continental Securities, LLC ("Continental"), submitted to HUD an application with supporting documents to insure a proposed mortgage loan of $7,012,500 under the HUD program to be used for refinancing the existing indebtedness of Brylin Hospitals, Buffalo, New York. On behalf of Continental, the application and accompanying mortgage credit analysis were signed in the name of Robert P. Corp ("Corp"), Vice President and the MAP underwriter for the proposal. On behalf of the borrower, the application was signed in the name of Eric D. Pleskow ("Pleskow"), who was identified as the President and sole shareholder of both Linreal Corporation ("Linreal") and Brylin Hospitals, Inc. ("Brylin"). As described in the application materials, Linreal was the mortgagor entity and owner of the real estate, and Brylin was the operator of the hospitals and lessee of the buildings under an operating lease between the two corporations. (In many instances herein, I shall refer to the two corporations as simply "Brylin Hospitals.") **Exhibits SJ7 and SJ8** are, respectively, the "Application for Project Mortgage Insurance" (HUD Form 92013) and the accompanying "Brylin Hospitals Mortgage Credit Analysis."

9.  The application's proposed mortgage amount of $7,012,500 was determined by applying the maximum insurable mortgage criteria described hereinabove (under "The HUD Program") based, in part, on paying off the existing indebtedness that was represented as totaling $5,746,546. The computation is shown in the "Supplement to Project Analysis" (Form HUD

92264-A), **Exhibit SJ9**, submitted to HUD by Continental, signed in the name of Corp and dated

February 15, 2001.  Total existing indebtedness of $5,746,546 is shown under the criterion of

amount based on existing indebtedness, etc., at page 2 of **Exhibit SJ9**, which is itemized at

the bottom of the last page of **Exhibit SJ9** to include a debt owed to "Heller" in the amount of

$1,350,000.  Under the submitted computation, the mortgage amount of $7,012,500 was

constrained by the criterion of the amount based on value of the property.  In support of

the existing indebtedness, the application was accompanied with a letter dated January 31, 2001,

**Exhibit SJ10**, signed in the name of Pleskow on behalf of Brylin Hospitals, and addressed to

Corp with Continental, identifying as an "existing debt" the following:  "Heller Financial -

$1,350,000.00."  (In the materials that HUD received from Continental, references were made

variously to "Heller," "Heller Financial," or "Heller Healthcare Finance, Inc." as the entity to

which the borrower had an existing indebtedness of $1,350,000 that it sought to refinance with

the HUD-insured loan.  I shall use the name "Heller" herein.)

       10.     In a letter dated February 22, 2001, **Exhibit SJ29**, HUD wrote Continental

to acknowledge receipt of the application and the commencement of HUD's review.  Thereafter,

changes were made to the line items concerning repair costs in the maximum insurable mortgage

computation, resulting in a revised "Supplement to Project Analysis" (Form HUD 92264-A).

*See* **Exhibit SJ11**.  The revision, dated April 23, 2001, executed in the name of Corp and

approved by HUD, did not contain any update or revision for the total existing indebtedness and

did not change the mortgage amount determination.  Again, under the submitted computation,

the mortgage amount of $7,012,500 was constrained by the criterion of the amount based on

value of the property. On May 1, 2001, HUD gave Continental a firm commitment to insure a loan not exceeding $7,012,500. *See* **Exhibit SJ14** (letter and firm commitment form).

11. As loan closing neared, the remaining steps in the process required Brylin Hospitals to certify its actual costs in connection with the refinancing in order to provide final support of the insured loan amount. This requirement is accomplished by submitting to HUD a "Mortgagor's Certificate of Actual Cost" (Form HUD 2205-A) and supporting documentation to certify, among other things, the amount of existing indebtedness to be refinanced. In a letter dated May 21, 2001, signed in the name of Corp, Continental wrote HUD to provide a preliminary schedule of the existing indebtedness for purposes of cost certification; the amount of the Heller debt was left blank. Continental stated that it was providing all documentation except for the Heller existing indebtedness, for which it expected to have a letter of documentation to give HUD in the next day or two. *See* **Exhibit SJ16** (letter of May 21, 2001, and schedule). In a fax sent to HUD on May 29, 2001 (**Exhibit SJ20**), Continental provided a revised schedule, dated May 29, 2001, showing an itemization of existing indebtedness for cost certification that included $1,350,000 for the Heller debt, together with a letter dated May 29, 2001, from Pleskow on behalf of Brylin Hospitals to Corp with Continental, which stated in part:

> In accordance with the Receivables Purchase and Sale Agreement among Heller Healthcare Finance, Inc., BryLin Hospitals, Inc. and Linreal Corporation I am advised that the indebtedness to Heller Healthcare Finance, Inc., as of June 1, 2001, will be $1,350,000.00.
>
> The payoff amount of $1,350,000.00 should be made by wire transfer to . . . .

12. In a fax sent to HUD on May 30, 2001 (**Exhibit SJ22**), Continental provided another schedule, again dated May 29, 2001, showing an itemization of existing indebtedness for

cost certification that included $1,350,000 for the Heller debt. (The schedule faxed to HUD on May 30, 2001, had changes from the previous version (**Exhibit SJ20**) of about $2,000 unrelated to the Heller debt.) Included with the fax of May 30, 2001 (**Exhibit SJ22**) is the "Mortgagor's Certificate of Actual Cost" (Form HUD 2205-A), dated June 1, 2001, executed in the name of Pleskow on behalf of Brylin Hospitals. The total existing indebtedness shown in the cost certification – including $1,350,000 for the Heller debt – is $5,859,383. The cost certification reads in part:

> The actual cost to the undersigned of labor, materials and necessary services for the purchase/ or refinancing of the existing property (land and improvements) in connection with the subject loan, **after excluding any kickbacks, rebates, adjustments made or to be made** are as follows: . . .
>
>                                                     To be Paid at Endorsement
> 1. . . . Existing Indebtedness              $5,859,383
>
> . . . This certification is made, presented and delivered for the purpose of influencing an official action on behalf of the Secretary of Housing and Urban Development. This certification may be relied upon as a true statement of the facts contained herein. [Emphasis added.]

      13.      The loan closing, which had been scheduled for June 1, 2001, was rescheduled and held on June 5, 2001. The postponement was requested by Continental in a letter faxed to HUD on May 31, 2001 (**Exhibit SJ30**). As documented in HUD's "Multifamily Closing Memorandum" (Form HUD 290), **Exhibit SJ28**, HUD endorsed the loan for mortgage insurance on June 5, 2001. The lender and borrower provided HUD with a "Closing Settlement Statement" (**Exhibit SJ31**), dated June 5, 2001, certifying the sources and uses of funds in connection with the loan; this document, consistent with the "Mortgagor's Certificate of Actual Cost" (Form HUD 2205-A), at **Exhibit SJ22**, showed a use of $1,350,000 of the HUD-insured loan proceeds

- 8 -

to pay Heller. HUD was also provided with certifications dated June 5, 2001, executed in the name of Pleskow on behalf of Brylin and Linreal, entitled "Hospital's Undertaking" and "Borrower's Undertaking" (**Exhibits SJ32 and SJ33**, respectively), in which the hospital and borrower affirmed and certified that "any and all representations made by [the hospital and borrower] . . . in the application to [HUD] for mortgage insurance, remain in force and effect exactly as represented" and acknowledged that the "Lender and HUD are relying upon the affirmation" in closing the loan. (In the latter three exhibits, the lender is identified as GMAC Commercial Mortgage Corporation instead of Continental. It was not uncommon for a lender to receive an assignment from another lender, on or near the date of loan closing, of HUD's firm commitment to insure the loan. In practice, Continental often originated HUD-insured loans in which the insurance commitments were assigned to GMAC Commercial Mortgage Corporation to provide funds for the loans at closing.)

14.  In the section of the "Mortgagor's Certificate of Actual Cost" (Form HUD 2205-A) that immediately precedes HUD's signature, captioned "To Lender: Maximum Insurable Loan (For Completion by HUD)," the borrower's certified costs are used in the final computation of the maximum insurable loan. The copy of Form HUD 2205-A included with **Exhibit SJ22** was countersigned by HUD on June 5, 2001 (the date of loan closing), to denote approval of the insured mortgage amount of $7,012,500 based on the certified costs totaling $7,177,141 provided to HUD, a component of which was – as described in the supporting schedule – an "EXISTING INDEBTEDNESS" owed to "Heller Financial" in the amount of "$1,350,000.00"

## The Brylin Loan
## With a Heller Debt of $554,992

15.     If HUD had been become aware that Brylin Hospitals' indebtedness to Heller was $554,992 within days of the loan closing, HUD would not have been permitted to insure a loan predicated on an indebtedness of $1,350,000 that was contrary to HUD's directives. Under the HUD program, HUD would have been required to recalculate the maximum insurable mortgage amount to be consistent with HUD's directives.

16.     **Exhibit SJ34** are schedules that demonstrate, as a matter of mathematical computation, that the insured mortgage amount would have been $6,350,300 instead of the actual $7,012,500 had all of the borrower's non-percentage based certified cost amounts provided to HUD at the loan closing been accepted as correct and used in the calculation of the insured mortgage amount *except that* the Heller debt is in the amount of $554,992 instead of $1,350,000. **Exhibit SJ34** employs the same methodology as used in the actual loan computation, and it compares, in three columns, the results of the two computations submitted to HUD (the initial computation in February 2001 and the revision in April 2001) with the scenario of a Heller debt of $554,992 used at loan closing. The first column in the schedules sets forth the amounts shown in **Exhibit SJ9**, the "Supplement to Project Analysis" (Form HUD 92264-A), dated February 15, 2001. The second column in the schedules sets forth the amounts shown in **Exhibit SJ11,** the revised "Supplement to Project Analysis" (Form HUD 92264-A), dated April 23, 2001. The third column in the schedules uses the borrower's non-percentage based certified cost amounts provided at closing – per the "Mortgagor's Certificate of Actual Cost" (Form HUD 2205-A) and supporting schedules, included with **Exhibit SJ22** – except that it substitutes a Heller debt amount of $554,992. In comparing the borrower's certified cost amounts

(**Exhibit SJ22**) with the third column of **Exhibit SJ34**'s schedules, note that the HUD Fees and Lender's Fees, which are based on a percentage factor of the mortgage amount, have also been reduced in accordance with the recalculated mortgage amount.

17. As demonstrated by **Exhibit SJ34**, whereas the actual Brylin loan amount, $7,012,500, was constrained by the criterion of amount based on value (inasmuch as the borrower certified to actual costs of $7,177,141, **Exhibit SJ22**), a Heller debt of $554,992 would have constrained the loan by the criterion of amount based on existing indebtedness, repairs and loan closing charges, resulting in a loan of $6,350,300.

_____
WAYNE A. WILLARD

SUBSCRIBED and SWORN TO before me, the undersigned authority, on this 14th day of August, 2009.

My Commission Expires:

10/31/2013

BRIDGET MARTIN
Notary Public, State of New York
Qualified in Erie County
My Commission Expires October 31, 20 13

_____
Notary Public in and for
Erie County, New York

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:08-CV-00333-JTC |
| | ) | |
| ROBERT P. CORP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF BETTY A. BELIN

DISTRICT OF COLUMBIA)    s.s.:

Betty A. Belin, being first duly sworn upon her oath, does depose and say:

1.  My name is Betty A. Belin. I am the Chief, Multifamily Claims Branch, Office of Financial Services, with the Headquarters of the U.S. Department of Housing and Urban Development ("HUD"), Washington, D.C. I have been with HUD since 1974 and have worked in the multifamily post-insurance accounting and operations area for most of my tenure with the agency. I have been Chief of the Multifamily Claims Branch since December 2005. The Multifamily Claims Branch is responsible for reviewing and processing claims for mortgage insurance benefits presented to HUD on behalf of holders of HUD-insured multifamily mortgage loans. My official duties include supervision of the office responsible for reviewing and processing claims for mortgage insurance benefits and accessing files and records of HUD documenting HUD's receipt and payment of these claims.

2.  During the time period addressed in the complaint in this action, insurance claims for loans insured under sections 232/223(f) of the National Housing Act, as amended, 12 U.S.C.

§§ 1715w, 1715n, that went into default were presented to HUD and settled in two or three phases – designated as a "partial" settlement; a "final" settlement; and, if applicable, a "supplemental" settlement.  In general, the partial claim settlement covered a portion of the unpaid principal balance of the loan, together with an interest factor; and the final claim settlement added or subtracted an adjustment to the previous payment based on amounts advanced by the lender for taxes and insurance, funds held in escrow by the lender on account of the loan, and other specified items.  Also, in some instances, a lender would file and HUD would process a supplemental claim to address corrections or additions to the lender's previous claim submissions.  When a claim was filed, the lender would cause either a conveyance of the foreclosed property or, more frequently, an assignment of the defaulted mortgage, to be made to HUD.

      3.     As documented in the appended exhibits of HUD's records, which set forth the activities of my office and are established and maintained by HUD in the ordinary and regular course of business, the loan that is the subject of this action, identified as Brylin (or Bry-Lin) Hospitals; Buffalo, NY; FHA Project No. 014-22019, resulted in a mortgage insurance claim received and paid by HUD in 2002.  On April 8, 2002, HUD received the lender's "Application for Insurance Benefits," Form HUD-2747 (**Exhibit SJ35**) and its "Mortgagee's Application for Partial Settlement," Form HUD-2537 (**Exhibit SJ36**).  Through a fax of April 17, 2002, the lender notified HUD that it had caused an assignment to HUD of the mortgage for Brylin Hospitals to be filed for record on April 17, 2002 (**Exhibit SJ37**).  On June 7, 2002, HUD received the lender's "Fiscal Data in Support of Claim for Insurance Benefits," Form HUD-2742 (**Exhibit SJ38**).  HUD used the Form HUD-2537 (**Exhibit SJ36**) in

processing the partial claim settlement and the Form HUD-2742 (**Exhibit SJ38**) in processing the final claim settlement; HUD's claim processing adjustments are reflected on the Form HUD-2742. The records do not indicate receipt of a supplemental claim for this loan.

4.     Initially, HUD paid the lender a partial claim settlement of $6,406,742.38. Thereafter, following HUD's determination of the adjusted claim amount upon processing of the lender's final claim submission, the lender sent HUD a reimbursement of $230,010.71. Accordingly, after adjustment, HUD settled the mortgage insurance claim for a total of $6,176,731.67. The following appended materials document HUD's settlement of the lender's mortgage insurance claim: (a) HUD's letter of April 19, 2002, to the lender notifying it that HUD processed the partial claim settlement (**Exhibit SJ39**); (b) HUD's partial claim settlement worksheet (**Exhibit SJ40**); (c) an amortization schedule indicating the unpaid principal balance used in the claim settlement computation (**Exhibit SJ41**); (d) the partial claim settlement statement and voucher (**Exhibit SJ42**); (e) the final claim settlement statement and voucher (**Exhibit SJ43**); and (f) the supplemental claim settlement statement and voucher (**Exhibit SJ44**). Inasmuch as a supplemental claim was not received for this loan, there was not any further adjustment to the claim per the supplemental statement and voucher; however, the supplemental statement and voucher documents HUD's receipt of a reimbursement of $230,010.71 from the lender pursuant to the adjustment calculated in HUD's processing of the final claim settlement. Note that the so-called "Certificate of Claim" amount of $200,552.16 – shown in the latter two documents – was not an actual claim payment but only a *contingent* additional payment that HUD calculated but was not required to make. **Exhibit SJ45**, entitled "Individual FHA Report," is a summary from HUD's Multifamily Claims

System of the insurance claim settlement for Brylin Hospitals; it shows that, as revised, the date of default of this loan was September 1, 2001, and that, after adjustment, HUD settled the mortgage insurance claim for a total of $6,176,731.67.

5. The next set of exhibits demonstrates, as a matter of mathematical computation, what HUD's claim payment would have been had HUD processed a claim similar to the actual Brylin Hospitals claim in all respects *except that* it shows the original principal amount of the insured loan as $6,350,300.00 instead of the actual $7,012,500.00. As demonstrated, under this scenario, the entire adjusted claim payment would have been $5,498,332.29 instead of $6,176,731.67. The exhibits that follow contain strikethroughs and interlineations on the face of the actual claim processing documents to show the changes that would have resulted from the starting point of a lower unpaid principal balance: (a) the partial claim settlement worksheet (**Exhibit SJ46**, *compare with* **Exhibit SJ40**); (b) an amortization schedule indicating the unpaid principal balance (**Exhibit SJ47**, *compare with* **Exhibit SJ41**); (c) with regard to the partial claim settlement worksheet, **Exhibit SJ46**, an interest calculator showing the computation used therein (**Exhibit SJ48**); (d) the partial claim settlement statement and voucher (**Exhibit SJ49**, *compare with* **Exhibit SJ42**); (e) the final claim settlement statement and voucher (**Exhibit SJ50**, *compare with* **Exhibit SJ43**); and (f) & (g) with regard to the final claim settlement statement and voucher, **Exhibit SJ50**, interest calculators showing the computations used therein (**Exhibits SJ51 and SJ52**). Under the stated scenario, the partial claim settlement would have been $5,801,800.81 instead of $6,406,742.38 (*see* the last lines of **Exhibits SJ46 and SJ49**); the processing of the final claim submission would have required the lender to reimburse $303,468.52 instead of $230,010.71 (*see* the entry opposite "Cash" near the top of

page 3 of **Exhibit SJ50**); and, after adjustment, the entire claim settlement would have been for $5,498,332.29 instead of $6,176,731.67 – a savings to HUD of $678,399.38 (see the entry opposite "Adjusted Claim" near the bottom of page 2 of **Exhibit SJ50**).

_____
BETTY A. BELIN

SUBSCRIBED and SWORN TO before me, the undersigned authority, on this 12th day of August, 2009.

My Commission Expires:

Mehul Patel
Notary Public, District of Columbia
My Commission Expires 1/1/2013

_____
Notary Public in and for
the District of Columbia