```
 1         IN THE UNITED STATES DISTRICT COURT FOR THE
 2                   WESTERN DISTRICT OF NEW YORK
 3   ----------------------------------------
 4   UNITED STATES OF AMERICA,
 5
 6           Plaintiff,
 7   -vs-
 8
 9   ROBERT P. CORP,
10
             Defendant.
11
     ----------------------------------------
12
13       Deposition of KAREN TUNIS-MANNY, held before
14   Kelly S. Hairston, Notary Public, at 138 Delaware Avenue,
15   Buffalo, New York, on Monday, February 17, 2009 at 9:30
16   a.m., pursuant to notice.
17
18   APPEARANCES:    UNITED STATES ATTORNEY'S OFFICE,
                     U.S. DEPARTMENT OF JUSTICE,
19                   BY: BRIAN R. YOUNG, ESQ.,
                     601 D Street, Northwest, Room 9147
20                   Ben Franklin Station, PO Box 261,
                     Washington, D.C. 20044,
21                   Ph. (202) 353-2265,
                     Attorney for the Plaintiff.
22
23
                                                             1
```

```
 1               U.S. DEPARTMENT OF HOUSING AND
                 URBAN DEVELOPMENT,
 2               OFFICE OF THE GENERAL COUNSEL,
                 BY: KENNETH R. MASSMAN, ESQ.,
 3               1250 Maryland Avenue, SW, Suite 200,
                 Washington D.C., 20024-2163,
 4               Ph. (202) 619-8351
                 Attorney for HUD.
 5
                 HISCOCK & BARCLAY, LLP.,
 6               BY: GABRIEL M. NUGENT, ESQ.,
                 One Park Place,
 7               300 South State Street,
                 Syracuse, New York 13202,
 8               Ph. (202) 353-2265,
                 Attorney for the Defendant.
 9
                 PERSONIUS MELBER, LLP.,
10               BY: RODNEY O. PERSONIUS, ESQ.,
                 1633 Statler Towers,
11               Buffalo, New York 14202,
                 Ph. (716) 855-1050,
12               Attorney for Karen Tunis-Manny.
13
14
15
16
17
18
19
20                    EXHIBIT
21                     SJ 3
22
23
                                                             2
```

|   | EXHIBITS | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| 48 | Fax | 18 |
| 49 | Document | 20 |
| 50 | Document | 21 |
| 51 | Memorandum | 23 |
| 52 | Supplement to Project Analysis | 32 |
| 53 | Letter | 35 |
| 54 | Document | 36 |
| 55 | Fax | 41 |
| 55 | Fax (Remarked) | 42 |
| 56 | Report | 46 |
| 57 | E-mail | 51 |
| 58 | Letter | 54 |
| 59 | Letter | 62 |
| 60 | Document | 64 |
| 61 | Escrow Instruction | 73 |
| 62 | Fax | 103 |
| 63 | Fax | 108 |
| 64 | Letter | 110 |
| 65 | Letter | 112 |
| 66 | Letter | 113 |
| 67 | Letter | 114 |
| 68 | Fax | 115 |
| 69 | E-mail | 117 |
| 70 | E-mail | 118 |
| 71 | E-mail | 120 |
| 72 | E-mail | 122 |
| 73 | E-mail | 123 |
| 74 | Documents | 124 |
| 75 | Document | 126 |
| 76 | Document | 126 |
| 77 | Document | 141 |
| 78 | Letter | 143 |
| 79 | Memo | 149 |
| 80 | Letter | 152 |
| 81 | Memorandum | 153 |
| 82 | Fax | 157 |
| 83 | Agreement | 187 |
| 84 | E-mail | 192 |
| 85 | List | 194 |
| 86 | E-mail | 195 |

1             KAREN TUNIS-MANNY,
2   41 Colony Court, Snyder, New York, 14226, having
3   been first duly sworn, was examined and testified as
4   follows:
5
6   The following stipulations were entered into by
7   counsel:
8
9     It is hereby stipulated by and between the attorneys
10  for the respective parties hereto that the oath of the
11  Referee is waived, that signing, filing and
12  certification of the transcript are waived and that all
13  objections, except as to the form of the questions, are
14  to be reserved until the time of trial.
15
16  MR. YOUNG: Read and sign.
17             EXAMINATION
18 BY MR. YOUNG:
19 Q. Ms. Manny, thank you very much for coming in today. I
20   know we met earlier, but my name is Brian Young. I
21   work for the Justice Department and I represent the
22   United States in this matter. This is Ken Massman,
23   he's an attorney with HUD, the Department of Housing

1   and Urban Development and this is Mr. Gabe Nugent. He
2   is with a firm in Syracuse and he represents Mr. Corp
3   in this matter. Ms. Manny, is this the first time
4   you've been deposed?
5 A. No.
6 Q. How many times have you been deposed in the past?
7 A. Once before.
8 Q. I'll run through the deposition ground rules sort of
9   quickly then since you've done it before. I'm going to
10  ask a series of questions and the court reporter is
11  going to record all of the answers that you give.
12  Because he's going to be recording the answers, we ask
13  that you answer verbally. Don't nod your head or make
14  non verbal answers because the court reporter won't be
15  able to record what you say.
16    At some point in the deposition, I'm sure I'm going
17  to ask a question that doesn't make sense or that's
18  jumbled. If and when that happens, please just ask me
19  to clarify the question. If you need to take any
20  breaks, just let me know and we can take as many breaks
21  as you want, you want coffee or water, anything like
22  that.
23    At some point, somebody will probably object to one

1   of my questions. If and when that happens, that's just
2   to preserve -- that's for the record and you can go
3   ahead and answer the question after the objection is
4   stated unless your attorney instructs you not to answer
5   the question.
6     Can you think of any reason that you can't give
7   truthful testimony today?
8 A. There's no reason.
9 Q. Okay. Do you have any questions about the deposition
10  process?
11 A. No.
12 Q. And if you need to consult Mr. Personius at any point,
13  just let me know and we can step out of the room or
14  I'll put you guys in the conference room, you can speak
15  to Mr. Personius. Could you briefly run through your
16  educational history?
17 A. Beginning with college?
18 Q. Yes, start with college and then any graduate degrees.
19 A. I went to the State University of New York at Buffalo
20  and obtained a Bachelor's degree with a major in
21  psychology and immediately following my undergraduate
22  degree, I pursued a Juris Doctorate degree also at the
23  State University of New York at Buffalo.

1 Q. Are you license to practice law in any states?
2 A. In the state of New York.
3 Q. State of New York? And are you practicing right now?
4 A. Yes.
5 Q. What's your present employer?
6 A. I currently work for Buffalo Medical Group in the role
7   of in-house counsel.
8 Q. Can you work backwards from your present employment
9   since you graduated from law school?
10 A. Yes. Prior to Buffalo Medical Group, I worked at
11  Niagara Falls Memorial Medical Center. I was vice
12  president and general counsel from approximately June
13  2002 until February 2008. Prior to that point, I was
14  at BryLin Hospitals where I worked from approximately
15  June 1996 through June 2002 and before then I was
16  in-house counsel at National Health Care Affiliates
17  from approximately December 1982 until June 2002 -- no,
18  until June 1996.
19 Q. Do you have a specialty, a legal specialty?
20 A. Health Care law.
21 Q. Do you have any other specialty beyond Health Care
22  law?
23 A. No.

**Page 9**

1  Q. You mentioned that you worked at BryLin Hospital; is
2     that correct?
3  A. Yes.
4  Q. What is BryLin Hospital?
5  A. BryLin Hospital is a private hospital for treatment of
6     mental health, including psychiatric and substance
7     abuse.
8  Q. Did you say you worked as the general counsel to
9     BryLin?
10 A. I was in-house counsel.
11 Q. In-house counsel, all right.
12 A. Um-hmm.
13 Q. Can you describe your duties as -- your duties as
14    in-house counsel for BryLin?
15 A. Primarily supported the operations of the organization
16    and took care of the health care legal needs, whether
17    it was medical practice, physician contracting,
18    supported some of the labor law issues as well.
19 Q. Do you know whether BryLin made an effort to obtain a
20    HUD insured loan to refinance its debt?
21 A. They did.
22 Q. Were you involved in BryLin's efforts to obtain this
23    loan?

**Page 10**

1  A. Yes.
2  Q. Could you tell us what your involvement was in these
3     efforts?
4  A. I worked with the finance department and with the
5     president CEO to gather documents and to provide
6     information in order for the loan to be requested and
7     ultimately approved.
8  Q. Who at BryLin decided to pursue -- that BryLin needed a
9     loan?
10 A. Mr. Pleskow.
11 Q. Who is Mr. Pleskow?
12 A. Mr. Pleskow was the president of the organization.
13    Also it's a privately held hospital and he was the
14    owner as well.
15 Q. Do you know when Mr. Pleskow made a decision to pursue
16    a loan for BryLin?
17 A. I don't.
18 Q. Do you know why BryLin needed a loan?
19 A. BryLin ran into some financial difficulty, some cash
20    flow problems and needed to consolidate its debt and
21    pursue a non commercial product, I believe.
22 Q. You said BryLin had financial difficulties?
23 A. Cash flow troubles.

**Page 11**

1  Q. Cash flow troubles. Could you describe the cash flow
2     troubles for us?
3  A. I believe there were problems that arose from an
4     accounts receivable software problem. It caused
5     difficulty with BryLin getting its bills out and
6     collecting revenue and spiraled into difficulty in
7     paying its bills and conducting its business.
8  Q. Did -- do you know whether BryLin had trouble receiving
9     reimbursements from the Canadian system, do you recall
10    anything about that, Canadian Health Care System?
11 A. I believe that arose before I joined the
12    organization.
13 Q. What was that issue, could you describe that?
14 A. It's -- what I was told was there was a large book of
15    business with OHIP in Canada and when the Canadian
16    government changed the way that they permitted their
17    citizens to access care in the United States, it
18    precipitously shut down and that was a rather large
19    book of business.
20 Q. Did you say OHIP?
21 A. I believe -- yes, OHIP.
22 Q. Could you spell that for the record?
23 A. I think that may be an acronym, O-H-I-P.

**Page 12**

1  Q. What is OHIP?
2  A. I think it's the Ontario Health -- and I'm not quite
3     sure what it was. It was only referred to OHIP and I
4     understood it to be the health program.
5  Q. Okay. Did BryLin -- let me back up for a second. I'm
6     going to use the term HUD or HUD loan and that includes
7     loans insured by the Federal Housing Administration or
8     the FHA. I'm just going to use those terms
9     interchangeably; is that okay?
10 A. Yes.
11 Q. And if for some reason you think there's a distinction
12    that needs to be drawn, just please let me know.
13 A. Okay.
14 Q. And I'm also going to use the phrase BryLin to describe
15    both BryLin Hospital and Linreal Corporation which I
16    understand to be the owner of BryLin; is that
17    correct?
18 A. As I recall, it was the real estate holding company.
19 Q. Okay, and if I use the term BryLin to include Linreal,
20    is that okay?
21 A. Yes.
22 Q. Okay, and if for some reason you think that I need to
23    draw a distinction between the two, just let me know.

Page 13:

1  A. Okay.
2  Q. So what was the time period when BryLin first started
3     to seek a loan?
4  A. I don't remember.
5  Q. Do you remember whether BryLin -- do you remember from
6     whom BryLin started seeking loans?  That wasn't a great
7     question.  I take it at some point BryLin obtained a
8     HUD insured loan; is that right?
9  A. That's correct.
10 Q. All right.  Did BryLin also seek loans from
11    conventional lenders?
12 A. My recollection is that Mr. Pleskow pursued multiple
13    efforts to obtain financing, yes.
14 Q. Were any of those efforts successful?
15 A. No.
16 Q. Do you know why the efforts were not successful?
17 A. I do not.
18 Q. And at some point, BryLin pursued a HUD insured loan;
19    is that right?
20 A. Yes.
21 Q. Do you know whether Mr. Pleskow pursued the
22    conventional loans before the HUD insured loan?
23 A. I believe so.

Page 14:

1  Q. How did you first learn of the possibility that BryLin
2     could obtain a HUD insured loan?
3  A. I believe Mr. Pleskow informed me.
4  Q. Do you remember when he informed you of this?
5  A. No, I don't.
6  Q. Do you know how Mr. Pleskow learned of the opportunity
7     to obtain a loan insured by HUD?
8  A. I don't.
9  Q. Do you know who Robert Corp is?
10 A. Yes.
11 Q. How did you -- do you remember when you first met
12    Robert Corp?
13 A. I remember meeting him.
14 Q. Do you remember how you met him?
15 A. I believe Mr. Pleskow introduced me to him.
16 Q. Okay.  Do you remember what the time period was when
17    you first met Mr. Corp?
18 A. No, I don't remember when this all commenced.
19 Q. Did you have any discussions with Mr. Corp when you
20    first met him or around the time when you first met him
21    about the possibility of a -- BryLin obtaining a HUD
22    insured loan?
23 A. Would you repeat?

Page 15:

1  Q. Sure.  Did you have any conversations with Mr. Corp
2     about the possibility of BryLin obtaining a loan
3     insured by HUD?
4  A. Mr. Pleskow, who was the owner of the organization,
5     took the lead in discussing matters with Mr. Corp, but
6     I recall that I was present in some of the meetings.
7  Q. Have you ever heard the term Map loan?
8  A. Yes.
9  Q. What does that term mean to you?
10 A. It was my understanding that the Map program was a
11    program that was conceived by HUD where they trained or
12    they selected brokers or individuals to spearhead the
13    loans and they both trained and vetted them and put
14    their trust into these individuals in such a way that
15    we were instructed that we were not to have any direct
16    contact with the loan.  It would all go through the Map
17    approved broker.
18 Q. All right.  Were you familiar with this Map program
19    before you met Mr. Corp?
20 A. No.
21 Q. Did Mr. Corp discuss with you his experience in
22    originating loans under this Map program?
23    MR. NUGENT:  Objection to form.

Page 16:

1     THE WITNESS:  With me, no.
2  Q. (By Mr. Young):  Do you know whether he discussed this
3     topic with anybody at BryLin?
4  A. I don't know.
5  Q. And did you describe -- let me back up.  Could you tell
6     us what Mr. Corp's role was in BryLin's efforts to
7     obtain a HUD insured loan?
8  A. He was the point person with HUD to submit documents
9     and assess whether the loan was viable and if so, to
10    pursue the loan and to obtain the approval.
11 Q. Did BryLin hire Mr. Corp or retain his services?
12 A. I don't believe so.
13 Q. Do you know how Mr. Corp was compensated for his
14    efforts?
15 A. I believe he was paid at closing.
16 Q. Are you familiar with a firm called Heller Health Care
17    Financial?
18 A. Yes.
19 Q. And can you -- did BryLin have a relationship with
20    Heller?
21 A. Yes.
22 Q. Can you describe that relationship for us?
23 A. BryLin factored their receivables through Heller.

```
 1  Q. What does that mean in laymen's terms, to factor a
 2     receivable?
 3  A. BryLin sold its accounts receivable to Heller who
 4     provided a lump sum for use by BryLin and to get
 5     repaid, they collected the receivables as they were
 6     paid by patients or insurance companies to defray their
 7     loan. And it was a continuing relationship where they
 8     could continue to purchase receivables and provide cash
 9     to BryLin.
10  Q. Were you satisfied with BryLin's relationship with
11     Heller?
12  A. Was I personally satisfied?
13  Q. Yes.
14  A. No.
15  Q. Why were you not satisfied?
16  A. They were -- I found them difficult to work with, what
17     little relationship I had with them. The fallout was
18     there was not sufficient cash for BryLin to pay its
19     vendors or to meet its payroll or to satisfy its
20     operations and it became a very difficult relationship
21     and a difficult place to work.
22  Q. Is it accurate to describe Heller as a creditor of
23     BryLin?
```

17

```
 1  A. As a creditor?
 2  Q. Yes.
 3  A. I believe so.
 4  Q. All right. Was there an amount of money that BryLin
 5     was able or had the ability to draw from Heller?
 6     MR. NUGENT: Objection to form.
 7  Q. (By Mr. Young): Do you understand that question?
 8  A. I understand the question. The Heller relationship was
 9     really overseen by our finance department and I had a
10     general understanding of what the -- what the Heller
11     arrangement was, but really was not involved on a day
12     to day.
13  Q. Okay. In other words, was there a ceiling of credit
14     that Heller was willing to extend to BryLin?
15     MR. NUGENT: Objection to form.
16     THE WITNESS: The way I understood it, there was a
17     line of credit type of arrangement where we -- where
18     BryLin could access up to a certain amount if it could
19     be substantiated and/or repaid.
20     (Proposed Deposition Exhibit No. 48 marked for
21     identification.) Fax.
22  Q. (By Mr. Young): Ms. Manny, I'll show you what's been
23     marked for identification as Exhibit 48. It's a
```

18

```
 1     facsimile transmittal with Bates number D 027161. The
 2     date is January 4, 2001. Have you seen this fax
 3     before?
 4  A. Yes.
 5  Q. Okay. I want to direct your attention to the subject
 6     matter -- well, let me back up. Is this a fax from you
 7     to Mr. Corp?
 8  A. Yes.
 9  Q. All right. Can I direct your attention to the subject
10     portion of the fax where it says, "As you know, Heller
11     is anxious and concerned which is affecting our day to
12     day relationship with them." Can you tell us what you
13     meant by the phrase anxious and concerned?
14  A. Yeah. Heller was concerned about the viability of
15     BryLin Hospitals and its ability to repay its
16     indebtedness.
17  Q. Before that, you used the phrase "as you know," why did
18     you use the phrase "as you know"?
19  A. I had conversations with Bob that Heller was
20     concerned.
21  Q. Could you describe the conversations for us?
22  A. I believe they involved the -- Heller not producing
23     sufficient cash for BryLin to conduct its business.
```

19

```
 1  Q. Do you remember when the conversations occurred?
 2  A. I, I don't remember.
 3  Q. I'll take it at least before January of 2001?
 4     MR. NUGENT: Objection --
 5     THE WITNESS: Yes.
 6     MR. NUGENT: -- to form.
 7  Q. (By Mr. Young): Do you recall about how many
 8     conversations you had with Mr. Corp on this subject
 9     matter?
10  A. I don't recall.
11  Q. I'll show you what we'll mark for identification as
12     Exhibit 49. The documents are Bates ranged HUD 00158
13     to HUD 00161. It's a document that says Heller Health
14     Care Finance on top of it.
15     (Proposed Deposition Exhibit No. 49 marked for
16     identification.) Document.
17  Q. (By Mr. Young): Ms. Manny, have you seen this document
18     before?
19  A. Recently.
20  Q. Do you know what this document is?
21  A. I don't.
22  Q. Do you know who created this document?
23  A. I do not.
```

20

1  Q. Do you recall, do you recall having any conversations
2     with Mr. Corp about this document?
3  A. No.
4  Q. Do you know whether -- well, let's go to the portion
5     that says balances. Does this reflect the balance of
6     BryLin's debt to Heller?
7  A. I don't know.
8  Q. Do you know around the time of March -- well, strike
9     that.
10    I'll show you what we'll mark for identification as
11    Exhibit 50. It has HUD's Bates range HUD 00162 through
12    HUD 00170. It says BryLin Hospitals at the top.
13    Payoff as of June 4, 2001.
14    (Proposed Deposition Exhibit No. 50 marked for
15    identification.) Document.
16 Q. (By Mr. Young): Do you recognize this document,
17    Ms. Manny?
18 A. No.
19 Q. Can you tell me, did -- was BryLin successful in its
20    efforts to obtain a loan insured by HUD?
21 A. Yes.
22 Q. And I'll just refer to this as the BryLin loan or the
23    HUD loan; is that okay?

                                                              21

1  A. Um-hmm, yes.
2  Q. Was BryLin required to pay closing costs associated
3     with this loan?
4  A. Yes.
5  Q. Did you ever have any concerns -- do you remember when
6     the loan closed approximately?
7  A. Approximately June 4, 2002.
8  Q. Okay, and --
9  A. 2001.
10 Q. 2001, okay, and at any point before the closing, were
11    you -- did you have any concerns that BryLin would not
12    be able to cover its closing costs?
13 A. Yes.
14 Q. And why were you concerned that BryLin would not be
15    able to cover its closing costs?
16 A. Its cash flow was insufficient.
17 Q. Did you have any conversations with Mr. Corp about
18    BryLin's ability to cover its closing costs?
19 A. Yes.
20 Q. And could you tell us the substance of those
21    conversations?
22 A. I advised Mr. Corp that BryLin did not have the cash
23    sufficient to meet its closing obligations.

                                                              22

1  Q. When did you tell Mr. Corp this approximately?
2  A. Approximately within the week before closing.
3  Q. What did Mr. Corp say to you in response?
4  A. I don't remember.
5  Q. Do you remember if Mr. Corp had any suggestions about
6     how BryLin could deal with this problem?
7     MR. NUGENT: Objection to the form.
8     THE WITNESS: I don't remember.
9  Q. (By Mr. Young): I'll show you what we'll mark for
10    identification as Exhibit 51. It has HUD's Bates range
11    00171 through 00127 and it's a memorandum dated
12    February 23, 2001.
13    (Proposed Deposition Exhibit No. 51 marked for
14    identification.) Memorandum.
15 Q. (By Mr. Young): Have you viewed this document before,
16    Ms. Manny?
17 A. Recently, yes.
18 Q. Do you know who Mehdi Maida is?
19 A. I believe he worked for Heller.
20 Q. And does this document describe a meeting that occurred
21    on February 23, 2001?
22 A. It does.
23 Q. Do you recall, were you present at the meeting?

                                                              23

1  A. Yes.
2  Q. Do you remember the substance of the meeting, what was
3     discussed?
4  A. I don't.
5  Q. Do you remember being present at the meeting?
6  A. Barely.
7  Q. I'd like to direct your attention to the third
8     paragraph, it says, BryLin requested their line with
9     HHF to be increased to 1.350 million at least a day
10    before closing so HUD will cover the full amount. This
11    will generate extra cash flow for BryLin to pay the
12    closing fees as well as other vendors." Did BryLin ask
13    Heller to extend more credit to cover the closing
14    costs?
15    MR. NUGENT: Objection to the form.
16    THE WITNESS: I don't remember.
17 Q. (By Mr. Young): Do you remember -- okay. Do you
18    remember whether BryLin made any efforts to convince
19    Heller to extend additional credit?
20 A. Yes.
21 Q. Before -- and were these efforts undertaken before the
22    closing of the HUD loan?
23 A. Yes.

                                                              24

### Page 25

1  Q. Who do you remember -- do you remember who participated
2     in the efforts to ask Heller to extend additional
3     credit?
4        MR. NUGENT: Objection to the form.
5        THE WITNESS: When BryLin was asking, I believe it
6     was the finance department.
7  Q. (By Mr. Young): Okay. Was that somebody at BryLin's
8     finance department?
9  A. Yes.
10 Q. Do you remember whether Robert Corp had any involvement
11    in BryLin's efforts to convince Heller to extend
12    additional credit?
13       MR. NUGENT: Objection to form.
14       THE WITNESS: In what time period?
15 Q. (By Mr. Young): Before the closing of the HUD loan?
16 A. He did right before the closing of the HUD loan.
17 Q. Okay, and can you describe his role for us?
18 A. Mr. Corp participated in conference calls with Heller
19    to discuss obtaining additional funding up to the
20    amount of the line of credit to permit BryLin to
21    address certain indebtedness and to obtain cash for
22    closing.
23 Q. Do you know if Mr. Corp's efforts were successful?

### Page 26

1        MR. NUGENT: Objection to the form.
2        THE WITNESS: BryLin did eventually get an escrow
3     arrangement with Heller that permitted the additional
4     funding required to close.
5  Q. (By Mr. Young): Did -- aside from the escrow that you
6     just referenced, do you know whether BryLin attempted
7     to secure from Heller just an advance of funds?
8        MR. NUGENT: Objection to form.
9        THE WITNESS: BryLin consistently requested
10    additional funds from Heller under its agreements and
11    in order to operate its business. It was pretty much a
12    weekly request.
13 Q. (By Mr. Young): Okay, and what were the -- was
14    Heller -- did Heller, in fact, make the advances that
15    BryLin requested?
16       MR. NUGENT: Objection to form. I'm sorry, I tried
17    get it in before you answered.
18       THE WITNESS: Heller -- no, Heller would not, would
19    not fund further.
20 Q. (By Mr. Young): Did you have any conversations with
21    Mr. Corp about whether Heller would fund further as you
22    said?
23       MR. NUGENT: Objection to the form.

### Page 27

1        THE WITNESS: During what time period?
2  Q. (By Mr. Young): Any period?
3  A. I spoke a great deal about Heller because BryLin
4     couldn't meet its obligations and Mr. Corp was aware
5     during the time period of obtaining that he was
6     affiliated with BryLin to obtain a loan that Heller was
7     not releasing funds.
8  Q. Okay. Did you ever advise Mr. Corp that Heller was not
9     releasing additional funds to BryLin?
10       MR. NUGENT: Objection to form.
11 Q. (By Mr. Young): Or have any conversations on that
12    topic?
13 A. Yes, I believe I just said so, yes.
14 Q. And do you recall approximately when these
15    conversations occurred?
16 A. My recollection was refreshed with the Exhibit 48. I
17    believe they started as early as January that Heller
18    was not releasing cash and we were anxious for them to
19    get a comfort level that BryLin was viable and going to
20    be able to repay their indebtedness in order to release
21    more cash.
22 Q. I'd like to take you back to Exhibit 51, same
23    paragraph, the third paragraph. I'll quote some

### Page 28

1     language from this paragraph. It says, "The money
2     would most likely be sent to an escrow account." What
3     is that -- do you know what that sentence means, what
4     it refers to, escrow account?
5  A. I have no recollection of this conversation having
6     occurred. It was refreshed by reading this. I still
7     don't recall the conversation, so I'm not sure I can
8     explain it further.
9  Q. Okay. Do you know whether Mr. Corp participated in
10    this February 23, 2001 meeting?
11 A. I don't believe he did.
12 Q. Do you know whether -- did you have any conversations
13    with Mr. Corp about what occurred at this February 23,
14    2001 meeting?
15 A. I don't recall any conversations.
16 Q. Do you know whether Mr. Corp was a party to any
17    conversations, maybe not with you, but with somebody
18    else about what occurred at the February 23, 2001
19    meeting?
20       MR. NUGENT: Objection to the form.
21       THE WITNESS: I don't know.
22 Q. (By Mr. Young): Do you remember at what point BryLin
23    decided to go or decided to pursue or actually apply

**Page 37**

A. I don't remember Trish Maroney.

Q. Can you go to the next page of the document which is HUD 0061. Do you see Mr. Pleskow's signature in the center of the document?

A. Yes.

Q. And is that -- you recognize that as Mr. Pleskow's signature?

A. Yes.

Q. All right. Do you remember -- did you have any role in the preparation of this document?

A. No.

Q. And this is a mortgagor's certificate of actual cost; is that correct?

A. Yes.

Q. And is this a HUD document, do you recognize it as a HUD document?

A. Yes.

Q. Do you know where Mr. Pleskow would have obtained -- do you know from where Mr. Pleskow obtained this document?

A. Do I know absolutely? No.

Q. Where do you think he obtained the document?

MR. NUGENT: Objection to the form.

**Page 38**

THE WITNESS: I think it was from Bob Corp.

Q. (By Mr. Young): Does BryLin Hospitals maintain HUD forms at its office?

A. No.

Q. Why do you think Mr. Corp provided this document?

A. This was his role in preparing the loan application.

Q. Throughout the preparation of the application for this BryLin loan, did Mr. Corp provide BryLin Hospitals with HUD forms?

A. Yes.

Q. Do you know whether he provided BryLin Hospitals with this specific form that we're looking at here?

MR. NUGENT: Objection to form.

THE WITNESS: I do not, I don't know.

Q. (By Mr. Young): Did Mr. Corp ever provide BryLin Hospital with HUD forms that were already filled out? Do you want me to rephrase?

A. Please.

Q. You had said earlier I think that Mr. Corp provided BryLin Hospital with HUD forms which needed to be completed for the BryLin loans; is that accurate?

A. I don't -- I believe Mr. Corp completed all of the HUD forms for BryLin's signature.

**Page 39**

Q. Okay. What's your basis for that belief?

A. I don't believe we had the in-house expertise or knowledge to complete these forms.

Q. Let's look at this form in particular, HUD 0061. I think it says there it's dated May 5, 2001 -- I'm sorry, June 1, 2001. I think that's when Mr. Pleskow signed it; is that correct?

A. That's when it's dated.

Q. In June 2001 was there anybody at BryLin Hospital who would have been capable of completing this form?

MR. NUGENT: Objection to form.

THE WITNESS: I don't believe so.

Q. (By Mr. Young): And why do you say you don't believe so?

A. The hospital had a finance department that wouldn't have had the information that's being requested of -- on this form, recording expenses, legal and organizational expenses. They just wouldn't have had that information to be able to complete the form.

Q. Do you remember whether you had any conversations with Mr. Corp about this form, the mortgagor certificate of actual costs?

A. I have no recollection of any conversation.

**Page 40**

Q. Can you turn to Page HUD 0063? It's a schedule that says BryLin Hospitals and it represents existing indebtedness to various creditors. Do you know who prepared this document?

A. I don't.

Q. Do you know whether Mr. Corp prepared the document?

MR. NUGENT: Objection to form.

THE WITNESS: I don't know.

Q. (By Mr. Young): And can you see the -- where it represents the indebtedness to Heller Financial as 1.35 million?

A. I see that.

Q. Did you have any conversation with Mr. Corp about BryLin's indebtedness to Heller?

MR. NUGENT: Objection to form.

THE WITNESS: At what period of time?

Q. (By Mr. Young): Let's start with June of 2001, around the time that this document was signed?

A. Yes.

Q. Can you tell us what the substance of those conversations was?

A. BryLin was requested to obtain a payoff letter from Heller and requested a payoff letter that reflected a

## Page 41

 1    lower amount and Mr. Corp indicated that that would not
 2    suffice for the loan closing.
 3  Q. Let's -- what do you mean by the -- you said the word
 4    payoff letter. What is that, what does payoff letter
 5    mean?
 6  A. The amount of money it was going to take to -- for
 7    Heller to release its -- to release BryLin from its
 8    UCC-1's and other -- and the entire arrangement, its
 9    legal obligations.
10  Q. I'll show you what we'll mark for identification as
11    Exhibit 55. It's a document with Bates number D 03923
12    and it says Heller Letterhead on top.
13        (Proposed Deposition Exhibit No. 55 marked for
14        identification.)
15  Q. (By Mr. Young): Ms. Manny, I'll show you a document
16    that goes with what we've marked as Exhibit 55. I'll
17    show you the -- this is the fax transmittal sheet with
18    it. Unfortunately I only have one copy and I can make
19    some copies for the court reporter during the break.
20    But I'll show it to Mr. Nugent first.
21        (Brief pause in proceedings.)
22        MR. YOUNG: I had introduced a document that we
23    marked as Exhibit 55, but we wanted to include the fax

## Page 42

 1    transmittal letter on top, so we're going to renumber
 2    Exhibit 55 and it has GE Bates number 0773 and it is a
 3    fax transmittal dated May 15, 2001 and we'll remark
 4    this one as Exhibit 55.
 5        (Proposed Deposition Exhibit No. 55 marked for
 6        identification.) Fax.
 7  Q. (By Mr. Young): Ms. Manny, do you recognize this fax
 8    transmittal sheet?
 9  A. Yes.
10  Q. And do you recognize the document, the second page of
11    this exhibit which is the Heller letterhead document?
12  A. Recognize?
13  Q. Yes. Do you know what it is?
14  A. I do know what it is.
15  Q. What is this document?
16  A. It appears to be a recommended payoff letter.
17  Q. From whom did you obtain this document?
18  A. I believe I obtained it from Continental Securities,
19    Bob Corp.
20  Q. Why did -- did you have any conversations with Mr. Corp
21    about this document?
22  A. About this document? I don't recall.
23  Q. Was it your understanding before the BryLin loan closed

## Page 43

 1    that HUD would require BryLin to document its existing
 2    indebtedness?
 3  A. I recall that the existing indebtedness would have to
 4    have been documented, yes.
 5  Q. And do you know, was the purpose of this letter to
 6    document an existing indebtedness?
 7  A. I believe so.
 8  Q. Did you have any conversations with Mr. Corp about this
 9    document here, Exhibit 55?
10        MR. NUGENT: Objection to form.
11        THE WITNESS: I don't recall any conversations.
12  Q. (By Mr. Young): Did you have any conversations with
13    Mr. Corp about obtaining a payoff letter documenting
14    BryLin's debt to Heller at all?
15  A. I don't recall conversations.
16  Q. I notice this form payoff letter is on -- is supposed
17    to be on Heller letterhead; is that correct?
18  A. Yes.
19  Q. Do you remember whether Mr. Corp advised BryLin to
20    obtain a payoff letter on Heller letterhead?
21        MR. NUGENT: Objection to form.
22        THE WITNESS: I recall that Bob Corp wanted a payoff
23    letter from Heller on its letterhead, yes.

## Page 44

 1  Q. (By Mr. Young): And do you know why Mr. Corp wanted
 2    the payoff letter to be on the Heller letterhead?
 3        MR. NUGENT: Objection to form.
 4        THE WITNESS: Do I know why Mr. Corp wanted that?
 5  Q. (By Mr. Young): Yes.
 6  A. I don't know why.
 7  Q. Did Mr. Corp ask you to obtain a payoff letter from
 8    Heller?
 9  A. Yes.
10  Q. Do you remember when he asked you this?
11  A. I can look at the fax cover sheet and deduce it was
12    sometime in mid May, May 15.
13  Q. And the fax cover sheet says recommended payoff letter
14    from underwriter, what does recommended payoff letter
15    mean?
16  A. I believe Mr. Corp suggested that this would be an
17    acceptable format for Heller to put on their letterhead
18    to demonstrate current indebtedness.
19  Q. Okay, and you say demonstrate current indebtedness,
20    demonstrate to whom?
21  A. To HUD.
22  Q. To HUD. What did you do with this letter once you
23    received it from Mr. Corp?

**Page 45**

1  A. I faxed it to Heller.
2  Q. Why did you fax it to Heller?
3  A. To request that they review and consider it for their
4     form of payoff letter that was being requested of
5     them.
6  Q. And do you know what happened next?
7     MR. NUGENT: Objection to form.
8  Q. (By Mr. Young): After you faxed this document to
9     Heller?
10 A. Could you be more specific?
11 Q. Sure. Did -- so you asked Heller to provide a payoff
12    letter; is that correct?
13 A. That's correct.
14 Q. And did you ask them to provide it in the form that Mr.
15    Corp had given to you?
16 A. Yes.
17 Q. That being Exhibit 55; is that correct?
18 A. That's correct.
19 Q. Do you know, did Heller, in fact, provide a payoff
20    letter in the form that you had requested?
21 A. In this form, no.
22 Q. Okay. I'll show you what we'll mark for identification
23    as Exhibit 56. It has HUD Bates range 00177 to 00182

**Page 46**

1     and just for identification purposes, it starts with a
2     TX report Heller Health Care on top.
3        (Proposed Deposition Exhibit No. 56 marked for
4        identification.) Report.
5  Q. (By Mr. Young): Do you know who Dwight Meyer is,
6     Ms. Manny? It's the -- on the transmittal cover sheet
7     which is HUD 00177.
8  A. It's possible he was counsel for Heller.
9     MR. PERSONIUS: Are you guessing?
10    THE WITNESS: I'm guessing, I'm sorry.
11 Q. (By Mr. Young): Is this a document that Heller faxed
12    to you and Mr. Corp?
13 A. Yes.
14 Q. Okay, and did they fax it to you in response to your
15    request for a payoff letter?
16    MR. NUGENT: Objection to form.
17    THE WITNESS: I believe so.
18 Q. (By Mr. Young): Do you know -- I'll rephrase. Do you
19    know why Heller faxed you this document?
20 A. A payoff letter had been requested for the HUD closing
21    and this is what they provided.
22 Q. Can I -- I'll show you, direct your attention to HUD
23    00177 towards the bottom. The notes comments section

**Page 47**

1     describes this document as a draft payoff letter. Do
2     you know why the author used the adjective draft for
3     the payoff letter?
4  A. I don't.
5  Q. Did you have any discussions with Mr. Corp about this
6     document?
7  A. Yes.
8  Q. And when did you have -- how many conversations did you
9     have?
10 A. I don't remember how many.
11 Q. Do you remember approximately when they occurred?
12 A. I don't remember.
13 Q. It was shortly after you received the document?
14 A. I assume so.
15 Q. Okay. What did you discuss with Mr. Corp about this
16    document?
17 A. It's my recollection that Mr. Corp was concerned with
18    the payoff amount.
19 Q. And when you say payoff amount, what do you mean by
20    that?
21 A. The amount listed in the letter of approximately
22    643,247.51.
23 Q. What did Mr. Corp -- how did he express the concerns

**Page 48**

1     that you mentioned?
2  A. It's my recollection that he felt it would not suffice
3     for the HUD closing.
4  Q. And do you recall anything also about what he told you
5     about this amount?
6  A. No, I don't.
7  Q. Did Mr. Corp tell you -- so I think you testified that
8     Mr. Corp said this would not suffice; is that
9     correct?
10 A. Would not suffice.
11 Q. Did Mr. Corp tell you what to do -- did he tell you
12    anything else, tell you what to do next?
13    MR. NUGENT: Objection to form.
14 Q. (By Mr. Young): Do you want me to rephrase that?
15 A. Please.
16 Q. Let's back up a second. Do you know why Mr. Corp
17    believed that this payoff amount, I think it's of
18    $643,000, do you know why he thought that that would
19    not suffice for the HUD closing?
20 A. I believe there was a need for the 1.35, 1 point --
21    yeah, 35 number to be reflected in the letter.
22 Q. And did you have -- did you discuss that need with Mr.
23    Corp?

## Page 49

1  A. Did I discuss it with him?
2  Q. Yes.
3  A. No, it was his need.
4  Q. Okay. I mean, did Mr. Corp discuss that need
5     with you?
6  A. Yes.
7  Q. And why was there a need to have Heller represent the
8     debt as 1.35 million?
9        MR. NUGENT: Objection, form.
10       THE WITNESS: Yeah.
11 Q. (By Mr. Young): Let's back up. You said there was a
12    need to have the debt at 1.35 million; is that right?
13 A. Yes, that was, that was what Mr. Corp indicated to
14    me.
15 Q. Okay. So is it accurate to say Mr. Corp represented to
16    you -- let me rephrase that.
17       Is it accurate to say that Mr. Corp told you that
18    BryLin needed a payoff letter from Heller which
19    represented the debt at 1.35 million?
20       MR. NUGENT: Objection.
21       THE WITNESS: That's accurate.
22 Q. (By Mr. Young): And do you know why Mr. Corp wanted
23    the -- a payoff letter from Heller representing the

## Page 50

1     debt as 1.35 million?
2        MR. NUGENT: Objection to form.
3        THE WITNESS: I don't recall if I knew then why.
4  Q. (By Mr. Young): Okay. Did you discover anything
5     subsequently that informed you?
6  A. It's my understanding that that substantiated the
7     indebtedness submitted to HUD for the amount of the
8     loan that was provided.
9  Q. Okay. Did Mr. Corp -- do you know whether -- did Mr.
10    Corp advise you to submit this payoff letter which is
11    Exhibit -- which is in Exhibit 56 to Heller?
12 A. I'm sorry?
13 Q. I'm sorry, let me rephrase that.. I'm still referring
14    to Exhibit 56, the payoff letter?
15 A. Yes.
16 Q. The draft payoff letter. Did Mr. Corp advise you to
17    submit this document to HUD?
18 A. BryLin was not -- never submitted documents to HUD.
19 Q. Okay.
20 A. We weren't asked to or even permitted to.
21 Q. Did Mr. Corp advise you to obtain another payoff letter
22    from Heller?
23 A. Yes.

## Page 51

1  Q. And why did he advise you to obtain another payoff
2     letter from Heller?
3        MR. NUGENT: Objection to form.
4        THE WITNESS: My recollection was there were two
5     reasons. The first reason was to reflect the
6     appropriate dollar amount that was necessary to
7     substantiate the loan. The second was to obtain cash
8     from Heller who had been withholding money from BryLin
9     that was needed to pay off certain indebtedness and
10    other matters to be able to close the loan.
11 Q. (By Mr. Young): And how do you -- what is your
12    understanding or what is your recollection based on, is
13    it based on conversations with Mr. Corp?
14 A. My recollection?
15 Q. Yes.
16 A. My recollection is based on what I remember happening
17    at the time.
18 Q. Okay.
19 A. I haven't spoken to Mr. Corp since the loan closed.
20 Q. We'll move to what we'll mark for identification as
21    Exhibit 57. It's a document starting at HUD 00248 and
22    ending at HUD 00250 -- I'm sorry, it ends at HUD 00252.
23       (Proposed Deposition Exhibit No. 57 marked for

## Page 52

1     identification.) E-mail.
2  Q. (By Mr. Young): Ms. Manny, for identification
3     purposes, is this an e-mail that you wrote to
4     Mr. Brennan after receiving Heller's draft payoff
5     letter of May 23, 2001?
6  A. Yes.
7  Q. And who is Mr. Brennan?
8  A. Mr. Brennan was counsel for GMAC.
9  Q. And you drafted this letter; is that correct?
10 A. I drafted this e-mail.
11 Q. The e-mail, I'm sorry.
12 A. That's correct.
13 Q. And the e-mail is at HUD 00249. What was your purpose
14    in sending this e-mail to Mr. Brennan?
15 A. To address some of the miscellaneous items that were
16    open and I felt needed to be addressed before
17    closing.
18 Q. And did you send this e-mail to Mr. Brennan in the
19    ordinary course of your business?
20 A. I did.
21 Q. Did you also fax this e-mail to Mr. Corp?
22 A. I did.
23 Q. Why did you also -- why did you fax the e-mail to Mr.

**Page 61**

1  A. Yes.
2  Q. And how many conversations did you have with those
3     two?
4  A. I would say several.
5  Q. Several. Do you remember the approximate time periods
6     of when they occurred?
7  A. They predated closing.
8  Q. Do you remember what was discussed in the conversations
9     that you had with Mr. Corp and Mr. Brennan?
10 A. Primarily the HUD payoff letter and cash needs of
11    BryLin.
12 Q. And what did you discuss with those two or what was
13    discussed during those -- let me back up.
14    You said one of the topics was the HUD payoff
15    letter; is that correct?
16 A. The Heller payoff letter.
17 Q. I'm sorry, the Heller payoff letter. What did you
18    discuss or what was discussed about the Heller payoff
19    letter?
20 A. The need for the 1.35 million dollar figure to be
21    reflected in the Heller payoff letter.
22 Q. We'll mark for identification, the next exhibit is 59.
23    This is a document with HUD Bates stamp range HUD 00185

**Page 62**

1     to HUD 00188 and it is a letter dated May 30, 2001.
2     (Proposed Deposition Exhibit No. 59 marked for
3     identification.) Letter.
4  Q. (By Mr. Young): Do you remember -- do you remember
5     receiving this letter from -- well, let's back up. Is
6     this letter addressed to Mr. Pleskow at BryLin
7     Hospitals?
8  A. Yes.
9  Q. And is this from Heller?
10 A. Yes.
11 Q. Do you remember seeing this letter when it was sent?
12 A. Yes.
13 Q. Do you remember whether you had any conversations with
14    Mr. Corp about this letter?
15 A. I don't remember any conversations.
16 Q. Okay. Do you know whether Mr. Corp viewed this
17    letter?
18    MR. NUGENT: Objection to form.
19    THE WITNESS: Do I know what Mr. Corp --
20 Q. (By Mr. Young): Let me rephrase. Do you know whether
21    Mr. Corp saw this letter?
22 A. Do I know?
23 Q. Yes.

**Page 63**

1  A. I don't know.
2  Q. Do you believe that Mr. Corp saw this letter?
3     MR. NUGENT: Objection to form.
4     THE WITNESS: I believe -- yes, I believe he did.
5  Q. (By Mr. Young): And why do you believe that Mr. Corp
6     saw this letter?
7  A. This was the letter he was waiting for in terms of
8     memorializing the escrow arrangement and reflecting the
9     1.35 million dollar indebtedness.
10 Q. In the days leading up to the closing of the BryLin
11    loan, was it your practice to share with Mr. Corp all
12    documents that were sent from Heller?
13 A. Yes.
14 Q. Do you know whether this letter was ever submitted to
15    HUD?
16 A. Do I know?
17 Q. Yes.
18 A. BryLin didn't submit anything to HUD.
19 Q. Okay. Do you know whether anybody submitted this
20    letter to HUD?
21 A. I don't know.
22 Q. Show you for -- we'll mark for identification Exhibit
23    60 and this is a document with HUD Bates range HUD

**Page 64**

1     03056 to HUD 0059 and it starts with a Continental
2     Securities telecopier cover letter and it's the copier
3     date on top is 5-29-2001.
4     (Proposed Deposition Exhibit No. 60 marked for
5     identification.) Document.
6  Q. (By Mr. Young): Ms. Manny, I'd like to direct your
7     attention to the third page of this document which is
8     Bates stamped HUD 0058 and I'll state for the record
9     this is a letter on BryLin letterhead dated May 29,
10    2001. Did you play a role in the creation of this
11    letter, Ms. Manny?
12 A. Yes, I believe I prepared this letter.
13 Q. And did you have any discussions with Mr. Corp about
14    this letter before you prepared it?
15 A. Mr. Corp directed me to prepare this letter.
16 Q. And what sort -- what direction did he give you?
17 A. He asked for BryLin to prepare a letter reflecting the
18    1.35 million dollar indebtedness and providing wire
19    transfer instructions.
20 Q. Do you know why he asked you to prepare a letter on
21    BryLin -- let me -- let me back up a second. Mr. Corp
22    instructed you to draft this letter; is that correct?
23 A. That's correct.

### Page 65

1  Q. Do you know why he instructed you to draft this
2     letter?
3  A. No.
4  Q. Do you know whether -- was this letter -- was the
5     purpose of this letter to document BryLin's
6     indebtedness to Heller?
7  A. That appears to be one of the purposes, yes.
8  Q. And do you remember, did Mr. Pleskow sign this
9     letter?
10 A. Yes.
11 Q. And so is it accurate to say then you drafted the
12    letter and Mr. Pleskow then signed the letter; is that
13    right?
14 A. I believe so, yes.
15 Q. Let me back up, I'll back up one more step. Is it
16    accurate to say Mr. Corp instructed you to draft this
17    letter?
18 A. Yes.
19 Q. And then is it also accurate to say that you, in fact,
20    drafted the letter?
21 A. That's correct.
22 Q. And after you drafted the letter, did you give it to
23    Mr. Pleskow?

### Page 66

1  A. That's correct.
2  Q. Do you know what happened to the letter after
3     Mr. Pleskow signed it?
4  A. I believe it was sent to Mr. Corp.
5  Q. And why do you believe it was sent to Mr. Corp?
6  A. It's addressed to Mr. Corp.
7  Q. Did you transmit it to Mr. Corp, do you know who
8     transmitted it?
9  A. I don't remember.
10 Q. I think you testified earlier that Mr. Corp had
11    initially advised that BryLin obtain a payoff letter on
12    Heller letterhead; is that correct?
13    MR. NUGENT: Objection to form.
14    THE WITNESS: Yes.
15 Q. (By Mr. Young): Okay. I'll rephrase that. Did you
16    have any discussions with Mr. Corp about obtaining from
17    Heller a letter, a payoff letter on Heller letterhead?
18 A. Yes.
19 Q. And what was that discussion?
20 A. Mr. Corp in preparation for closing directed us to
21    obtain a payoff letter from Heller on their own
22    letterhead.
23 Q. And at some point, did Mr. Corp instruct you to draft a

### Page 67

1     payoff letter on BryLin letterhead?
2  A. He instructed me to draft a letter. I don't know
3     whether he referred to it as a payoff letter.
4  Q. Okay, and is the letter, the one that you're referring
5     to as HUD 00058?
6  A. Yes.
7  Q. Did you have any discussions with Mr. Corp about the
8     fact that the letter was not on Heller letterhead?
9  A. I don't recall any conversations.
10 Q. Do you know -- I think we talked about Ms. Maroney,
11    Trish Maroney earlier. Is that her name that appears
12    on HUD 0056?
13 A. In the from line, yes.
14 Q. And do you know who Ms. Maroney is?
15 A. I don't remember Ms. Maroney. I can guess who she may
16    have been.
17 Q. Do you remember ever sharing any documents with
18    Ms. Maroney that you did not also share with Robert
19    Corp?
20 A. My contact was Mr. Corp.
21 Q. Can we go to Page HUD 0057? Do you recognize this
22    document, this schedule?
23 A. Do I recognize it?

### Page 68

1  Q. Yes.
2  A. I might have seen it.
3  Q. Did you play a role in the creation of this document?
4  A. No.
5  Q. Do you know whose handwriting is on it, do you
6     recognize that handwriting?
7  A. No.
8  Q. Do you know whether Mr. Corp played a role in the
9     creation of this document?
10 A. I don't know.
11 Q. Let's go back to the document at HUD Page 0058, that's
12    the May 29 letter?
13 A. Yes.
14 Q. Did you discuss -- you said you drafted the letter; is
15    that right?
16 A. Yes.
17 Q. Okay. Did you discuss the contents of the letter with
18    Mr. Corp?
19 A. Yes.
20 Q. Did Mr. Corp review this letter after you had drafted
21    it?
22 A. It was sent to him.
23 Q. Okay. Let's go to --

**Page 101**

1 Q. Did the subject line of this document refer in any way
2 to the ceiling or the amount that Heller -- BryLin was
3 able to borrow from Heller?
4   MR. YOUNG: Objection.
5   THE WITNESS: I don't see any reflection to a
6 ceiling.
7 Q. (By Mr. Nugent): Do you have any recollection --
8 A. Reference rather.
9 Q. Based on what you wrote here, did you intend to refer
10 to any ceiling on the Heller debt?
11   MR. YOUNG: Objection.
12   THE WITNESS: No.
13 Q. (By Mr. Nugent): Do you recall having any discussions
14 with Mr. Corp around the time you drafted this document
15 related to the ceiling of the Heller debt?
16 A. My conversations with Mr. Corp were around the
17 frustration at BryLin that there was more capacity for
18 money to be shared from Heller to BryLin and they were
19 unwilling to do so. There wasn't any specific talk
20 about up to what dollar amount, just there was more
21 there.
22 Q. Did you have any -- so at this time, you don't recall
23 having any discussions with Mr. Corp about the ceiling

**Page 102**

1 of the Heller debt?
2 A. No.
3 Q. Were you having discussions at this time with Heller
4 about the ability to draw down additional funds?
5 A. Me personally?
6 Q. Yes.
7 A. I was not the point person, the lead person for that.
8 That came from our finance department.
9 Q. Okay. Would that have been Mr. Daley?
10 A. Depending on the time frame, it could have been Mr.
11 Daley, yes.
12 Q. Is there anyone else that -- I know you're confused as
13 to whether it might be Daley or someone else. Is there
14 any other name that comes to mind that could be a point
15 person within that time period?
16 A. No other name. It was a fully staffed department and
17 there was some turnover as well.
18 Q. Okay, and so, but you don't recall yourself having any
19 discussions about --
20 A. No.
21 Q. Do you recall whether Mr. Daley and Mr. Corp had
22 discussions?
23 A. I don't know.

**Page 103**

1 Q. Do you recall whether this cash flow situation improved
2 following January 4, 2001 with Heller?
3   MR. YOUNG: Objection.
4   THE WITNESS: No, I don't recall if there was an
5 improvement.
6 Q. (By Mr. Nugent): And was -- does this letter, what you
7 wrote to -- this fax I should say, does this have any
8 reference to any of the documents Mr. Corp submitted to
9 HUD on BryLin's behalf?
10 A. No.
11   MR. NUGENT: Mark a document. I guess we're at 62.
12   (Proposed Deposition Exhibit No. 62 marked for
13   identification.) Fax.
14 Q. (By Mr. Nugent): By the way, do you go by
15 Ms. Tunis-Manny or Ms. Manny?
16 A. Can you call me Karen.
17 Q. I'll call you Ms. Manny for the record; is that all
18 right?
19 A. That would be fine.
20 Q. Ms. Manny, I've marked a document, it has Bates numbers
21 D 2700 through -- let me just make sure we have the
22 right document because yours looks thicker than mine.
23 Okay. D 2747 through it looks like D 2760?

**Page 104**

1 A. Yes.
2 Q. That's what you have in front of you?
3 A. That's what I have.
4   MR. NUGENT: Is that what you have, Brian?
5   MR. YOUNG: Yep.
6 Q. (By Mr. Nugent): And it appears to be a fax from you
7 to Bob Corp and Basil Elmer?
8 A. Yes.
9 Q. Do you recall ever seeing this document?
10 A. Yes.
11 Q. When did you first see it?
12 A. When I created it.
13 Q. Have you seen it since you created it?
14 A. I don't think I saw the cover sheet, but I believe I've
15 seen the memo.
16 Q. The attached memo?
17 A. Just the attached memo, just the two pages as I
18 recall.
19 Q. When did you see that?
20 A. That was in the package of documents.
21 Q. Okay. Could you go to the page Bates numbered D 2749?
22 The third paragraph on that page reads, "Bob, thanks so
23 much for speaking Mike Gardullo at Heller. We

**Page 105**

1  appreciate your time and efforts." Do you see that
2  language?
3  A. Yes.
4  Q. Do you know what it refers to?
5  A. I believe it refers to the faxed sheet and subject line
6     that we discussed just prior to these questions.
7  Q. How did you know Mr. Corp had spoken to Mr. Gardullo?
8  A. I believe he told me he did.
9  Q. And did you have any follow-up discussions with Heller
10    related to that?
11 A. No.
12 Q. And there's a reference in the next paragraph to Key
13    Bank indebtedness?
14 A. Yes.
15 Q. It looks like you're talking there -- I won't read the
16    paragraph, but you're providing information related to
17    that indebtedness?
18 A. Yes.
19 Q. Is that consistent with your role in connection with
20    the HUD transaction, providing information to Mr. Corp
21    and Mr. Elmer?
22 A. Yes, it's consistent that I provided information.
23 Q. Were you aware that information provided to Mr. Elmer

**Page 106**

1     would be provided -- could be provided to the
2     Government?
3        MR. YOUNG: Objection.
4        THE WITNESS: Pardon me?
5  Q. (By Mr. Nugent): Were you aware that information you
6     provided to Mr. Elmer could be provided -- when I say
7     the Government, I mean HUD?
8  A. HUD?
9        MR. YOUNG: Objection.
10       THE WITNESS: This Government? Was I aware? I
11    don't think I thought about it.
12 Q. (By Mr. Nugent): Did you -- but you understood that
13    Mr. Elmer may be providing information to the
14    Government, information supplied by BryLin?
15       MR. YOUNG: Objection.
16       THE WITNESS: I really felt that Mr. Corp was
17    approved under the Maps program and was the one who was
18    gathering information and providing it to HUD.
19 Q. (By Mr. Nugent): So you were aware that information
20    that BryLin provided to Mr. Corp might be provided to
21    HUD?
22 A. Absolutely, yes, would be provided to HUD.
23 Q. Would be. And did you try to provide accurate

**Page 107**

1  information when you provided information to Mr.
2  Corp?
3  A. Yes.
4  Q. Are you aware of any information that you provided to
5     Mr. Corp that was untruthful in any way?
6  A. No.
7  Q. Do you know the name Sharon Delles?
8  A. I don't remember that name.
9  Q. Let me mark a document. Well, let me ask you first,
10    did you work at anyone -- with anyone at Continental
11    Securities other than Mr. Corp?
12 A. Most -- I worked with Mr. Corp. Others may have
13    received information, but I worked with Mr. Corp. He
14    was the --
15 Q. Do you recall having discussions with anyone at
16    Continental other than Mr. Corp?
17 A. No, I don't recall other discussions.
18 Q. Do you recall providing information to anyone at
19    Continental other than Mr. Corp?
20 A. I believe I provided it to his offices. If there were
21    other people in the offices, they may have received
22    it.
23       MR. NUGENT: Let's mark this as 63.

**Page 108**

1       (Proposed Deposition Exhibit No. 63 marked for
2       identification.) Fax.
3  Q. (By Mr. Nugent): So I've put in front of you,
4     Ms. Manny, a document Bates number D 2660 to D 2661.
5     Have you seen that document before?
6  A. Yes.
7  Q. Did you create the document?
8  A. I did.
9  Q. And it looks to be a fax cover sheet from you to
10    someone named Sharon Delles at Continental?
11 A. Yes.
12 Q. Dated February 15, 2001?
13 A. Yes.
14 Q. Does this refresh your memory as to whether you
15    provided information to persons at Continental other
16    than Mr. Corp?
17 A. I provided this -- I provided information to Sharon
18    Delles, it appears.
19 Q. Now we talked -- you don't recall the name Trish
20    Maroney?
21 A. I don't.
22 Q. Sitting here today you don't recall?
23 A. No.

**Page 161**

1  Q. Do you recall having any discussions with Mr. Corp on
2     or around May 15 related to what the actual balance of
3     the Heller line of credit was?
4  A. I don't have any recollection.
5  Q. Take a look at Exhibit 56. I want to go back to some
6     of your testimony and I want to be fair because it was
7     a little while ago, but I think you testified that if
8     you turn to the third page of the document where the
9     actual draft of the letter begins, that Mr. Corp was
10    concerned about the payoff amount that's bracketed in
11    the second paragraph, is that --
12 A. Yes.
13 Q. Was that your testimony? What did you mean by that,
14    did Mr. Corp say anything that gave you that
15    impression?
16 A. Mr. Corp directed -- Mr. Corp wanted a payoff letter in
17    the amount of 1.35 million dollars and when he saw this
18    amount, it was problematic for him.
19 Q. For him?
20 A. Or problematic.
21 Q. Did you have any discussion with him about what would
22    happen if BryLin was unable to get a payoff letter that
23    said 1.35 million was owed to Heller?

**Page 162**

1  A. Did I have a conversation with him? Yes.
2  Q. Can you describe for me what you said and what he said
3     in that conversation?
4  A. Well, I believe he indicated to us that -- or to BryLin
5     Hospitals that the amount of the loan would be reduced
6     and BryLin indicated to Mr. Corp that there would be
7     insufficient cash to close the transaction.
8  Q. And it was at that time after you received this letter
9     that you had that discussion?
10 A. I don't recall the time line.
11 Q. Would it have been triggered by this receipt of this
12    letter?
13 A. It probably was.
14 Q. So after you told Mr. Corp that BryLin wouldn't have
15    sufficient cash if the loan were to be reduced, what
16    did he say to you, if anything?
17 A. I don't remember the conversations.
18 Q. Was there any discussion at this time of whether BryLin
19    could draw down on the loan, the loan with Heller?
20 A. Yeah, I think there was conversation about whether or
21    not we could maximize -- BryLin could maximize the
22    loan, the line of credit.
23 Q. Can you tell me what he said and what you said?

**Page 163**

1  A. I cannot, I can't.
2  Q. Who brought up the notion of drawing down the loan?
3  A. I don't remember.
4  Q. That notion had been discussed before in the May 14 --
5     March 14, 2001 letter from Pleskow to Heller?
6  A. My memory was refreshed by the documents, yes.
7  Q. Could it have been that you brought up the idea of
8     drawing down the loan?
9        MR. YOUNG: Objection.
10       THE WITNESS: I did not bring up the idea.
11 Q. (By Mr. Nugent): Not at the time of this discussion?
12 A. No.
13 Q. Does Mr. Corp suggest that the loan be drawn down?
14 A. It could have been Mr. Corp.
15 Q. Could it have been someone else involved in the
16    discussions?
17 A. It could have been somebody else.
18 Q. You just don't recall one way or the other?
19 A. I do not.
20 Q. And then you said that Mr. Corp, I think you used the
21    term he said this would not suffice?
22 A. Yes.
23 Q. What did you understand that to mean?

**Page 164**

1  A. It wouldn't substantiate the dollar amount that the HUD
2     loan was being granted at. It would reduce the amount
3     of the loan if the 1.35 million dollar payoff was not
4     included in the Heller payoff letter.
5  Q. Now this discussion, did it happen in one discussion
6     following the receipt of this draft payoff letter?
7  A. There may have been multiple conversations about this,
8     it was complicated.
9  Q. Was it a telephonic discussion?
10 A. I believe so.
11 Q. Do you know who called who in the first part of the
12    discussion?
13 A. I don't.
14 Q. Did you have any discussions with Eric Pleskow related
15    to your conversation with Mr. Corp?
16 A. I kept Mr. Pleskow informed.
17 Q. Did you advise him that there was a chance that the HUD
18    loan transaction wouldn't happen as a result of this
19    payoff letter?
20 A. I believe I did. I believe I said it was potentially
21    in jeopardy with -- if there was -- not so much at the
22    reduced amount, but without cash to close.
23 Q. What was Mr. Pleskow's response to that?