# TRANSCRIPT OF PROCEEDINGS

```
In the Matter of:              )
                               )
UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )   Docket No.:
v.                             )   08-CV00333-07C
                               )
ROBERT P. CORP,                )
                               )
              Defendant.       )
```

Deposition of:  Michael G. Gardullo

Pages:  1 through 111

Place:  Washington, D.C.

Date:   March 12, 2009

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
contracts@hrccourtreporters.com



EXHIBIT SJ 4

```
 1      Q    Okay.  Given that you were here during the
 2 previous deposition and heard me explain the
 3 deposition ground rules to Mr. Hoffman, can you think
 4 of any reason why I need to go over that today?
 5      A    No, I don't.
 6      Q    Okay.  Is there any reason that you can't
 7 give truthful testimony today?
 8      A    There is not.
 9      Q    Mr. Gardullo, where are you employed, sir?
10      A    I'm employed with General Electric.
11      Q    How long have you been with General
12 Electric?
13      A    With General Electric and its successor
14 company since 1995.
15      Q    And is General Electric a successor to
16 Heller Healthcare Finance?
17      A    It is.
18      Q    When did General Electric acquire Heller
19 Healthcare?
20      A    General Electric acquired all of Heller in
21 October of 2001, October 1.
22      Q    Were you employed by Heller Healthcare
23 before it was acquired by General Electric?
24      A    I was.
25      Q    Could you tell us what the date range of
```

1  your employment with Heller was?

2    A   I was employed by Heller when they acquired

3  Healthcare Financial Partners in July of 1998.

4    Q   Okay. And is it accurate to say you

5  continued working for Heller until it was acquired by

6  GE?

7    A   That would be correct.

8    Q   Okay. And is it also accurate to say that

9  you stayed on with GE until the present?

10   A   That is correct.

11   Q   In the year 2000 to 2001, can you tell us

12  your job description when you were working for Heller?

13   A   I was a vice president with Heller during

14  that time period. My position at that time was one of

15  a workout officer.

16   Q   What does that mean?

17   A   At most lending institutions, there is a

18  group of professionals that deal with problem

19  situations and assets that need to be either worked

20  out through a refinancing, a liquidation, a

21  bankruptcy. Any type of those types of special

22  circumstances would involve professionals such as

23  myself.

24   Q   Did you have that position for the entire

25  calendar year 2000 and 2001?

1  what sorts of services did Heller provide to BryLin?

2     A    Heller was a lender.  They provided various
3  products to healthcare providers in terms of a range
4  of products and asset-loan-type -- a revolving type of
5  loan to an asset-purchase type of agreement to a term
6  loan.  It was a wide range of products that were
7  offered.

8     Q    And is it accurate to say that Heller was a
9  creditor of BryLin?

10    A    That would be accurate.

11    Q    Do you know when Heller and BryLin's
12 relationship began?

13    A    To the best of my recollection, it was the
14 1999 timeframe, maybe early 2000.  I first became
15 involved directly in the fall of 2000.

16    Q    Did that relationship terminate between
17 BryLin and Heller?

18    A    Ultimately it did.

19    Q    Do you know when it terminated?

20    A    June 4 or 5th of 2001.

21    Q    And could you describe generally, and then
22 we'll get into specifics, the terms or the nature of
23 the financial relationship between BryLin and Heller?

24         MR. GORDIN:  Objection to form.

25         MR. YOUNG:  I'm sorry.

12

1      BY MR. YOUNG:

2      Q    Could you describe the nature of the
3 relationship between BryLin and Heller?

4      A    I would say as a lender/borrower.

5      Q    Have you heard the term "factoring"?

6      A    Yes.

7      Q    What does that mean?

8      A    There's a lot of different issues for the
9 term "factoring." Generally it's the purchase of an
10 accounts receivable where the purchaser owns the
11 receivable, and it's without any other recourse back
12 to the borrower or the seller.

13     Q    Did BryLin and Heller have a factoring
14 arrangement?

15     A    No.

16     Q    They did not?

17     A    No.

18          MR. YOUNG: Okay. Let me show you what's
19 been marked for identification already as Exhibit 89,
20 and this is a document with GE Bates ranges GE-0318 to
21 GE-0330, and it is dated August 25, 2000.

22                              (The document referred to was
23                              previously marked for
24                              identification as Exhibit No.
25                              89.)

1      BY MR. YOUNG:

2      Q    Mr. Gardullo, before I ask you questions
3 about this document, do you know what this Bates range
4 number is, what this signifies, the GE Bates range?

5      A    This was a document that was generated from
6 GE's files supplied to your office.

7      Q    Is it accurate to say that the GE Bates
8 range signifies that a document was produced by Heller
9 and given to the United States Department of Justice?

10     A    Yes.

11     Q    Okay.  Can you describe the process through
12 which these documents were produced to the Department
13 of Justice?

14     A    To my recollection, we received either a
15 call or a subpoena -- I cannot recall -- requesting
16 information.  We retained counsel.  We were
17 represented.  We worked with counsel to supply the
18 documents over to the offices.

19     Q    Okay.  Do you know, were they transmitted
20 electronically or on paper copy?

21     A    I do not.

22     Q    Can you tell us if the copies that you
23 provided, that Heller provided, were true and accurate
24 copies of the originals?

25     A    I believe so.  The document I'm looking at

```
 1   is one.
 2        Q    Let's go back to Exhibit 89.  Have you seen
 3   this document before?
 4        A    Yes.
 5        Q    Okay.  What is this document?
 6        A    This is a forbearance agreement between
 7   Heller and BryLin.
 8        Q    Did you generate this document?
 9        A    I had a good part in the process of
10   generating this document.  I was not the sole
11   individual; counsel would have helped.
12        Q    What is a "forbearance agreement"?
13        A    A "forbearance agreement" is an agreement
14   between usually, in this case specifically, a lender
15   and a borrower where the lender is agreeing to forbear
16   its rights and remedies due to defaults that occurred
17   on the part of the borrower.
18        Q    On this date, August 25, 2000, had BryLin
19   defaulted to Heller?
20        A    They had.
21        Q    Okay.  Do you remember approximately when
22   the default occurred?
23        A    It would have been shortly before this.
24        Q    Okay.  I'd like to direct your attention to
25   the page, GE-0318, the very bottom.  Do you see the
```

1   draw down additional funds from Heller?

2       A   Just for clarification, before the execution

3   of this document or after it?

4       Q   After the execution.

5       A   After the execution, they would have had

6   definitely the ability to continue with our

7   relationship.

8       Q   Okay.  Would they have had an unqualified

9   right to draw funds from Heller?

10       A   Absolutely not.  It would have been

11   discretionary under the terms of this agreement and

12   any subsequent agreements that we might have entered

13   into.

14       Q   Stated differently, did Heller have the

15   right to refuse to extend additional credit to BryLin?

16       A   Only if a request was made outside this

17   document or any of the other loan documents, such as

18   exceptional purchase.

19       Q   Let's turn your attention in the same

20   exhibit, Exhibit 89, to page GE-0322.

21       A   Yes.

22       Q   Do you see the column that says "Purchase

23   Cap"?

24       A   Yes.

25       Q   What does that mean?  What does that

1    represent?

2    A    As part of the forbearance agreement, Heller
3    was agreeing to modify the existing loan agreement,
4    which capped the loan purchase amount at I believe
5    $1,350,000. We were agreeing within this document
6    that we would increase it temporarily to the 1.6 and
7    then bring it back per this amortization schedule by
8    the maturity of this forbearance agreement on March 9
9    to $1,262,500.

10    Q    Okay. When you say "cap," or when this says
11    "cap," does that mean it's the total that BryLin could
12    draw from Heller?

13    A    Yes.

14    Q    All right. Did BryLin have a right, an
15    unqualified right, to draw up to the cap from Heller?

16    A    They had the ability to draw up to that
17    amount with sufficient collateral that GE or Heller
18    deemed to be sufficient to make a purchase or to my
19    knowledge.

20    Q    What happened if GE deemed the collateral to
21    be insufficient?

22    A    Then we had no obligation to use it.

23    Q    Did GE ever refuse to extend more money if
24    it deemed the collateral to be insufficient?

25    A    Yes.

1           MR. YOUNG:  I'll show you what we'll mark
2  for identification as Exhibit No. 97.  It has GE Bates
3  range GE-0461 through GE-0467, and it's dated March 9,
4  2001.
5                           (The document referred to was
6                           marked for identification as
7                           Exhibit No. 97.)
8           BY MR. YOUNG:
9      Q    Mr. Gardullo, do you recognize this
10 document?
11     A    I do.
12     Q    Can you tell us what it is?
13     A    It's a subsequent extension of the
14 forbearance agreement beyond the original maturity
15 date of the document we were just discussing.
16     Q    Okay.  So the document we just discussed,
17 Exhibit 89, that was an initial forbearance agreement,
18 is that correct?
19     A    That is correct.
20     Q    All right.  Does Exhibit No. 97 extend that
21 forbearance agreement?
22     A    It does, to July of 2001.
23     Q    And is this effective as of March 9, 2001?
24 I see the date up there.
25     A    Yes, it would have been.

18

```
1           MR. YOUNG:  I'll show you what we'll mark
2   for identification as Exhibit No. 97.  It has GE Bates
3   range GE-0461 through GE-0467, and it's dated March 9,
4   2001.
5                           (The document referred to was
6                           marked for identification as
7                           Exhibit No. 97.)
8           BY MR. YOUNG:
9       Q   Mr. Gardullo, do you recognize this
10  document?
11      A   I do.
12      Q   Can you tell us what it is?
13      A   It's a subsequent extension of the
14  forbearance agreement beyond the original maturity
15  date of the document we were just discussing.
16      Q   Okay.  So the document we just discussed,
17  Exhibit 89, that was an initial forbearance agreement,
18  is that correct?
19      A   That is correct.
20      Q   All right.  Does Exhibit No. 97 extend that
21  forbearance agreement?
22      A   It does, to July of 2001.
23      Q   And is this effective as of March 9, 2001?
24  I see the date up there.
25      A   Yes, it would have been.
```

27

1   Q   How did you respond when BryLin asked to
2   obtain an additional advance?
3   A   While we were sympathetic, we had difficulty
4   coming to grips with readvancing funds to a borrower
5   that in the past had acted the way they did, and
6   institutionally we just weren't comfortable with that.
7   Q   So how did this meeting conclude?
8   A   We told them that we would review it and we
9   would get back to them. I do believe that we offered
10  an alternative. Rather than lending additional money,
11  we tried to allow them to get additional liquidity by
12  tweaking one of the provisions of the documents that
13  allowed more cash to be retained by the borrower than
14  previously.
15  Q   Let's go to the third paragraph of this, and
16  I'll read from the center. It's starting at the
17  center of the paragraph: "Michael Gardullo stated
18  that, 'As long as we are comfortable that the deal
19  will close, we would consider funding up to $1.35
20  million. The money would most likely be sent to an
21  escrow account. HHF will need a statement of sources
22  and uses of funds before committing to any deal with
23  BryLin.'"
24      Mr. Gardullo, can you tell me what that
25  means, that "the money would most likely be sent to an

1   escrow account"?

2       A    Really just that.  They had discussed their
3   request to readvance the money, to have money drawn
4   back up to a previous loan cap, and that the only way
5   we would feel comfortable doing that would be with the
6   escrow type of function where we would understand that
7   the money would be used exactly for what the express
8   purpose was, which was to take care of a bunch of
9   closing costs, expenses, repairs related to a HUD
10  refinancing that may or may not occur in the future.

11      Q    Okay.  Is it accurate to say that the folks
12  from BryLin asked Heller to extend the loan up to $1.3
13  million at this meeting?

14      A    They did.

15      Q    Okay.  And did anybody from BryLin say why
16  they wanted to give the loan up?

17      A    They did.  They had expressed the desire to
18  use those additional funds for vendor payments,
19  repairs to the hospital and some closing costs.  To
20  the best of my recollection, it was an ongoing
21  conversation that we had over time.

22      Q    Do you remember who at BryLin made the
23  request?

24      A    It would have been primarily Karen Manning
25  and Eric Pleskow.

1  Q  Have you ever had any discussions with Mr.
2  Corp about the topics discussed at this meeting?
3       MR. NUGENT:  Objection to form.
4       THE WITNESS:  I have a vague recollection
5  that Mr. Corp was involved in conference calls between
6  BryLin and Heller where the HUD financing was talked
7  about generally.  I don't have any specific
8  recollection of dates or the actual topics because he
9  was not a key element to our relationship with BryLin.
10  My focus was BryLin, and he was involved in the
11  refinance effort, which was important to BryLin, but
12  it wasn't that key to Heller.
13       BY MR. YOUNG:
14  Q  Okay.  What did you understand Mr. Corp's
15  role to be as it pertains to this HUD-insured loan
16  that's referenced on Exhibit 90?
17  A  My recollection is that he was like an
18  underwriter.  He asked questions along the lines of an
19  underwriter.  I would assume that that was his role.
20  Q  And you said that you had a recollection of
21  conference calls involving Mr. Corp, is that right?
22  A  That Mr. Corp was a participant of.
23  Q  Can you tell me to the best of your
24  recollection when these calls occurred?
25  A  They would have definitely been prior to

1   June of 2001, but, no, I couldn't be more specific
2   than that.
3         Q    Do you know how many conference calls you
4   participated in in which Mr. Corp also participated?
5         A    My recollection is very few.  There weren't
6   a lot of calls that he would have been involved on.
7   Again, it's a vague recollection.  Possibly two or
8   three would have been the maximum.
9         Q    Was it more than one?
10        A    It was definitely more than one.
11        Q    Was it less than 10?
12        A    Way less than 10.  I think it was in the
13  range of two.
14        Q    All right.  And can you tell us what you
15  remember about what you discussed on these conference
16  calls in which you and Mr. Corp were participants?
17        A    Again, I don't have a strong recollection of
18  any one specific call.  The tenor of the calls was
19  always pretty much along the lines of this type of a
20  meeting where the borrower is requesting for Heller to
21  readvance up and them trying to convince us that this
22  is something that is, one, more money; two, it's not
23  out of the ordinary course for a lender to do that;
24  and, three, they were going to use these proceeds to
25  do these various repairs and the payments to vendors

32

1   and the like and could Heller please help was the type

2   of continual conversations we had over multiple

3   months, probably starting around March and continuing

4   right into May.

5        Q    And what did you say on these calls?

6        A    Again, we were open to a dialogue. We

7   weren't trying to be a problem, but we were not

8   comfortable with winding back up to a problem debtor.

9   We just weren't happy with the risk of lending to

10  these guys. We were concerned. You know, it's

11  difficult for a lender who has had money converted to

12  continuing that relationship, let alone add risk to

13  that relationship, and that was the battle we were

14  internally dealing with was that tension between

15  trying to help out a borrower and yet knowing that

16  we've already gotten burned in this situation, and we

17  really have a problem here.

18       Q    Okay. Is it fair or accurate to say that

19  Heller was reluctant to extend additional credit to

20  BryLin?

21            MR. NUGENT:  Objection to form.

22            THE WITNESS:  I think "reluctant" would be a

23  good adjective.

24            BY MR. YOUNG:

25       Q    Okay. On these conference calls that we

Heritage Reporting Corporation
(202) 628-4888

33

1    have discussed in which you were a participant and Mr.

2    Corp was a participant among other people, did you

3    express this reluctance during the conversation?

4    A   Again, I want to be clear that I cannot

5    recall exactly when Mr. Corp would have been on the

6    phone and not been on the phone, but the tenor of the

7    conversations with the borrower would have always been

8    frank and open. We were never ambiguous about our

9    concern about lending them more money, and expressly

10    we were always telling them, "This is the amount of

11    your loan balance with us. Go and do your deal."

12    Q   Do you know why Mr. Corp -- what his role

13    was for participating in conference calls?

14    MR. NUGENT:  Objection to form.

15    THE WITNESS:  My recollection was the very

16    first introduction with him was through Karen, and

17    that is when she introduced him and the role that he

18    would play. Other than that, no.

19    MR. GORDIN:  May I ask a clarifying

20    question?

21    MR. YOUNG:  Sure.

22    MR. GORDIN:  By "Karen," you mean the person

23    you referred to in the --

24    THE WITNESS:  Karen Manning.

25    //

1        BY MR. YOUNG:

2    Q    What reason would you have in the course of
3  your duties with Heller to talk with Mr. Corp?

4    A    None.

5        MR. NUGENT: Objection.

6        BY MR. YOUNG:

7    Q    Okay. And he was on some of these
8  conference calls, correct?

9    A    Yes.

10    Q    Okay. You said he was on at least two or
11  three of these conference calls, is that correct, or
12  approximately two or three?

13    A    To the best of my recollection, yes.

14    Q    Okay. Can you think of any topic that you
15  would have discussed in these two or three conference
16  calls that we're talking about other than BryLin's
17  relationship with Heller?

18    A    It would have been BryLin's relationship
19  with Heller vis-à-vis this HUD refinancing. That was
20  the purpose of those calls. We were having weekly
21  reports from BryLin to Heller in terms of the status,
22  especially as we got closer to the eventual closing,
23  but we were receiving written reports as well as
24  weekly conference calls, and it's on those conference
25  calls that my recollection is Mr. Corp was involved in

1    a couple of those.

2    Q    Okay.  Did you say earlier you don't recall
3    specifically which calls Mr. Corp was involved in?  Is
4    that correct?

5    A    That is correct.  It's been a few years.

6    Q    Okay.  Is it your testimony, though, that
7    you believe on those conference calls in which Mr.
8    Corp was a participant that you expressed Heller's
9    reluctance to extend additional credit to BryLin?

10        MR. NUGENT:  Objection to form.

11        THE WITNESS:  I believe that would have been
12   clearly signaled to Mr. Corp and to Continental and to
13   the borrower.

14        BY MR. YOUNG:

15   Q    Okay.  Since there is an objection, let's
16   phrase it differently.  Do you believe that you
17   signaled to Mr. Corp Heller's reluctance to extend
18   additional credit to BryLin?

19        MR. NUGENT:  Objection.

20        THE WITNESS:  Yes.

21        BY MR. YOUNG:

22   Q    Okay.  What is your basis for that
23   statement?

24   A    Our conversation to the borrower throughout
25   the course of dealing with them through these

1    forbearance agreements was just that, and that
2    communication was frank and open not only with the
3    borrower but also with any other party that they were
4    involved with, including Continental and including two
5    previous third parties who had come in attempting to
6    either acquire the hospital or to purchase the
7    hospital through a bankruptcy proceeding.
8               In each of those incidences, Heller always
9    clearly stated its reluctance to continue in any way
10   with this borrower or successor entities and that we
11   were in a declining relationship, as expressed in the
12   forbearance agreement and the amortization schedules
13   that we required.
14        Q    Is it accurate to say then that you
15   expressed this reluctance to Mr. Corp?
16             MR. NUGENT:  Objection to form.
17             THE WITNESS:  I would say it would be
18   accurate, yes.
19             MR. YOUNG:  Okay.  I'm going to show you
20   what we'll mark for identification as Exhibit 98, and
21   this has Bates number D02761.  It's a communication, a
22   fax, from Karen Manning to Bob Corp, dated January 4,
23   2001.
24   //
25   //