1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2    ---------------------------------

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5        vs.                    CIVIL ACTION NO.

6    ROBERT CORP,               1:08-CV-00333-JTC

7                    Defendant.

8    ---------------------------------

9              Proceedings in the above-entitled
     action were held pursuant to notice on
10   January 13, 2009 at the Offices of the
     United States Attorney, Syracuse, New York.

11

12

13   TESTIMONY OF:   ROBERT CORP

14

15

     APPEARANCES:    BRIAN R. YOUNG, ESQ.
16                   Office of the United States Attorney
                     U.S. Department of Justice
17                   601D Street, Room 9147
                     Washington,  D.C.  20004
18
     ALSO PRESENT:   KENNETH R. MASSMAN, ESQ.
19                   STACIE WILSON

20
                     GABRIEL M. NUGENT, ESQ.
21                   ELLEN KIMATIAN EAGEN
                     Attorneys for Plaintiff
22                   Hiscock & Barclay
                     300 South State Street
23                   Syracuse, New York

24

25   REPORTED BY:
     SUSAN M. BYRNE

SUSAN M. BYRNE
(315) 243-7560

EXHIBIT
SJ 6

1      Capmark Finance, in May of '06, was GMAC Commercial

2      Mortgage.  So I was with them from August of 2000 --

3      I am sorry -- August of 2004.  Prior to that point, I

4      was a principal in Continental Securities, LLC, a

5      mortgage banking firm here in Syracuse, going

6      backwards until December of 2000.

7           From December of 2000 until June of 1990, I was

8      a principal at Continental Securities Corporation.

9      Going backwards from 1990 to 1986, I was an employee

10     of Continental Securities Corporation.  And prior to

11     that, from 1980 to 1986, I worked for Ernst and

12     Whinney, now known as Ernst and Young, a CPA firm.

13  Q  Does Continental Securities exist any more?

14  A  No.

15  Q  What happened to Continental?

16  A  Well, two things happened to Continental.  In

17     December of 2000, we sold our servicing portfolio to

18     GMAC Commercial Mortgage and reconstituted from a

19     corporation to an LLC.  And then in August of 2004,

20     the LLC sold its remaining assets to GMAC Commercial

21     Mortgage, and we became employees.

22  Q  Prior to the date at which Continental sold its

23     portfolio to GMAC, was there any sort of business

24     relationships between GMAC and Continental?

25  A  No.

```
1    Q   Did Continental originate loans and sell them to
2        GMAC?
3                MR. NUGENT:  Object to the form.
4    Q   Is that accurate to say?
5                MR. NUGENT:  You can answer.  I just
6            lodged an objection.
7    A   After December 31st, 2000, yes, we originated loans
8        and sold them to GMAC.
9    Q   What about before December?
10   A   We originated loans and maintained them in our own
11       portfolio.
12   Q   I understand.  Have you ever been listed as a
13       Defendant or a Plaintiff in any other lawsuits?
14   A   No.
15   Q   Did you review any documents in preparation for your
16       testimony today?
17   A   Yes.
18   Q   Which documents did you review?
19   A   The documents that were in my files.
20   Q   And are those documents that pertained to the Brylin
21       loan?
22   A   Yes.
23   Q   Is it your Brylin file, is that accurate to say?
24   A   Yes.
25   Q   Okay.  Did you review any documents -- do you know if
```

1      those documents were produced to the United States as

2      part of discovery?

3  A   Yes.

4  Q   Do you know if you reviewed any documents which

5      haven't been produced to the United States?

6  A   No.

7  Q   Are you familiar with HUD's MAP program?

8  A   Yes.

9  Q   What is HUD's MAP program?

10 A   MAP stands for Multifamily Accelerated Processing.

11     It is a mechanism to alleviate the direct processing

12     responsibilities of an application from HUD and puts

13     them on the lender level.

14 Q   Were you a HUD approved MAP underwriter?

15 A   Yes.

16 Q   What's the approval process?  Could you describe

17     that, to become HUD approved as a MAP underwriter?

18 A   Primarily demonstrating to HUD your experience in the

19     multifamily business.

20 Q   Does HUD issue a certificate, or what's the approval

21     that HUD gives?

22 A   I believe it's a letter.

23 Q   Did your job responsibilities with Continental

24     involve the MAP program?

25 A   Yes.

1    Q   You do you have any general recollection?

2    A   Not that I can come up with.

3    Q   Mr. Corp, before I go on, I am going to, when I say

4        Brylin, I am including the entity, Linreal, in that

5        corporation.  Do you know what Linreal is?

6    A   Yes.

7    Q   If I refer to Brylin and Linreal as the same, will

8        that be a problem, or is that accurate?

9    A   That's fine.

10   Q   If at any point I say Brylin, and you think it's

11       important to differentiate between Brylin and

12       Linreal, will you tell me?

13   A   Yes.

14   Q   I am going to refer to HUD and the FHA, the Federal

15       Housing Administration, as HUD.  Is that okay if I do

16       that?

17   A   Yes.

18   Q   And if there is any distinction you want to draw

19       between HUD and the FHA, please let me know.

20           So what was your role or your job responsibility

21       in Brylin's HUD insured loan?

22   A   I was the originator, and I was the MAP underwriter.

23   Q   What were your responsibilities as the originator?

24   A   My responsibility as an originator is to originate

25       new business.

| | | |
|---|---|---|
| 1 | Q | What does that mean?  Could you elaborate on that? |
| 2 | A | To find entities or borrowers that need HUD financing |
| 3 | | and to provide them with that financing. |
| 4 | Q | Did you say you were the underwriter as well? |
| 5 | A | Correct. |
| 6 | Q | What are your responsibilities as an underwriter? |
| 7 | A | As a MAP underwriter, the responsibilities are to |
| 8 | | underwrite all aspects of the loan in preparation for |
| 9 | | submission to HUD. |
| 10 | Q | Could you elaborate on what it means to underwrite |
| 11 | | all aspects of the loan? |
| 12 | A | It would involve securing appraisals, market studies, |
| 13 | | engineering and inspection reports, operating and |
| 14 | | other information from the borrower, assembling all |
| 15 | | those documents together into an underwriting package |
| 16 | | and making a determination as to whether it should be |
| 17 | | submitted to HUD for their review. |
| 18 | Q | Do you make a determination whether the documents are |
| 19 | | supposed to be submitted to HUD for review? |
| 20 | A | Could you say that again? |
| 21 | Q | I think you said you made a determination whether or |
| 22 | | not the documents that were assembled should be |
| 23 | | submitted to HUD for review? |
| 24 | A | Whether the entire underwriting package should be |
| 25 | | submitted to HUD for their review. |

1    Q    How do you make that determination?

2    A    By following the underwriting guidelines and the MAP

3         guide.

4    Q    Do you have any responsibility towards HUD's -- let

5         me rephrase.  As the MAP underwriter, did you have

6         any responsibilities to HUD as a MAP underwriter?

7    A    Yes.

8    Q    What are your responsibilities towards HUD?

9    A    I don't know what the exact responsibilities are.

10        They are listed in the MAP guide.  I don't recall at

11        this time, but I am sure the responsibility includes

12        underwriting a good package and submitting a good

13        application to HUD.

14   Q    Did you have -- were you responsible for verifying

15        that the information in the underwriting package was

16        accurate?

17   A    To the extent necessary.

18   Q    What defines to the extent necessary?

19             MR. NUGENT:  Object to the form.

20   A    That would be different for different aspects of the

21        package.

22   Q    Well, what about with respect to representations

23        concerning Brylin Hospital's debt to other lenders?

24             MR. NUGENT:  Object to the form.

25   Q    What are your responsibilities under the MAP?

```
1    A   Yes.
2                    MR. YOUNG:  I will show you what we
3              will mark as Exhibit 15.  It has HUD's
4              Bates number HUD 0031.  It's an application
5              for a project mortgage insurance.
6                    (Exhibit 15 marked for identification)
7         BY MR. YOUNG:
8    Q   Mr. Corp, have you seen this document before?
9    A   Yes.
10   Q   Who prepared this document?
11   A   Somebody in my office.  I don't remember exactly who.
12   Q   Did you sign this document?
13   A   Yes.
14   Q   Is this an application to insure a loan in the amount
15       of $7,012,500?
16   A   Yes.
17   Q   How did you arrive at this figure, the $7,012,500
18       figure?  What does that represent?
19   A   It represents 85 percent of the appraised value.
20   Q   Appraised value of what, of Brylin Hospital?
21   A   Yes.
22   Q   How did you learn what the appraised value of Brylin
23       Hospital was?
24   A   The appraiser.
25   Q   Is the appraiser independently hired?  Do you hire an
```

1    independent appraisal service?

2       MR. NUGENT:  Object to the form.

3  A Yes.

4  Q Did you submit this document to HUD?

5  A Yes.

6       MR. YOUNG:  I will show you what we

7    have marked as Exhibit 16.  It's HUD Bates

8    number HUD 0039.  It's a Supplement to

9    Project Analysis.

10     (Exhibit 16 is marked for identification)

11  BY MR. YOUNG:

12  Q Mr. Corp, did you submit this document to HUD?

13  A Yes.

14  Q And please turn to page HUD's 0040.  Do you see the

15    representation that the existing indebtedness is

16    $5,746,546?

17  A Yes.

18  Q How did you arrive at that figure as the existing

19    indebtedness?

20  A From the information provided to me by Brylin.

21  Q Does that figure, this five million dollar figure,

22    include a debt owed to Heller Financial?

23  A Yes.

24  Q What does this document represent to HUD that that

25    debt is?

1   A   $1,350,000.

2   Q   At the time that you submitted this document, did you

3        know whether Heller's debt -- I am sorry, Brylin's

4        debt to Heller was in fact $1,350,000?

5   A   At this exact moment in time, no, I did not know.

6   Q   How did you know to write down $1,350,000 in that

7        space that represents the Heller debt?

8   A   Based on the information provided to me by Brylin.

9   Q   What information did Brylin provide to you that was

10       probative of debt to Heller?

11   A   A letter.

12   Q   Could you describe the letter?

13   A   It was a letter telling me that the debt was

14       $1,350,000.

15   Q   Did you ever speak to anybody at Brylin concerning

16       its debt to Heller?

17             MR. NUGENT:  Object to the form.

18             MR. YOUNG:  What's the objection?

19             MR. NUGENT:  Well, related to this, or

20       when?

21   BY MR. YOUNG:

22   Q   Well, before submitting this document, did you ever

23       speak to anybody at Heller?  I am sorry, let me

24       rephrase.  Before submitting this document, did you

25       ever speak to anybody at Brylin about Brylin's debt

1        MR. YOUNG:  I will show you what we

2        will mark as Exhibit 17.  This is a letter

3        dated January 31st, 2001, addressed to

4        Robert Corp.

5        MR. NUGENT:  Do you want to read the

6        page?

7        MR. YOUNG:  I'm sorry.  The Bates

8        number is HUD 0043.

9        MR. NUGENT:  There is two Bates ranges

10       on this document.  I don't know why that

11       is.

12       MR. YOUNG:  On the record, it also has

13       HUD 01410 and HUD Bates range 0043.

14            (Exhibit 17 marked for identification)

15   BY MR. YOUNG:

16   Q   Mr. Corp, do you recall seeing this letter?

17   A   Yes.

18   Q   Did you have any discussions with anybody at Brylin

19       about this letter?

20   A   I don't recall.

21   Q   Do you see where it represents additional

22       indebtedness to Heller Financial?

23   A   Yes.

24   Q   And it says, $1,350,000; is that correct?

25   A   That's what it says.

1    Q    Do you know how Mr. Pleskow arrived at this figure of

2         $1,350,000?

3                   MR. NUGENT:   Object to the form.

4    A    No.

5    Q    Did you ever have any discussions with Mr. Pleskow

6         about whether Brylin was in debt to Heller in the

7         amount of $1,350,000?

8    A    No.

9    Q    What about Ms. Manny, did you ever have any

10        discussions with Ms. Manny about whether Brylin was

11        in debt to Heller in the amount of $1,350,000?

12                  MR. NUGENT:   Object to the form.

13   A    I don't recall.

14   Q    Did you request this letter from Mr. Pleskow?

15   A    I requested it from Brylin.

16   Q    Okay, and what was your request?

17   A    To provide me information on the total existing

18        indebtedness that was going to be refinanced by the

19        new loan.

20   Q    Did you play a role in drafting this letter?

21   A    No.

22   Q    Did you review this letter before Mr. Pleskow signed

23        it?

24   A    I don't recall, I think no.

25   Q    Did you submit this letter to HUD?

1     A   Yes.

2     Q   Do you recall having any conversations with anybody

3         which pertained to this letter, Exhibit 17?

4                MR. NUGENT:  Pre-authoring?

5     BY MR. YOUNG:

6     Q   Let's start with pre-authoring.

7     A   No.

8     Q   What about post?

9     A   I don't think so.  I don't remember.

10             MR. YOUNG:  I will show you a document

11        that has HUD Bates range 0045.  It's a

12        Supplement to Project Analysis, and we will

13        mark it as Exhibit 18.

14           (Exhibit 18 marked for identification)

15     Q   Mr. Corp, can you go back for a second?  Before we go

16         to Exhibit 18, can we go back to 17 for a second?

17         Was this letter the basis for your representation

18         concerning the Heller debt in the Supplement to

19         Project Analysis?

20     A   Yes.

21     Q   All right.  In other words, is it accurate to say

22         that you relied on this letter in creating the

23         Supplement to Project Analysis?

24     A   Yes.

25     Q   Did you rely on any other information that you had

1   concerning Brylin's debt to Heller in creating the

2   Supplement to Project Analysis?

3 A No.

4 Q Well, turning your attention back to Exhibit 18, do

5   you recognize this document?

6 A Yes.

7 Q Did you sign this document?

8 A I believe it was signed for me.

9 Q Okay.  By whom?

10 A I don't recall.  Probably somebody in my office.

11 Q Did you authorize that person to sign the document on

12   your behalf?

13 A Yes.

14 Q Did you submit this document to HUD?

15 A At their request, yes.

16 Q I am sorry, was that at HUD's request?

17 A Correct.

18 Q What was the purpose of this document?

19 A It was an Amendment to the original Supplement to

20   Project Analysis that was included in our

21   application.

22 Q Why was it necessary to make an amendment?

23 A Because HUD instructed us to.

24 Q I will direct you to page HUD 0046.  Once again we

25   see that the existing indebtedness is represented as

```
 1            $5,746,546.  How did you arrive at that number?

 2    A    It's the same number that was on the previous form.

 3    Q    Did you obtain any additional information in between

 4         this form and the previous form?

 5    A    No.

 6    Q    Did you seek any additional information from Brylin

 7         concerning Heller's indebtedness?  I am sorry, let

 8         me rephrase that.  Did you seek any additional

 9         information from Brylin concerning the Heller debt

10         in between this form, which is Exhibit 18, and the

11         previous form?

12                   MR. NUGENT:  Object to the form.

13    A    No.

14    Q    Did you believe that -- and Exhibit 17 is dated --

15         the Supplement to Project Analysis is dated February

16         15th, 2001; is that correct?

17    A    Yes.

18    Q    And the amendment which is Exhibit 18 is dated April

19         23rd, 2001; is that correct?

20    A    Yes.

21    Q    All right.  And the debt to Heller is represented on

22         both of these forms as $1,350,000; is that correct?

23    A    Yes.

24    Q    All right.  Did you believe that the debt, that

25         Brylin's debt to Heller did not change between
```

1     February 2001 and April 23rd, 2001 when you submitted

2     the Amended form?

3              MR. NUGENT:  Object to the form of the

4         question.

5  A   I had no idea what the balance of the Heller debt did

6     between these two dates.

7  Q   Did you ask Brylin?

8  A   No.

9  Q   Did you ask Brylin whether they were making any

10     payments on the debt?

11  A   No.  Can I elaborate at all on this?

12              MR. YOUNG:  Please.

13              MR. NUGENT:  Sure.

14  A   The only reason this form exists is because HUD asked

15     us to make some changes to repairs, and that's it.

16     It had nothing to do with any other numbers.  HUD

17     requested us to move some figures between the repair

18     line item and the initial deposit to replacement

19     reserve line item and asked us to amend the form to

20     reflect their requested changes.  That's the only

21     reason we did that April form.

22  Q   Did you ask anybody at Brylin whether Brylin's debt

23     to Heller had remained constant since January of

24     2001?

25              MR. NUGENT:  Object to the form.

1          MR. YOUNG:  What's the objection?

2          MR. NUGENT:  You asked it three times,

3      and I am not sure what the time frame is.

4      Again, I think you are probably linking it

5      to this document, but you didn't say that

6      in the question.

7          MR. YOUNG:  I guess we can rephrase it

8      and ask it a fourth time.

9  BY MR. YOUNG:

10  Q   Did you think that Brylin's debt to Heller remained

11      constant between January of 2001 and April of 2001?

12          MR. NUGENT:  Object to the form.

13  A   I did not know.

14          MR. YOUNG:  I will show you what we

15      will mark as Exhibit 19.  It has HUD Bates

16      range HUD 0053.  It's a letter dated May

17      21st, 2001 to Diane Rosinski.

18          (Exhibit 19 marked for identification)

19  Q   Mr. Corp, do you recognize this letter?

20  A   Yes.

21  Q   Did you author this letter?

22  A   Yes.

23  Q   I will direct your attention to the last paragraph of

24      page HUD 0053.  It says, enclosed is a Form 2205-A

25      with all documentation except for the Heller

```
 1        Financial existing indebtedness.  I expect to have

 2        that letter in the next day or two, and when I do, I

 3        will have the Cost Certification completed and sent

 4        to you, along with that letter.  Why did you not

 5        include the Heller debt in the Cost Certification

 6        attached to this letter?

 7   A    Because I didn't have any information on it at this

 8        time.

 9   Q    And who was -- who did you seek the information from?

10   A    Karen Manny at the facility.

11   Q    Did you ask Karen Manny to provide you with

12        information about Brylin's indebtedness to Heller?

13   A    Yes.

14   Q    What did Ms. Manny tell you?

15             MR. NUGENT:  Object to the form.

16   A    That she was attempting to get the information from

17        Heller.

18   Q    Did Ms. Manny express to you she was having trouble

19        obtaining that information from Heller?

20   A    I don't recall.

21   Q    Did you have any other conversations, can you recall

22        anything else about your conversation with Ms. Manny

23        concerning information on the Heller Debt as it's

24        referenced in this letter?

25             MR. NUGENT:  Object to the form.
```

```
 1    A   I don't recall.

 2    Q   Did you ask Ms. Manny to provide you with information

 3        on the Heller debt?

 4            MR. NUGENT:  Object to the form.

 5    A   I don't recall specifically, but I was working with

 6        her on getting documents that we needed.

 7    Q   Did Ms. Manny explain to you why she did not provide

 8        you with information in the information you had

 9        sought pertaining to the Heller debt?

10    A   No.

11    Q   Did you ask Ms. Manny why she was unable to provide

12        you with the information that you needed?

13            MR. NUGENT:  Object to form.

14    A   No.

15    Q   I will read again from the paragraph.  It says:  I

16        expect to have that letter in the next day or two,

17        and when I do, I will have the Cost Certification

18        completed and sent to you, along with that letter.

19        Could you tell us what the phrase, that letter,

20        refers to?

21    A   A letter detailing the amount due do Heller.

22    Q   A letter from whom?

23    A   From Heller or from Brylin.

24    Q   Did you have any discussions with anybody at Brylin

25        about obtaining a letter which set forth the Heller
```

1      debt?

2   A   I believe I gave her, Karen, a suggested form of what

3      the letter from Heller could look like.

4   Q   Do you know what she did with the form?

5   A   I do not know.

6   Q   Why did you give her a suggested form?  What was the

7      point of that?

8   A   To assist her in getting a letter.

9   Q   Do you know whether Ms. Manny ever obtained a letter

10      from Heller?  Let me rephrase that.  Do you know

11      whether Ms. Manny ever obtained a payoff letter from

12      Heller?

13   A   In the form I suggested, I do not believe so, but I

14      don't know.

15   Q   Do you know whether Ms. Manny ever made any attempt

16      to obtain from Heller a payoff letter in the form

17      that you suggested?

18   A   I don't know.

19   Q   Did you ever ask Ms. Manny whether she had made any

20      effort to obtain from Heller a payoff letter in the

21      form that you suggested?

22   A   I don't recall.

23   Q   So you provided Ms. Manny with a draft payoff letter;

24      is that correct?

25   A   A form.

1    Q    And you never saw a letter from Heller that was in

2         that form; is that right?

3    A    That's correct.

4    Q    Did you ask Ms. Manny what happened?

5              MR. NUGENT:  Object to the form.

6    A    I don't recall.

7    Q    Did you have any conversation with anybody, Ms. Manny

8         or anybody else, which would pertain to a payoff

9         letter from Heller?

10             MR. NUGENT:  Object to the form.

11   A    When?

12   Q    At any point.

13             MR. NUGENT:  I will maintain the

14        objection.

15   A    To the form of the payoff?  Could you rephrase or

16        repeat the question?

17   Q    Have you ever had any conversations with anybody

18        which pertained to the form of a payoff letter

19        provided by Heller?

20   A    Yes.  I gave Karen a suggested form.

21             MR. NUGENT:  Could we take a break?

22        We have been going for more than an hour.

23             MR. YOUNG:  Can I just finish this

24        line?

25             MR. NUGENT:  How long?  How many

1            questions?

2                    MR. YOUNG:  Give me three more.

3                    MR. NUGENT:  Okay.

4        BY MR. YOUNG:

5    Q   Any conversations other than Ms. Manny?

6    A   I don't recall.

7                    MR. YOUNG:  That's fine.

8                    (Recess)

9        BY MR. YOUNG:

10   Q   Mr. Corp, before we went off the record, I think you

11       said that you had provided to Karen Manny a draft

12       payoff letter.  Was that accurate?

13   A   A form payoff letter.

14   Q   I am sorry, a form payoff letter.

15                   MR. YOUNG:  I will show you what we

16           have Bates numbered as D03923.  It's a

17           document that says, Heller Letterhead, on

18           top.

19               MR. NUGENT:  We already marked it as

20           Exhibit 5 from yesterday.

21               MR. YOUNG:  I wasn't going to

22           reintroduce the same exhibits, just start

23           again.

24               MR. NUGENT:  Isn't that going to get

25           confusing?

```
 1              (Off-the-record discussion held)
 2              MR. YOUNG:  I am showing you what's
 3         been Bates numbered D03923.  It's a
 4         document that says Heller letterhead on
 5         top.  And we will mark it as Exhibit 20.
 6              (Exhibit 20 marked for identification)
 7    BY MR. YOUNG:
 8    Q    Mr. Corp, do you recognize this document?
 9    A    Yes.
10    Q    Is this the form payoff letter that you provided to
11         Ms. Manny?
12    A    Yes.
13    Q    And are you suggesting to Ms. Manny that the Heller
14         payoff letter come on Heller letterhead?
15              MR. NUGENT:  Object to the form.
16    A    Yes.
17              MR. YOUNG:  Okay.  I will ask it
18         another way then, if there is an objection.
19    BY MR. YOUNG:
20    Q    Why have you written Heller letterhead on the
21         heading?
22    A    Because it was my suggested or suggested form of
23         payoff letter from Heller.
24    Q    Why do you suggest that the letter should come from
25         Heller?
```

1   A   Because that's usually the easiest way to get a

2       payoff number.

3   Q   Why is the easiest way to get a payoff number?

4   A   Because they are the lender.

5   Q   Do you know whether Brylin was able to obtain a

6       payoff letter from Heller?

7   A   In this form?

8   Q   In any form.

9   A   In this form, I never saw one.  I saw a letter that

10      came in later in the month.

11              MR. NUGENT:  For the record, this form

12          has some handwriting and looks like black

13          magic marking on it as well, just for the

14          record.

15  BY MR. YOUNG:

16  Q   Do you know whether Brylin submitted to HUD a payoff

17      letter on Heller letterhead?

18  A   No.

19  Q   You don't know, or Brylin did not?

20  A   They did not.

21  Q   Did you ask Brylin or anybody at Brylin why they

22      didn't submit to HUD a payoff letter on Heller

23      letterhead?

24  A   Because they submitted one on their letterhead.

25  Q   Well, you had suggested, did you not, that Brylin

1       submit a letter on Heller letterhead?

2   A   I suggested, but didn't require.

3   Q   I understand.  And it appears that Brylin did not

4       follow your advice; is that correct?

5               MR. NUGENT:  Object to the form.

6   A   Correct.

7   Q   Stated another way, it appears that Brylin submitted

8       a letter on Brylin letterhead; is that correct?

9   A   Correct.

10  Q   And did you have any discussions with anybody at

11      Brylin about why they submitted the payoff letter on

12      Brylin letterhead, as opposed to Heller letterhead,

13      which you had suggested?

14  A   I don't recall specific discussions.

15  Q   Do you recall any general discussions?

16  A   I don't recall general discussions.

17  Q   Were you curious as to why they didn't, why Brylin

18      didn't adhere to your form letter?

19              MR. NUGENT:  Object to the form.  Is

20          he curious?  The time frame, and I don't

21          know what you mean by curious.

22  BY MR. YOUNG:

23  Q   Did you wonder, in June of 2001, did you wonder why

24      Brylin didn't submit a payoff letter on Heller

25      letterhead, as you suggested?

1               MR. NUGENT:  Object to the form.

2    A   In June of 2001, no.

3    Q   At any point, did you wonder why Brylin didn't submit

4        a payoff letter on Heller letterhead?

5               MR. NUGENT:  I would caution the

6               witness, to the extent that this might

7               solicit attorney/client communications, if

8               you can answer without referring to

9               attorney communications, then you can

10              answer.

11                  (Court reporter reads the pending question)

12              MR. NUGENT:  Objection.  Maintain the

13              objection.

14   A   I am not sure how to answer that.

15   Q   What can I do to clarify my question for you?

16   A   At any time, did I wonder?

17              MS. EAGEN:  Counsel, if I can add, you

18              haven't established whether he is aware of

19              any payoff letter on Heller letterhead or

20              not.

21              MR. YOUNG:  I think we did.

22   BY MR. YOUNG:

23   Q   Do you know whether Brylin submitted to HUD or

24       anybody submitted to HUD a payoff letter on Brylin

25       letterhead?

1    A    To HUD, no.

2    Q    To whom did they submit a letter?

3    A    We got an unsigned draft by fax of a letter from

4         Heller in May.

5    Q    Okay.  And did Brylin submit any documentation to HUD

6         in support of the assurance that its debt to Heller

7         was 1.35 million?

8    A    Their letter.

9    Q    And whose letterhead was that letter on?

10   A    Brylin.

11   Q    When did you find out that Brylin was submitting a

12        letter on Brylin letterhead to HUD?

13   A    Whatever the date of that letter was.

14   Q    On the day of that letter, did you ask anybody at

15        Brylin why they were submitting a letter on Brylin

16        letterhead, as opposed to Heller letterhead, as you

17        had recommended?

18   A    No.

19   Q    On the date of that letter, did you have any

20        misgivings about Brylin submitting the letter on

21        Brylin letterhead, as opposed to Heller letterhead?

22             MR. NUGENT:  Object to the form.

23   A    No.

24   Q    So you took the time to provide Brylin with this form

25        letter, which is specifically on Heller letterhead,

1 and Brylin did not adopt your advice, and you never

2 thought twice about that?

3    MR. NUGENT:  Object to the form.

4 Q Is that correct?

5 A That's correct.

6    MR. NUGENT:  I want to consult with my

7    client about an issue about attorney/client

8    privilege.

9    (Off-the-record discussion held)

10    (Time:  11:07 - 11:10)

11    MR. YOUNG:  Mr. Corp, I will show you

12    a document beginning HUD Bates range HUD

13    0060.  It's a Telecopier cover letter dated

14    May 30th 2001 to Kim Carmichael from Trish

15    Maloney, and we will mark it as Exhibit 21.

16    MR. NUGENT:  This was -- Exhibit 20

17    was Exhibit 5 from yesterday.  Exhibit 21,

18    formerly known as Exhibit 6.

19    (Exhibit 21 marked for identification)

20 BY MR. YOUNG:

21 Q Mr. Corp, have you had a chance to review, do you

22  recognize what this is?

23 A Yes.

24 Q Mr. Corp, who is Trish Maloney?

25 A She was my partner in Continental.

1      BY MR. YOUNG:

2   Q   The completed form before it was sent to HUD?

3   A   I do not recall.

4   Q   So you don't know one way or the other whether you

5       reviewed this completed form before it was sent to

6       HUD.  Is that accurate?

7   A   I don't remember if I looked at the completed form

8       before it went to HUD.  In all likelihood, I did not.

9   Q   All right.  Do you recall viewing this completed

10      form, Exhibit 21, after it was sent to HUD?

11  A   The only time I probably would have seen it would

12      have been at the closing table, as closing documents

13      were being passed.

14  Q   Did you know at the closing that Brylin was

15      representing to HUD that the Heller debt stood at

16      $1,350,000?

17  A   I could see that from the closing documents at the

18      closing table.

19  Q   And you viewed that at the closing table?

20  A   I probably did, but I don't recall specifically

21      seeing it, but it's a closing checklist item.

22  Q   Is it your practice to review closing checklist items

23      at the closing table?

24  A   No.

25  Q   Could you go to page HUD 0061, which is part of

```
 1              D02699.  It's dated January 30th, 2001, and

 2              it's a telecopier cover letter from

 3              Continental Securities, and we will mark it

 4              as Exhibit 22.

 5                   (Exhibit 22 marked for identification)

 6         BY MR. YOUNG:

 7    Q    Mr. Corp, do you recognize this as an e-mail to you

 8         from Karen Manny?

 9    A    Yes.

10    Q    Okay.  Could I direct your attention to the final

11         page, which is D 02701.  It's the third from bottom

12         paragraph.  It says:  Bob, thanks so much for

13         speaking with Mike Gardullo at Heller.  We appreciate

14         your time and efforts.  Do you know what Ms. Manny is

15         referring to here in this conversation?

16    A    No.

17    Q    Do you know if she is referring to the conference

18         call that we talked about a couple minutes ago?

19    A    I don't know.

20              MR. YOUNG:  Mr. Corp, I am going to

21              show you a document with Bates range

22              D 02761.  It's a Brylin Hospitals fax

23              transmittal dated January 4th, 2001.  And

24              we will mark it as Exhibit 23.

25                   (Exhibit 23 marked for identification)
```

1        BY MR. YOUNG:

2    Q   Mr. Corp, do you recognize this as a communication to

3        you from Karen Manny?

4    A   Yes.

5    Q   I would like to direct your attention to the subject

6        language, specifically, the sentence says:  As you

7        know, Heller is anxious and concerned, which is

8        affecting our day-to-day relationship with them.  Do

9        you recall what Ms. Manny is referring to about

10       Heller being anxious and concerned?

11               MR. YOUNG:  Object to the form.

12   A   I don't recall.

13   Q   What do you think she is referring to?

14               MR. NUGENT:  Object to the form.

15   A   What do I think she is referring to?

16   Q   As you sit here today?

17   A   I think she is referring to the relationship between

18       Heller and Brylin, which may not have been the

19       greatest, and she is concerned with continuing to get

20       cash from their accounts receivable working capital

21       line.

22   Q   Why do you say that the relationship between Heller

23       and Brylin might not have been the greatest?

24   A   Based on reading this.

25   Q   What facts are you aware of which would lead you to

1    the conclusion that the relationship may not have

2    been the greatest?

3  A  Heller is anxious and concerned, which is affecting

4    our day-to-day relationship with them.

5              MR. NUGENT:   Note the witness was

6          referencing the Exhibit 23.

7  A  The subject line.

8  Q  Do you know whether Heller was concerned it would not

9    be paid back its money from Brylin?

10 A  I don't remember.

11 Q  Did you have any conversations with anybody at Brylin

12    over whether Heller -- whether Brylin might default

13    on the Heller loan?

14 A  Default on the Heller loan?  I don't recall any

15    conversations like that.

16 Q  What about any conversations pertaining to whether

17    Brylin might miss payments on the Heller loan?

18 A  I don't recall any discussions like that.

19 Q  What did you do with this, this fax, after you

20    received it?

21 A  I don't recall.

22 Q  Do you recall what this fax references -- well, did

23    you ask Karen Manny, what do you mean by anxious and

24    concerned?

25 A  I don't recall asking her.

1   Q  Do you remember being alarmed by the fax?

2   A  No.

3   Q  You don't remember, or you weren't alarmed?

4   A  I don't remember being alarmed.

5   Q  So if you weren't alarmed, does that mean you were

6      not surprised to hear that Heller was anxious and

7      concerned?

8           MR. NUGENT:  Object to the form.

9   A  Restate that question.

10  Q  I think you said you weren't alarmed when you

11     received this fax; is that correct?

12  A  That's correct.

13  Q  And is it accurate to say that you weren't alarmed

14     because you were already aware that Heller was

15     anxious and concerned?

16         MR. NUGENT:  Object to the form.

17  A  I wasn't alarmed.  I don't recall the background or

18     basis behind it, but I wasn't alarmed at it.

19  Q  Do you know why Karen Manny would send you a fax with

20     this communication for what appears to be

21     insignificant information?

22         MR. NUGENT:  Object to the form.

23  A  She was asking me to call Mike Gardullo at Heller, as

24     it says here, to give them a comfort level on the

25     viability of the Brylin HUD application, to give them

1    A    No.

2    Q    Are you aware of an escrow arrangement between Heller

3         and -- let me rephrase that.  In February of 2001,

4         were you aware that Brylin and Heller were

5         contemplating entering into an escrow arrangement?

6    A    No.

7    Q    Did you ever suggest to anybody prior to February of

8         2001 that Brylin and Heller enter into an escrow

9         arrangement?

10   A    No.

11             MR. YOUNG:  I will show you a document

12         with HUD Bates number HUD 00177.  It is a

13         TX Report.  It says TX Report, and Heller

14         Health Care on top.  And we will mark it

15         for identification as Exhibit 25.

16             MR. NUGENT:  For the record, this was

17         Exhibit 3 from Mr. Brennan's deposition.

18             (Exhibit 25 marked for identification)

19   BY MR. YOUNG:

20   Q    Mr. Corp, do you recognize this document?

21   A    Yes.

22   Q    And did you receive this document on -- was it May

23        22nd, 2001?

24   A    I don't recall, but I certainly must have.

25   Q    Do you remember seeing this document before the

1      closing of the Brylin loan?

2  A  Yes.

3  Q  Do you see the line at the bottom that says, draft

4      payoff letter?

5  A  Uh-huh.

6  Q  What is a payoff letter?

7  A  A letter stating how to pay off a loan.

8  Q  Okay, what's the purpose of a payoff letter?

9  A  To summarize how to pay off a loan.

10  Q  Is it to summarize what the balance is on the loan?

11  A  Sure.

12  Q  And were you reviewing draft payoff letters, did you

13      review a draft payoff letter from Heller before the

14      Brylin loan closed?

15           MR. NUGENT:  Object to the form.

16  A  This is the first communication that I had seen from

17      Heller.

18  Q  Did you ask Heller to provide you with a draft payoff

19      letter?

20  A  I did not ask Heller to provide anything.

21  Q  Do you know whether anybody asked Heller to provide

22      you with a draft payoff letter?

23  A  I don't have direct knowledge of anybody asking that.

24  Q  Do you have indirect knowledge?

25  A  I don't have direct knowledge or indirect knowledge,

1       but we got a payoff letter, so somebody must have

2       asked them.

3   Q  Do you know why Heller sent you a payoff letter?

4   A  In anticipation of closing the new loan and paying

5       them off.

6   Q  Why did they send the letter to you, as opposed to

7       any of the other participants in the Brylin

8       transaction?

9   A  I don't know, probably because we were the new

10      lender.

11  Q  Were you involved in any negotiations with Heller

12      concerning the form of the payoff letter that they

13      were going to provide?

14            MR. NUGENT:  Object to the form.

15  A  No.

16  Q  Do you know whether there were negotiations between

17      Brylin and Heller pertaining to the form of the

18      Heller payoff letter?

19            MR. NUGENT:  Object to the form.

20  A  I don't know.

21  Q  What did you do with this document once you received

22      it?

23  A  I don't remember specifically when or in what manner,

24      but I contacted Brylin and informed them that if the

25      Heller payoff amount was as is stated in this letter,

```
 1            then the new HUD loan would be correspondingly

 2            reduced.

 3       Q    All right.  Did you advise anybody at HUD that you

 4            had received this letter from Brylin?  I am sorry,

 5            did you advise anyone from HUD that you had received

 6            this letter from Heller, this letter being

 7            Exhibit 25?

 8       A    No.

 9       Q    But in January of 2001, you had represented to HUD,

10            did you not, that Brylin's debt to Heller was

11            $1,350,000, correct?

12                 MR. NUGENT:  Object to the form.

13       A    Brylin represented their debt was $1,350,000.

14       Q    Did you sign that form, Exhibit Number 15?  I am

15            sorry, Exhibit Number 16?

16                 MR. NUGENT:  Dig it out.

17       A    I did, in reliance on the information I received from

18            Brylin.

19       Q    Did you transmit to HUD this exhibit?

20       A    Yes.

21       Q    Okay.  And then let's go back to Exhibit 25.  On May

22            22nd, 2001, you received this fax from Heller,

23            correct?

24       A    It has my name on it, so, yes.

25       Q    And can we go to page HUD 00179?  The second
```

paragraph says:  The payoff amount is approximately

$643,247.51.  Did you advise HUD that you received

the payoff letter from Heller in which Heller

represents the debt as less than 1.35 million?

       MR. NUGENT:  Object to the form.

A  No.

Q  Why did you not contact HUD?

A  It was a draft.  It wasn't a final document that had

to go anywhere yet.

Q  Did you think that this draft letter from Heller made

mistakes when it said that the Heller loan -- that

Brylin's balance was $643,000?

       MR. NUGENT:  Object to the form.

A  Did I think Heller made a mistake?

Q  Yes.

A  No, I didn't think Heller made a mistake.

Q  Heller is saying that the Brylin debt is $643,000,

aren't they?

A  They are.

Q  And you had represented to HUD or you had submitted

documentation which you signed and sent to HUD which

said that Brylin's debt to Heller was 1.35 million,

correct?

A  Three months earlier.

Q  And it never occurred to you, when you received this

letter, to contact HUD and say, hey, there has been a mistake?

        MR. NUGENT:   Is that a question?

        MR. YOUNG:   Yes.

        MR. NUGENT:   It was a statement.

    Object to the form.   We are not going to stand here with argumentative questions. If you want to do that, you can do it at trial.

       (Lunch recess)

BY MR. YOUNG:

Q   Mr. Corp, I think before we went off the record I had asked whether you alerted HUD to the fact that you received this letter from Heller representing the Brylin debt as $643,000, and I think you said no; is that correct?

A   That's correct.

Q   Do you know if anybody submitted this letter to HUD, this May 23rd letter, talking about Exhibit 25?

A   I don't know.   I am not aware of it going to HUD.

Q   In your experience doing these MAP loans, is it normal for a borrower to draft a payoff letter for a lender's signature?

       MR. NUGENT:   Object to the form.

A   Not unusual.

1       informed them that, with a lower amount due Brylin,

2       the HUD loan would be correspondingly lower.

3  Q  Did Brylin or anybody at Brylin say anything to you

4       about whether it was desirable for the HUD loan to be

5       reduced?

6  A  No, I don't recall any conversation like that.

7  Q  Did anybody from Brylin tell that you they planned to

8       have their debt to Heller increased to 1.35 million?

9  A  I don't recall a specific conversation or statement

10      to that fact, but at that point, John Brennan and

11      Karen Manny were working on that, and I wasn't

12      involved.

13  Q  Were you aware of any efforts on Brylin's part to

14      have their debt to Heller increased to 1.35 million

15      after receiving this letter, Exhibit 25?

16  A  As I just said, after I told Brylin their new loan

17      would be reduced based on that lower amount, Brylin

18      and John Brennan worked together on that.  What they

19      came up with to enable a new draw on the line of

20      credit, I was not involved in that effort.

21  Q  Did you have any awareness of that effort?

22  A  I was aware they were working on it, but I was not

23      involved in it.

24  Q  Did they -- did Mr. Brennan and Ms. Manny provide you

25      with any status reports?

```
 1                  MR. YOUNG:  I will show you a
 2           document.  I haven't found the Bates
 3           stamped version of it, but it's Exhibit 10
 4           to the Government Complaint.  It's a memo
 5           to Basil Elmer from Bob Corp dated May 7th,
 6           2001, and we will mark it for
 7           identification as Exhibit 28.  It's two
 8           pages.  It's a two-page document.  I know
 9           there is a Bates version somewhere.  This
10           is the one I had so . . .
11                  (Exhibit 28 marked for identification)
12      BY MR. YOUNG:
13      Q   Mr. Corp, do you recognize this document?
14      A   Yes.
15      Q   Did you author this memo?
16      A   Yes.
17      Q   And it's Basil Elmer, correct?
18      A   Correct.
19      Q   Why did you write this memo to Mr. Elmer?
20      A   In order to expedite the process of getting to
21          closing.
22      Q   I am going to read you the language on paragraph 2.
23          It says:  The firm commitment was processed with a
24          Heller Balance due of $1,350,000.  I need to know
25          what the payoff amount of that debt will be on May
```

```
 1        29th, 2001.

 2              What was the significance of May 29th, 2001?

 3    A   If you look at the first paragraph, that was the

 4        targeted closing date.

 5    Q   Did the loan in fact close on May 29th, 2001?

 6    A   It did not.

 7    Q   Do you know why the closing was delayed?

 8    A   I can't recall.  It's certainly not unusual for a

 9        closing to slip several days.

10              MR. YOUNG:  I will show you a document

11              with HUD 00173 on it.  It's a March 14th,

12              2001 letter to Michael Gardullo.  And we

13              will mark it for identification as

14              Exhibit 29.

15                 (Exhibit 29 marked for identification)

16                 (Off-the-record discussion held)

17    BY MR. YOUNG:

18    Q   Mr. Corp, have you seen this document before?

19    A   No.

20    Q   Is this the first time you have seen this document?

21    A   Yes.

22              MR. YOUNG:  Next I will show you a

23              document which has HUD Bates numbers 00248.

24              It's a facsimile transmission to Bob Corp

25              and Basil Elmer dated May 28th, 2001, and
```

1    Q   I will refer you back to Exhibit 31.  Is it accurate

2        to say that you never had any conversations about the

3        substance of this document with anybody before the

4        Brylin loan closed?

5    A   That is accurate.

6    Q   What was your role at the closing?

7    A   I really had no role at the closing.

8    Q   Did you sign documents at the closing?

9    A   I signed one document at the closing.

10   Q   What was that document?

11   A   That was an assignment of the firm commitment that

12       was issued to Continental.  It was assigned to GMAC

13       Commercial Mortgage.

14   Q   Could you explain to me in laymen's terms what effect

15       that signature had?

16   A   The firm commitment was issued to Continental

17       Securities to insure a loan that Continental

18       Securities may make.  We weren't going to make the

19       loan.  GMAC Commercial Mortgage was going to make the

20       loan, so we assigned our insurance rights to GMAC so

21       they could close the loan in their name.

22   Q   Would the loan have closed if you didn't sign that

23       document?

24   A   No.

25   Q   Can we go back to Exhibit 28 for a second?  That's

1    initial application, which was January of 2001 until

2    the closing, which was June of 2001; is that correct?

3            MR. NUGENT:  Object to the form.  Can

4        you read that back?

5            (Court reporter reads the pending question)

6            MR. NUGENT:  Did you mean that he had

7        no reason to believe it had changed, or no

8        reason to believe it had not changed?

9    BY MR. YOUNG:

10   Q   Let me back it up.  In the initial application, you

11       had signed a document that represented to HUD that

12       Heller's -- that Brylin's debt to Heller was

13       $1,350,000, correct?

14   A   Based on the information provided to me by Brylin,

15       correct.

16   Q   That was in January of 2001; correct?

17   A   That's correct.

18   Q   And at the closing, Brylin represented to HUD that

19       its debt to Heller was $1,350,000, correct?

20   A   Correct.

21   Q   And that was in June of 2001, correct?

22   A   Correct.

23   Q   So the debt as represented to Heller didn't change?

24       I'm sorry.  Strike that.  The debt as represented to

25       HUD did not change from January of 2001 to June of

1   2001; is that correct?

2           MR. NUGENT:  Object to the form.

3   A  I would phrase it by saying, the debt on January and

4      the debt in June were the same.  What it did in

5      between, I don't know.  As a line of credit, I would

6      expect it to change frequently.

7   Q  Did you take any steps to ascertain what the debt did

8      in between, as you said?

9           MR. NUGENT:  Object to the form.

10  A  No.

11  Q  Did you ever encourage Brylin to obtain from Heller

12     an advance which Brylin could use to pay its closing

13     costs on the loan?

14          MR. NUGENT:  Object to the form.

15  A  No.

16          MR. YOUNG:  I am going to show you a

17     document with HUD Bates number HUD 0035.

18     It says:  Brylin Hospitals Mortgage Credit

19     Analysis.  We will mark it for

20     identification as Exhibit 33.

21          (Exhibit 33 marked for identification)

22  BY MR. YOUNG:

23  Q  Did you author this document?

24  A  Yes.

25  Q  Could you direct your attention to page HUD 0038 and

1　　　　paragraph 11A?  It references paragraph 8.9E of the

2　　　　HUD MAP guide.  Do you know what is set forth in

3　　　　paragraph 8.9E of the MAP guide?

4　　A　If I looked at it, I would know.

5　　Q　Were you familiar with the contents of that paragraph

6　　　　when you signed this document in February of 2001?

7　　A　Yes.

8　　Q　I would like to take you back to the MAP guide, which

9　　　　is Exhibit 13.  Could you direct your attention

10　　　　specifically to page HUD 0013, which is under

11　　　　paragraph 8 of the MAP guide?  Could you go down to

12　　　　number 4, which says -- I will direct your attention

13　　　　to paragraph 4.  It says:  Do not recognize

14　　　　indebtedness:  A.  Recently placed against the

15　　　　project to increase the mortgage or circumvent

16　　　　program intent.  Could you tell me what your

17　　　　understanding of this provision is, Mr. Corp?

18　　A　My understanding of this provision is that HUD will

19　　　　not allow as eligible indebtedness to be refinanced

20　　　　recently incurred indebtedness on a facility or

21　　　　project.

22　　Q　What do you understand the phrase, recently incurred,

23　　　　to mean?

24　　A　My interpretation of recently incurred indebtedness

25　　　　is a new loan instrument signed by or recorded

```
1          they your files personally, or did they belong to

2          Continental Securities?

3     A    Company files.

4     Q    Now, you also -- there was testimony in questioning

5          about receipt of a letter from Heller on May 22nd or

6          May 23rd in which there showed a debt number in

7          brackets that was less than 1.35 million, referencing

8          the Heller debt.  Do you recall that document?

9     A    Yes.

10    Q    And I believe you also testified that upon receiving

11         that, you advised Ms. Manny that the HUD loan would

12         have to be reduced if that was the amount of the

13         debt, but thereafter, your efforts with respect to

14         Heller ceased; is that correct?

15    A    That's correct.

16    Q    And I think you also testified that Mr. Brennan was

17         involved with discussions with Heller from that point

18         on?

19    A    That's correct.

20    Q    Did you have any discussions with Mr. Brennan about

21         the results of his efforts with respect to Heller?

22    A    As we got to closing, when the closing was scheduled,

23         Mr. Brennan informed us that everything was set and

24         everything was okay.

25    Q    And did that include any issues related to Heller at
```