| UPPLEMENT TO PROJECT ANALYSIS | U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT OFFICE OF HOUSING | |
|---|---|---|
| ECTION/TITLE:    232/223(f) | | PROCESSING STAGE:   Firm |

UBLIC REPORTING BURDEN FOR THIS PROJECT ANALYSIS IS ESTIMATED TO AVERAGE 16 HOURS PER RESPONSE, INCLUDING THE TIME FOR REVIEWING NSTRUCTIONS, SEARCHING EXISTING DATA SOURCES, GATHERING AND MAINTAINING THE DATA NEEDED, AND COMPLETING AND REVIEWING THE OLLECTION OF INFORMATION.  SEND COMMENTS REGARDING THIS BURDEN ESTIMATE OR ANY OTHER ASPECT OF THIS COLLECTION OF INFORMATION, NCLUDING SUGGESTIONS FOR REDUCING THIS BURDEN, TO THE REPORTS MANAGEMENT OFFICER, OFFICE OF INFORMATION POLICIES AND YSTEMS, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, WASHINGTON, D.C.  20410-3600 AND TO THE OFFICE OF MANAGEMENT AND TO THE FFICE OF MANAGEMENT AND BUDGET, PAPERWORK REDUCTION PROJECT (2502-0331), WASHINGTON, D.C.  20503. O NOT SEND THIS COMPLETED FORM TO EITHER OF THESE ADDRESSES.

AME OF MORTGAGOR:   LINREAL CORPORATION

ROJECT NAME:        BRYLIN HOSPITALS                    PROJECT NUMBER:

OCATION:    1263 DELAWARE AVE, BUFFALO, NY & 11438 GENESEE STREET, ALDEN

YPE OF BORROWER:

☐ Private   ☑ Profit   ☐ Public   ☐ Non-Profit   ☐ Instrumentality, etc.

☐ Management Group   ☐ Sales Coop.   ☐ Investor-Sponsor   ☐ Builder/Seller   ☐ Limited Distribution

YPE OF PROJECT:

| | | |
|---|---|---|
| ☐ RENTAL HOUSING | ☑ SPECIALIZED USE FACILITY | ☐ -NEW CONSTRUCTION   ☐ NON- ELEVATOR |
| ☐ -COOPERATIVE | ☐ -INTERMEDIATE CARE FACILITY | ☐ -REHABILITATION   ☐ ELEVATOR |
| ☐ -CONDOMINIUM | ☐ -HOUSING FOR THE ELDERLY | ☐ -REDEVELOPMENT   ☑ EXISTING |
| ☐ -SINGLE RM OCCUPANCY | ☐ -MOBILE HOME COURT | ☐ -SUPPLEMENT LOAN   REFINANCE |
| ☐ -BOARD AND CARE | ☐ -CAPITAL ADVANCE 202/811 | ☐ -GROUP HOME |

DETERMINATION OF MAXIMUM INSURABLE MORTGAGE

| CRITERIA | | (COL. 1) | (COL. 2) | $ (COL. 3) |
|---|---|---|---|---|
| MORTGAGE OR LOAN AMOUNT REQUESTED IN APPLICATION | | | | 7,012,500 |
| RESERVED | | | | |
| AMOUNT BASED ON VALUE OR REPLACEMENT: | | | | |
| A VALUE (REPLACEMENT COST) FEE SIMPLE | $ 8,250,000 | x 85% | $ 7,012,500 | |
| B (1)      VALUE OF LEASED FEE | $ - | | | |
| (2)      GRANT/LOAN FUNDS ATTRIBUTABLE TO R.C. | $ - | | | |
| (3)      EXCESS UNUSUAL LAND IMPROVEMENT | $ - | | | |
| (4)      COST CONTAINMENT MORTGAGE DEDUCTION | $ - | | | |
| (5)      TOTAL LINES B1 TO B4 | $ - | x | $ - | |
| C UNPAID BALANCE OF SPECIAL ASSESSMENT | | $ - | | |
| D TOTAL LINE 3B PLUS LINE 3C | | | $ - | |
| E LINE A MINUS LINE D | | | | 7,012,500 |
| AMOUNT BASED ON LIMITATION PER FAMILY UNIT: | | | | |
| A NUMBER OF NO BEDROOM UNITS | | x $ - | $ - | |
| NUMBER OF ONE BEDROOM UNITS | | x $ - | $ - | |
| NUMBER OF TWO BEDROOM UNITS | | x $ - | $ - | |
| NUMBER OF THREE BEDROOM UNITS | | x $ - | $ - | |
| NUMBER OF FOUR OR MORE BEDROOM UNITS | | x $ - | $ - | |
| B COST NOT ATTRIBUTABLE TO DWELLING UNITS | $ - | x 100% | $ - | |
| C SITE NOT ATTRIBUTABLE TO DWELLING USE | $ - | x | $ - | |
| D TOTAL LINES A THROUGH LINE C | | | $ - | |
| E TOTAL NUMBER OF SPACES | 0 x $ - | | $ - | |
| F SUM:  VALUE OF LEASED FEE AND UNPAID BALANCE OF SPECIAL ASSESSMENT(S) | | | $ - | |
| G LINE D OR LINE E, WHICHEVER IS APPLICABLE, MINUS LINE F | | | | - |
| AMOUNT BASED ON DEBT SERVICE RATIO: | | | | |
| A MORTGAGE INTEREST RATE | | 7.500% | | |
| B MORTGAGE INSURANCE PREMIUM RATE | | 0.50% | | |
| C INITIAL CURTAIL RATE - ENTER LOAN Y     35 | | 0.590911% | | |
| D SUM OF ABOVE RATES | | | 8.590911% | |
| E NET INCOME           $ - | $ 949,523 | x 85% | $ 807,095 | |
| F ANNUAL GROUND RENT            +ANNUAL SPEC. ASS'MT. | | $ - | | |
| G LINE 5E MINUS LINE 5F | | | $ 807,095 | |
| H LINE 5G DIVIDED BY LINE 5D | | | | 9,394,700 |
| I. TAX ABATEMENT (IF ANY) | | | | - |
| J. LINE H PLUS LINE I | | | | 9,394,700 |

EXHIBIT

SJ 11

HUD 0045

HUD 01859

AME OF MORTGAGOR:   LINREAL CORPORATION          PROJECT NUMBER:
ROJECT NAME:        BRYLIN HOSPITALS
OCATION:            1263 DELAWARE A          0          0

DETERMINATION OF MAXIMUM INSURABLE MORTGAGE (CONTINUED)

| CRITERIA | | (COL. 1) | (COL. 2) | (COL. 3) |
|---|---|---|---|---|
| . AMOUNT BASED ON ESTIMATED COST OF REHABILITATION PLUS: | | | | |
| (I) 'AS IS' VALUE, OR (II) ACQUISITION COST OR | | | | |
| (III) EXISTING MORTGAGE INDEBTEDNESS AGAINST THE | | | | |
| PROPERTY BEFORE REHABILITATION: | | | | |
| A TOTAL ESTIMATED DEVELOPMENT COST | | $ - | | |
| B ESTIMATED COST OF OFF-SITE CONSTRUCTION | | $ - | | |
| C SUM OF LINE 6A AND LINE 6B | | | $ - | |
| D GRANT/LOAN FUNDS ATTRIBUTABLE TO R.C. ITEMS | | $ - | | |
| E LINE 6C MINUS LINE 6D | | | $ - | |
| F AS IS' VALUE OF PROP. BEFORE REHAB. | $ 0 x 100.0000% | $ - | | |
| G EXISTING MORTGAGE INDEBTEDNESS (PROP. OWNER) | | | | |
| OR PURCHASE PRICE OF PROPERTY (TO BE ACQUIRED) | | $ - | | |
| H LINE 6E PLUS LINE 6F | - | | $ - | $ |
| I. LINE 6H    $              X         100.00% | | | | - |
| . AMOUNT BASED ON BORROWER'S TOTAL COST OF ACQUISITION SECTION 223(f) | | | | |
| A PURCHASE PRICE OF PROJECT | | $ - | | |
| B REPAIRS AND IMPROVEMENTS, IF ANY | | $ - | | |
| C OTHER FEES | | $ - | | |
| D LOAN CLOSING CHARGES | | $ - | | |
| SUM OF LINES 7A THROUGH LINE 7D | | | $ - | |
| NTER THE SUM OF ANY GRANT/LOAN AND RESERVE FOR REPLACEMENT AND | | | | |
| MAJOR MOVABLE EQUIPMENT TO BE PURCHASED AS A ASSET OF THE PROJECT | | | $ - | |
| G LINE 7E MINUS LINE    - | | | $ - | $ |
| H LINE 7G    $              X         85.00% | | | | |
| | | | | $ |
| . AMOUNT BASED ON SUM OF UNIT MORTGAGE AMOUNTS | | | $ | |
| . AMOUNT BASED ON ESTIMATED COST TO BORROWER: | | | | |
| A TOTAL ESTIMATED COST (EXCL. OF SITE & REQUIRED CONST. OFF THE SITE) | | $ - | | |
| B PURCHASE PRICE OF SITE | | $ - | | |
| C TOTAL COST OF CLEARING SITE, IF ANY | | $ - | | |
| D EXPENSE OF RELOCATING OCCUPANTS, IF ANY | | $ - | | |
| E COST OF OFF-SITE CONSTRUCTION, IF ANY | | $ - | | |
| F SUM OF LINES 9A THROUGH 9E | | | $ - | |
| G LINE 9F    $              X         100.0000% | | | | - |
| 10 AMOUNT BASED ON EXISTING INDEBTEDNESS, REPAIRS & LOAN CLOSING CHARGES SECTION 223(f) | | | | |
| A TOTAL EXISTING INDEBTEDNESS | | $ 5,746,546 | | |
| B REQUIRED REPAIRS | | $ ~~328,417~~  411,728 | | |
| C OTHER FEES | | $ - | | |
| D LOAN CLOSING CHARGES | | $ 3,284 | | |
| E SUM OF LINES 10A THROUGH LINE 10D | | $ 998,173 | | |
| F ENTER THE SUM OF ANY GRANT/LOAN & RESERVE FOR | | | $ ~~7,076,420~~  7,159,731 | |
| REPLACEMENT AND MAJOR MOVABLE EQUIPMENT ON DEPOSIT | | | | |
| G LINE 10E MINUS LINE 10F | | | $ ~~7,076,420~~  7,157,731 | |
| H 70% OF VALUE | $         0 X   70% | | $ - | |
| I. GREATER OF LINE 10G OR LINE 10H | | | | ~~7,076,400~~  7,157,73 |
| * ATTACH FORMAT FOR COMPUTING LOAN CLOSING CHARGES. | | | | |
| MAXIMUM INSURABLE MORTGAGE (LOWEST OF THE FORGOING CRITERIA) | | | $ | |
| | | | | 7,012,500 |

**HUD 0046**

HUD 01860

NAME OF MORTGAGOR: LINREAL CORPORATION
PROJECT NAME: BRYLIN HOSPITALS
~TION: 1263 DELAWARE A                0              0
AL REQUIREMENTS FOR SETTLEMENT

PROJECT NUMBER:

**AN~ A**

FEES NOT TO BE PAID IN CASH:
A BSPRA/SPRA                          $
  BUILDERS PROFIT                     $        -
  OTHER:                              $        -
TOTAL (ENTER IN PART B ON LINE 5)     $        -
COMMITMENT, MKTG., GNMA
A FEES:
  OTHER:  PERMANENT LOAN              $        -
B DISCOUNTS:  CONSTRUCTION LOAN       $        -
  DEBT SVC. RESERVE (BOARD & CARE)    $        -
C ESCROWS:
  OTHER:                              $        -
TOTAL (ENTER IN PART B ON LINE 9)     $        .
WORKING CAPITAL:
A WORKING CAPITAL                     $
B MINIMUM CAPITAL INVESTMENT (SEC. 202/811)  $  -
C NON-REALTY ITEMS NOT INCLUDED IN MORTGAGE  $  -
TOTAL (ENTER IN PART B ON LINE 10)    $        -

**PART B**
1. a. Existing Debt & Loan Closing Cos   6,744,936
   b. Adjustment for Contracted Amounts in
      Excess of form HUD 92264 Estimates

   (1) CONSTRUCTION CONTRAC  $      -
   (2) ARCHITECT'S CONTRACT  $      -
   (3) OTHER                 $           $
   c. TOTAL OF LINES a.& b                  6,744,936
2. REQUIRED REPAIRS        $   328,417  411,728
3. SUBTOTAL (LINES 1c +2)          7,073,353  7,156,664
4. A. MORTGAGE AMOUNT  $ 7,012,500
   B. GRANT/LOAN
5. FEES NOT TO BE PAID IN CAS  $
6. SUBTOTAL (LINES 4A + 4B + 5)  $  7,012,500
7. CASH INVESTMENT REQUIRED (LINE 3 MIN  $  60,853  144,164
8. INITIAL OPERATING DEFICIT *               0
9. COMMITMENT, MARKETING FEES
   DISCOUNT AND ESCROWS       $      -
10. WORKING CAPITAL-REPAIRS            137,243
11. OFF-SITE CONSTRUCTION & DEMOLITION C
    ($        + $          )
12. TOTAL ESTIMATED CASH REQUIREMENT  $
    (SUM OF LINES 7 + 8 + 9 + 10 + 11)    198,096  281,407
FRONT MONEY ESCROW, IF ANY
    (SUBTRACT LINE 6 FROM LINE 1)

NOTE:  FOR SECTION 223(f) CASES, ATTACH THE FORMAT FOR COMPUTING THE OPERATING DEFICIT.

**II: SOURCE OF FUNDS TO MEET CASH REQUIREMENT / MORTGAGE CREDIT NOTES**

OURCE:                              AMOUNT

SPONSOR PLUS PREPAID TRANSACTION COSTS  $   198,096
                                        $        -
                                        $
                                        $
                                        $

OTAL AVAILABLE CASH FOR PROJECT         $   198,096

MORTGAGE CREDIT PROCESSING NOTES:
1.
2.
3.
4.
5.
6.
7.
8.
9.
10.

**V: RECOMMENDATION, REQUIREMENTS AND REMARKS**

LOAN CLOSING CHARGES BASED ON MORTGAGE AMOUNT:

FINANCING FEE        140,250
MIP                   70,125
EXAM FEE              21,038
PLACEMENT FEE        105,188
LEGAL & ORG           58,350
IDRR                 550,000
TITLE & RECORDING     50,156

TOTAL                995,106

Mortgage Recommendation

X      RECOMMEND APPROVAL;  SUBJECT TO CONDITIONS STATED IN ADDENDUM, IF ANY.

**HUD 0047**

       RECOMMEND REJECTION FOR REASONS STATED IN ADDENDUM.

IGNATURE OF THE MORTGAGE CREDIT EXAMINER:
X _____       DATE:  4-23-01

Robert P. Gs VP

TO COMPUTE FEES IN A REFINANCING TRANSACTION

Step 1.   Add the known dollar amounts for:

| | | | |
|---|---|---|---:|
| A. | Exisiting Indebtedness | | 5,746,546 |
| B. | Repairs | | 328,417 |
| C. | Initial Deposit to Reserve for Replacement | | 550,000 |
| D. | Legal | | 30,000 |
| E. | Organizational | | 28,350 |
| F. | Title and Recording | | 50,156 |
| G. | Other Fees (Arch, Inspection, Engineering) | (HUD) | 3,284 |
| H. | GNMA Fee (MBS) | | 0 |
| | | Total | 6,736,753 |

Step 2.   Deduct the amounts of any Replacement Reserve Escrow
currently on deposit with the mortgagee

| | | |
|---|---|---:|
| | | 0 |
| | Result | 6,736,753 |

Step 3.   Add the known percentages for:

| | | | |
|---|---|---|---:|
| A. | Financing Fee (Initial Service Charge) | | 2.0% |
| B. | MIP | | 1.0% |
| C. | Exam Fee | | 0.3% |
| D. | FNMA Fee | | 1.5% |
| E. | Discounts, if Allowable | | 0.0% |
| | | Total | 4.8% |

Step 4.   Subtract the sum from Step 3 from 100%                        95.2%

Step 5.   Divide the sum from Step 2 by the result from Step 4. The
quotient rounded down to the nearest hundred becomes the
mortgage amount.                                                        7,076,400

Step 6.   Compute and total the actual fees based on the mortgage
amount determined in Step 5.

| | | | |
|---|---|---|---:|
| A. | Financing Fee | | 141,528 |
| B. | MIP | | 70,764 *(70,125)* |
| C. | Exam Fee | | 21,229 |
| D. | FNMA FEE | | 106,146 |
| E. | Discounts | | 0 |
| | | Total | 339,667 |

Step 7.   Add to the sum from Step 6, the following:

| | | | |
|---|---|---|---:|
| A. | Legal & Organizational | 30,000+28,350 | 58,350 |
| B. | Initial Deposit to Reserve for Replacement | | 550,000 |
| C. | Title and Recording | | 50,156 |
| D. | GNMA Fee | | 0 |
| | | Total | 998,173 |

| Organization: | | | Debt: | |
|---|---:|---|---|---:|
| Frandina | 6,750 | | Key | 3,750,000 |
| GAR | 15,000 | | Heller | 1,350,000 |
| Phase I | 1,500 | | Taxes | 460,936 |
| LBP | 600 | | Charter | 61,779 |
| Survey | 4,500 | | Misc | 123,831 |
| | 28,350 | | | 5,746,546 |

**HUD 0048**

# Memorandum

Date:       February 23, 2001

To:         Credit File - Brylin

From:       Mehdi Maida

Re:         Meeting with Brylin

Attendants: Eric Pleskow, Sybil Potts and Karen Manny
            Michael Gardullo, Andrew Moore and Mehdi Maida

---

Brylin came to discuss refinancing alternatives, the loan balance, the Medicaid advance rate and the maturity of the loan.

According to the Brylin executives, the company is pursuing the HUD refinancing under the Maps Program, which has a turnaround of 60 days. Karen Manny is very confident that Brylin will get an answer within 30 days.

Brylin applied for a $7MM line with HUD. Out of that amount, Brylin has the HHF line listed as $1.350MM, which is approximately $300M higher than the actual outstanding balance. Brylin requested their line with HHF to be increased to $1.350MM at least the day before closing so HUD will cover the full amount. This would generate extra cash flow for Brylin to pay the closing fees as well as other vendors. Michael Gardullo stated that as long as we are comfortable that the deal will close, we would consider funding up to $1.350MM. The money would most likely be sent to an escrow account. HHF will need a statement of sources and uses of funds before committing to any deal with Brylin.

HUD also requested that Brylin performs some critical repairs before closing the deal. Some of the repairs include the insulation in the ceilings and the fire alarm system.

If the HUD deal closes, Brylin will consider using a new billing system. The company will assess to see if it is in its best interest. Regarding the lockbox, it will be kept open since it is in Brylin's name. This would be more beneficial for the company since no delays in payments will occur.

Brylin is considering some other refinancing alternatives. The company has been in touch with some potential lenders such as "Ask Funding", HBCC, Freed Maxick and "Beyond Real Estate". So far Brylin is relying more on the HUD deal since they have been getting good feedback.

Regarding the low balance, Brylin stated that it is mainly due to the increasing collections and amortization payments. Michael Gardullo made it clear that collections helped decrease the balance, yet it is also due to a lower census during the last few months.

**EXHIBIT**

**SJ 12**

GE-0090

HUD 00171

In order to help Brylin with the tight cash flow, Michael Gardullo offered to increase the fund-back from 50% to 100% for all the collections that cover dates of service older than 120 days. HHF was applying 50% of those collections to the batches. Brylin also requested to have an increase in its Medicaid advance rate from 71% to 80%. Michael Gardullo will look into it and give Brylin an answer in the near future.

Since the HUD refinancing will not occur until March at the earliest, HHF will be forced to extend the Brylin line until all the refinancing arrangements are finalized. The Brylin loan is scheduled to mature in March 2001.

**GE-0091**

# TRANSCRIPT OF PROCEEDINGS

In the Matter of:            )
                             )
UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )   Docket No.:
v.                           )   08-CV00333-07C
                             )
ROBERT P. CORP,              )
                             )
            Defendant.       )

Deposition of:  Jeffrey P. Hoffman

Pages:  1 through 39

Place:  Washington, D.C.

Date:   March 12, 2009

## HERITAGE REPORTING CORPORATION

*Official Reporters*

1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

EXHIBIT
SJ 13

7

1    and discuss that earlier subject.

2            Can you think of any reason that you can't

3    give truthful testimony today?

4    A    No reason.

5    Q    Okay.  Mr. Hoffman, are you here on behalf

6    of Heller Healthcare Finance?

7    A    Correct.

8    Q    Okay.  And can you tell me what the

9    relationship is between GE Healthcare Finance and

10   Heller Healthcare Finance?

11   A    GE purchased the assets of Heller a number

12   of years ago, and the entities were merged into GE.

13   Q    Does Heller exist anymore?

14   A    It does not.

15        MR. YOUNG:  I'll show you what we'll mark

16   for identification as Exhibit 88.

17                            (The document referred to was

18                            marked for identification as

19                            Plaintiff's Exhibit No. 88.)

20        MR. YOUNG:  We're starting with 88.  It's

21   the notice of deposition on GE Healthcare Finance

22   Service, Inc.  I'm sorry, but I only have one copy

23   with me right now.  I'll read it to you.

24            It specifies the matter which you've been

25   called to testify about, and the following subject

8

1    matter in this deposition is:  "The amount of

2    indebtedness owed by BryLin Hospitals, defined to

3    include any or all of BryLin Hospitals, Inc.; Linreal

4    Corporation; and Eric D. Pleskow to Heller Healthcare

5    Finance, Inc., formerly known as 'HCFP Funding, Inc.,'

6    at all times during the period between January 1,

7    2001, through June 5, 2001."

8          BY MR. YOUNG:

9        Q    Mr. Hoffman, are you prepared to give

10   testimony on behalf of GE on this topic today?

11       A    Yes.

12       Q    Mr. Hoffman, are you familiar with an entity

13   called BryLin Hospital?

14       A    I am.

15       Q    How did you become familiar with that

16   entity?

17       A    I worked at Heller Healthcare and HCFP and

18   knew the name, that it was one of our borrowers.

19       Q    Were you involved with a loan, a HUD-insured

20   loan, for BryLin Hospitals?

21       A    I was not.

22       Q    Did Heller and BryLin have a financial

23   relationship during calendar year 2001?

24       A    They did.

25       Q    Could you describe your understanding of

1    30(b)(6) notice was limited.  We do have a witness

2    here who is more familiar with the transaction.

3           I'm not going to instruct the witness not to

4    answer.  I'm just going to note for the record that

5    it's beyond the 30(b)(6) notice.

6           MR. YOUNG:  I understand that.

7           Mr. Gordin, are you saying that Mr. Gardullo

8    is more familiar with --

9           MR. GORDIN:  Yes.

10          MR. YOUNG:  Okay.  We can move on then.

11          BY MR. YOUNG:

12    Q   Mr. Hoffman, are you familiar with BryLin's

13    indebtedness to Heller during the first six months of

14    2001?

15    A   Yes.  I've seen schedules that show the

16    balances at various dates.

17    Q   Can you describe what those schedules are?

18    A   They were either reports generated by our

19    system or other correspondence.

20    Q   From January of 2001 until June of 2001 or

21    through June of 2001, was BryLin's indebtedness to

22    Heller increasing or decreasing?

23    A   The general trend was that it was

24    decreasing.

25          MR. YOUNG:  I'll show you what we'll mark

13

1    for identification as Exhibit 89.  It's a document

2    with --

3                 THE COURT REPORTER:  The other one was 89.

4                 MR. YOUNG:  I'm sorry.  We'll mark it for

5    identification as Exhibit 90.  It's a document with

6    Bates range HUD-00171 through HUD-00172, and it also

7    has GE Bates Nos. 0090 through GE-0091.

8                              (The document referred to was

9                               marked for identification as

10                              Plaintiff's Exhibit No. 90.)

11                THE WITNESS:  I'm familiar with this

12   document.

13                BY MR. YOUNG:

14        Q    All right.  Can I direct your attention to

15   the top of the third paragraph?  I'll quote the

16   language to you, and then I'll ask you about it.

17             It says:  "BryLin applied for a $7 million

18   line with HUD.  Of that amount, BryLin has the HHF

19   line listed as $1.350 million, which is approximately

20   300 higher than the outstanding balance.  BryLin

21   requests that their line with HHF to be increased to

22   $1.35 million at least the day before the closing."

23             Do you have any knowledge about what

24   BryLin's indebtedness was to Heller as of February 23,

25   2001?

1        A     I don't have an exact number.   In the

2   correspondence that I've seen and in the records that

3   I've seen, on a schedule, there is an amount as of

4   February 15, but I'm not sure that I've seen anything

5   with that exact date.

6        Q     Okay.  Does the language that I quoted to

7   you comport with your understanding of BryLin's

8   indebtedness to Heller in February of 2001?

9        A     It does.

10       Q     And you referenced a schedule?

11       A     Right.

12       Q     Do you have that schedule with you?

13       A     No.

14            MR. GORDIN:  We didn't bring any documents

15   other than the one that I distributed prior to the

16   deposition today.

17            BY MR. YOUNG:

18       Q     Mr. Hoffman, the schedule you referenced,

19   where is that schedule?

20       A     I think it may be back in our office.

21       Q     Is that something you would be able to

22   generate?

23       A     Yes.

24       Q     Okay.  And how long would it take you to

25   generate that?

18

1          Mr. Hoffman, do you understand BryLin's

2     indebtedness to Heller to be $860,436.05 on March 14,

3     2001?

4          A    Based on this letter, I would believe that

5     to be the case.

6          Q    All right.  Does this letter comport with

7     your understanding of BryLin's indebtedness to Heller?

8          A    It does.

9               MR. YOUNG:  I'll show you what we'll mark

10    for identification as Exhibit 92.  It's a document

11    with HUD Bates range HUD-00177 through HUD-00182, and

12    it also has GE-0093 through GE-0098.

13                              (The document referred to was

14                               marked for identification as

15                               Plaintiff's Exhibit No. 92.)

16              BY MR. YOUNG:

17         Q    Mr. Hoffman, have you seen this document

18    before?

19         A    I've seen this document.

20         Q    What is this document?

21         A    It's a draft payoff letter dated May 23,

22    2001.

23         Q    Did you play any role in the creation of

24    this document?

25         A    I did not.

19

1       Q     Can I direct your attention to page HUD-

2   00179?

3       A     Yes.

4       Q     I'll go to the second full paragraph, which

5   says:  "The payoff amount is approximately

6   $643,247.51."

7             Mr. Hoffman, can you tell us what this

8   number represents, the $643,000 figure?

9       A     It would represent the amount that Heller

10  would have needed to be paid off in full.

11      Q     As of what date?

12      A     As of May 23, 2001.

13      Q     Do you know how this number was generated

14  and put into this document?

15      A     Per the procedures that we had at the time,

16  we would have run a balance from our system,

17  calculated any fees or amounts due, added that

18  together and come up with a balance.

19      Q     And when you say "your system," can you

20  describe what that means?

21      A     We had an accounting system at the time

22  called "RTS" that we would book the A.R. purchase

23  activity to.

24      Q     Is it your understanding that the language

25  in the second paragraph or the number in the second

1    paragraph on page HUD-00179 is accurate?

2         A    Yes.

3         Q    In other words, does this document

4    accurately represent BryLin's indebtedness to Heller

5    as of the date of this document?

6         A    Yes.

7              (Pause.)

8              MR. YOUNG:   I'll show you what we'll mark

9    for identification as Exhibit 93.   It's a letter dated

10   May 30, 2001, and it has HUD Bates range 00185 through

11   00188 and GE Bates range GE-0002 through 0005.

12                        (The document referred to was

13                         marked for identification as

14                         Plaintiff's Exhibit No. 93.)

15             BY MR. YOUNG:

16        Q    Mr. Hoffman, have you seen this document

17   before?

18        A    I have.

19        Q    When did you first see this document?

20        A    I saw it in preparation for this deposition.

21        Q    What is this document?

22        A    It looks like a payoff letter with

23   additional language in it to allow for additional

24   purchases under the receiver purchase agreement.

25        Q    What does the term "payoff letter" mean?

1          A    "Payoff letter" means a letter that

2    describes the amount and the procedure for paying off

3    a loan or a financial arrangement.

4          Q    Did you play any role in generating this?

5          A    I did not.

6          Q    I'll direct your attention to the first

7    paragraph of the letter.  I'll read half the sentence.

8    The last sentence says:  "... and permit Seller to

9    repurchase all outstanding receivables purchased by

10   Purchaser from Seller is $604,378.51 as of May 30,

11   2001."

12              What does that $604,000 figure represent?

13         A    It represented the amount that the seller

14   would have to pay back to Heller to fully repay the

15   indebtedness.

16         Q    And who is the seller in this case?

17         A    The seller is BryLin.

18         'Q    And when it says "Purchaser," who is the

19   purchaser?

20         A    The purchaser would have been Heller.

21         Q    Does this letter comport with your

22   understanding of BryLin's indebtedness to Heller as of

23   May 30, 2001?

24              MR. GORDIN:  Objection to form.

25              MR. YOUNG:  You can answer.

1               THE WITNESS:  It does.

2               BY MR. YOUNG:

3        Q    Okay.  Does this letter or this document

4    accurately represent BryLin's indebtedness to Heller

5    as of May 30, 2001?

6               MR. NUGENT:  Objection to form.

7               THE WITNESS:  It does.

8               BY MR. YOUNG:

9        Q    And do you know how this $600,000 figure

10   would have been generated or arrived at?

11       A    I do.  It would have been generated by

12   printing out reports or reviewing reports from our

13   system, the RTS system, that tracks the balances on

14   all of the customers that we have.

15       Q    Okay.  Mr. Hoffman, we've talked about a

16   number of documents today which represent BryLin's

17   indebtedness to Heller.  One was dated February 23,

18   2001; one was dated March 14, 2001, and one was

19   May 30, 2001.  During this time period, the first six

20   months of 2001, was BryLin's indebtedness to Heller

21   increasing or decreasing?

22               MR. NUGENT:  Objection to form.

23               THE WITNESS:  If you take the period of the

24   six months ended through May 30, 2001, the balances

25   would have been decreasing.

Heritage Reporting Corporation
(202) 628-4888

1    the amount owed by BryLin as of two separate dates.

2         Q    Did you generate this document?

3         A    I did not.

4         Q    Do you know how it was generated?

5         A    It would have been generated by going

6    through our system as of the various dates and

7    printing out the balances due, and then we would have

8    also looked for other fees that we were owed, totaled

9    that up and come up with a total.

10        Q    I'd like to start with the first half of the

11   page, which says, "Payoff as of June 4, 2001."  That's

12   the top part of the page.

13        A    Right.

14        Q    I'll go to the bottom where it says, "Total,

15   $554,991.96."

16        A    I see that.

17        Q    What does that figure represent?

18        A    That represents the total amount of

19   indebtedness owed by BryLin to Heller as of June 4.

20        Q    Can you tell me, it says, "BryLin batch

21   total."  What does that mean?

22        A    We would batch together claims, or BryLin or

23   our customers would batch together claims, and the

24   total of those claims would be in this case the

25   $261,000.  We had various ways of tracking the claims