1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2    ----------------------------------

3    UNITED STATES OF AMERICA,

4                         Plaintiff,

5              vs.                      CIVIL ACTION NO.

6    ROBERT CORP,                       1:08-CV-00333-JTC

7                         Defendant.

8    ----------------------------------

9

10              Proceedings in the above-entitled
             action were held pursuant to notice on
11           January 13, 2009 at the Offices of the
             United States Attorney, Syracuse, New York.

12

13

14   TESTIMONY OF:   JOHN BRENNAN

15

16

17   APPEARANCES:    BRIAN R. YOUNG, ESQ.
                     Office of the United States Attorney
18                   U.S. Department of Justice
                     601D Street, Room 9147
19                   Washington,  D.C.  20004
     ALSO PRESENT    KENNETH MASSMAN, ESQ.

20

21                   GABRIEL M. NUGENT, ESQ.
                     ELLEN KIMATIAN EAGEN
22                   Attorneys for Plaintiff
                     Hiscock & Barclay
23                   300 South State Street
                     Syracuse, New York

24

25   REPORTED BY:
     SUSAN M. BYRNE

EXHIBIT
SJ 19

4

1   Q   Okay.  So is it safe for me to assume I can run

2       through these ground rules for depositions quickly?

3   A   Yes.

4   Q   I would like you to answer verbally, and I will ask

5       the questions.  The court reporter will take down

6       your answer.  If you need to take a break, let me

7       know, and we can take a break whenever you need to.

8       If you want to consult with Mr. Nugent, I have no

9       problem with that at any time in the deposition.  I

10     ask only if there is a question pending, you answer

11     the question before consulting Mr. Nugent.

12         Is there any reason you can think of that you

13     can't give truthful testimony today?

14   A   No.

15   Q   Okay, Mr. Brennan, can you tell us what your

16       educational background is?

17   A   I am an attorney.  I graduated from LeMoyne College

18       with a B.S. in Finance, and from Syracuse University

19       College of Law with a J.D.

20   Q   What year did you graduate from Syracuse?

21   A   From Syracuse was 1986.

22   Q   By whom are you employed today?

23   A   Byrne, Costello and Pickard.

24   Q   For how long have you been employed with that firm?

25   A   Since I got out of school in 1986.

5

Q   Are you a partner, or an associate?

A   Yes, I am a partner.

Q   Were you involved in a transaction to refinance the existing indebtedness of Brylin Hospitals?

A   Yes.

Q   Could you explain to us what Brylin Hospital is?

A   It was a facility in Buffalo that was a mental hospital.  I believe it had two locations, if I recall right, a downtown location and another location.  I can't remember where in the vicinity of Buffalo that was located, but I believe that was the smaller of the two, and that was intended for children's services.

Q   What is Linreal?

A   That was the owner of the facility.

Q   If I refer, when I refer to Brylin today, I am going to include Linreal in that definition.  Is that okay?

A   That's fine.  The operator of the facility was Brylin.  I can't remember the full name off the top of my head, but there was a lease between the two, and they were inter-related.  I believe the owner of Linreal was also the owner of Brylin.

Q   If in response to any of my questions you think it's important to distinguish between Linreal and Brylin, please do so, but I am just going to say Brylin, and

I intend to include either of the entities; is that okay?

A    That's fine.

Q    Could you tell us what your role was in this Brylin transaction?

A    I represented Continental Securities Corp. and GMAC Financial Services for purposes of closing the loan.

Q    What is Continental's status right now?  Is it in business?

A    I don't believe so.

Q    Do you know when it went out of business?

A    They sold their portfolio to GMAC, and I believe they liquidated within the last five years.  It may have been within the last two or three.

Q    Could you tell us what the Brylin transaction was intended to accomplish?

          MR. NUGENT:  Object to the form.

A    It was a facility, this was a mental facility looking to refinance its debt, and it was a struggling facility.  Not only did it have mortgage indebtedness, but it owed real estate taxes and a number of other obligations, and it was looking as part of this loan to essentially have a consolidation loan where it could take all of its debts and put it into one payment and be able to pay those back at a

lower interest rate.

Q   Who were the parties to the transaction?

A   Brylin Hospital, the operator, the owner, Linreal.  I
am not sure if it was corporation, but it was Linreal
something.  Continental Securities Corp. was the FHA
lender.  GMAC Commercial Mortgage Corporation was the
immediate lender who Continental Securities sold the
loan to, and HUD was the insurer of the loan.

Q   When you say, FHA, is that Federal . . .

A   Federal Housing Administration, a division of HUD.

Q   If I say HUD, or FHA, can we use those terms
interchangeably today?

A   That's fine.

Q   Was Brylin your first HUD insured transaction that
you had been involved in?

A   No.

Q   How many before that, if you can remember?

A   I am not sure of the precise number, but it would be
many.  I don't want to speculate to the number, but
it was many.

Q   Do you have an expertise in HUD insured loan
transactions?

A   Yes.  My firm has been involved with that since the
beginning of the FHA insurance program.

Q   Did you represent Brylin or Linreal in any capacity?

A   We wrote the title insurance policy at their request.

Q   Okay.  Who paid the -- did you get paid?  I am not
    interested in what you got paid or what the fee was.
    Did you get paid hourly, or did you get paid in a
    lump sum?

A   We were paid by the title insurance company as a
    percentage of the premium for the title policy.

Q   The Brylin loan closed in about June of 2001.  Do you
    remember that to be the case?

A   I think that's right.

Q   In the months leading up to the Brylin loan, who was
    your primary point of contact with each of the
    various clients, what individuals?

A   Well, my client was Continental Securities.  The
    point of contact there would be Robert Corp.  The
    point of contact for GMAC Commercial Mortgage would
    be a gentleman by the name of Dean Wantland,
    W-A-N-T-L-A-N-D.

Q   Did you deal with anyone at Brylin or Linreal with
    any regularity?

A   We dealt with Karen M-A-N-N-Y, who was their in-house
    counsel.  I think it's M-A-N-N-Y, if I remember
    right.

Q   How did you first learn or hear about the Brylin
    transaction?

1    Q   Did you ask Heller to provide a payoff letter that

2         represented that Brylin's indebtedness was

3         $1,350,000?

4    A   I don't recall that.

5    Q   Do you remember if Heller ever provided a payoff

6         letter representing the debt to be $1,350,000?

7    A   Yes, they did.

8    Q   Okay.  Was Mr. Corp involved in any way in your

9         efforts to procure a payoff letter from Heller?

10            MR. NUGENT:  Object to the form.

11   A   I don't remember.

12   Q   Did you ever have any conversation with Mr. Corp

13        about a payoff letter from Heller?

14   A   I don't remember specific conversation, but given

15        the nature of our relationship and the fact we were

16        trying to close a loan, I am sure there were -- there

17        was a discussion.

18   Q   What was the discussion about?  Can you give me any

19        recollection of the substance?

20   A   Without specifics, I am sure it was probably along

21        the lines that we were trying to get a payoff letter

22        out of Heller Healthcare, and the loan amount

23        currently due to Heller Healthcare was less than the

24        amount that was submitted to HUD and approved for

25        purposes of the HUD commitment.

1   Q   What's the purpose of the payoff letter?

2   A   We wanted assurances from the existing lender that a

3       certain amount of money is due to them, and they will

4       accept a payment of that amount of money for purposes

5       of releasing their liens and other security that may

6       be against the project.

7   Q   Did you intend, or was it intended -- let me try

8       again.  Did you have to submit the payoff letter to

9       HUD?

10  A   HUD requires submission of a Mortgagor's Certificate

11      of Actual Cost, which they wanted various things

12      included as part of.  One of which is generally a

13      payoff letter, yes.

14  Q   Do you know why Heller was unwilling to advance funds

15      to Brylin?

16              MR. NUGENT:  Object to the form.

17  A   I don't recall.  I know, and I do recall being

18      told by Karen Manny that they had a very difficult

19      relationship with one another, Brylin Hospital and

20      Heller Healthcare.

21  Q   Okay.  What do you mean by difficult?

22  A   My understanding was that Heller held their accounts

23      receivable, and that source of funds was used to

24      repay not only the Heller Healthcare loan, but also

25      the general other operating costs of the facility,

1  and that Heller was, according to Karen Manny,

2  sometimes reluctant to release those funds

3  appropriately, as far as Brylin Hospitals was

4  concerned.

5 Q Did you ever have any conversations with Mr. Corp

6  about the difficulties, I will say, between Brylin

7  and Heller?

8    MR. NUGENT:  Object to the form.

9 A I don't remember them.

10 Q Do you know if Mr. Corp was aware of the difficulties

11  between Brylin and Heller?

12    MR. NUGENT:  Object to the form.

13 A I am sure I would have told him, given the fact that

14  we were in contact to close this loan every day for

15  at least a couple of weeks.  I am sure I would have

16  told him.

17 Q Why would you have told him?  Why would it be

18  important to tell him?

19 A I told him anything and everything about what was

20  necessary to close this loan.

21 Q Did Brylin's troubles with Heller make it difficult

22  to close the loan?

23 A I am not sure I understand the question.

24 Q Let me do a better job.  I think you said earlier

25  that at least in Brylin's perspective, Heller wasn't

1    advancing the money as quickly as Brylin would like?

2  A  That's what we were being told by Karen Manny.

3  Q  Okay, did that, Heller's reluctance to free this

4    money up quickly, if I can say it that way, did that

5    ever threaten this HUD insured loan, make it more

6    difficult to close this loan?

7         MR. NUGENT:  Object to the form.

8  A  I don't think it made it more difficult to close.

9    The end result, as I explained to Karen Manny, was

10   that if the Brylin loan was not at the $1,350,000

11   amount that was approved in the HUD commitment, then

12   there would be a reduction in the amount of the loan.

13  Q  Okay.

14  A  I guess that would make it difficult to close the

15   original amount of the loan, but we told her that,

16   absent a payoff letter from Heller showing they were

17   due $1,350,000, there would be a reduction in the

18   loan.

19  Q  Did you ever have any conversations with Mr. Corp

20   about a potential reduction of the loan?

21  A  I am sure I told him that that was discussed with

22   Karen Manning.

23  Q  Do you remember if he said anything to you about --

24   on that topic?

25         MR. NUGENT:  Object to the form.

```
1   Q   Could you tell us, is there a manner in which HUD
2       calculates the maximum mortgage amount under this MAP
3       program?  Is there a formula or methodology?
4               MR. NUGENT:  I will object to the
5           form.
6   A   I am not a loan processor.  I am not all that
7       familiar with how HUD underwrites loans.  I believe
8       they use three different methods of valuation.
9   Q   It says in your letter, we have been advised that the
10      $1,350,000 debt due to Heller Healthcare Finance has
11      been paid down in recent months to $643,248.  How did
12      you learn that fact; do you remember?
13  A   I was told by Karen Manny.
14  Q   So you had discussions with Karen Manning about the
15      Brylin's debt to Heller?
16  A   That's correct.  As a matter of fact, Karen Manning
17      asked me to generate this letter.
18  Q   Do you remember if Mr. Corp was a party to any of
19      those discussions?
20  A   He may have been part of a conference call that
21      I was on with Karen Manny.  I don't know of any
22      conversations between Mr. Corp and Karen Manny that
23      were direct.
24  Q   And I think you said that Karen Manny had told you
25      she was concerned that she wanted the HUD insured
```

1     loan to be $7,012,500, and not to be reduced; is that

2     accurate to say?

3  A  No.  I advised Karen that the loan would be reduced

4     if the Heller debt was not $1,350,000.

5  Q  Okay.

6  A  And Karen then said, what do we do to make sure that

7     we don't have a mortgage reduction.  And I said, we

8     get a payoff letter from Heller.  And she indicated

9     at that point in time they had the absolute right to

10     draw money down from the Heller loan prior to the

11     closing.  And she asked, can we do that.  And I said

12     that would suffice for purposes of this transaction.

13  Q  Did Karen say why it would have been undesirable for

14     the loan to have been reduced?

15           MR. NUGENT:  Object to the form.

16  A  I don't remember.

17  Q  And did you have any -- can you recall any

18     conversations with Mr. Corp about -- did you have any

19     conversation with Mr. Corp concerning whether

20     Brylin's debt to Heller was 1.35 million?

21           MR. NUGENT:  Object to the form.

22  A  I believe during our conversation I made him aware of

23     the fact that the loan had been paid down, and that

24     Brylin was in the process of trying to get the

25     further advance so it would be $1,350,000 as of

1          closing.

2     Q    Okay.  Do you remember approximately when you told

3          him that?

4     A    Within -- certainly within the last week prior to the

5          closing.

6     Q    Do you remember when the closing was?

7     A    I believe it was on June 5th, I think was the day of

8          the closing.  I would have to look.  I don't have the

9          paper in front of me, the closing statement in front

10         of me.  June 5th, 2001.

11    Q    So is it accurate to say then that this conversation

12         would have occurred either in early June 2001 or late

13         May 2001?  You said it was a week before closing?

14    A    Yes.

15    Q    Last question I have on the letter here.  It says on

16         it, Exhibit 1, HUD page 183, it says, Counsel for

17         Brylin Hospitals, Karen Manny -- and we are in the

18         third paragraph -- has informed us, however, that

19         certain issues have developed regarding the amount of

20         indebtedness owed to Heller Healthcare Finance for

21         purposes of the FHA-insured mortgage loan.  What do

22         you mean by, issues, as the word is used in this

23         letter?

24    A    Could you point that out?  I missed it in the

25         document.

A   No, I don't.

Q   Do you know if you have seen it before today?

A   I believe I have.

Q   Did you ever have any conversations with anybody at
    Heller about this letter?

A   I may have had a conversation with Robert Goodrich.

Q   Do you remember the substance of the conversation?

A   I believe I was asking for a final payoff letter.
    This is a draft.

Q   Do you know why Heller sent this document to
    Mr. Corp?

A   No, I don't.

Q   Do you know whether Mr. Corp had any communications
    with Heller concerning the payoff letter?

A   He may have participated in a conference call with --
    prior to the closing that I had with Robert Goodrich.

Q   And do you remember the substance of this conference
    call with Robert Goodrich?

A   That we wanted a final payoff letter.

Q   Do you remember discussing this document with
    Mr. Corp?

A   This specific document, I don't remember that.

Q   Do you remember having any conversations with
    Mr. Corp about the fact or about the topic of
    Brylin's debt to Heller being $643,247?

1              MR. NUGENT:  Object to the form.

2    A   I don't remember a specific conversation, but I'm

3        sure I discussed it with him.

4    Q   Okay.  Do you remember what you discussed, what in

5        general?

6    A   The fact that the amount then due to Heller was less

7        than $1,350,000, and that unless we received

8        confirmation that $1,350,000 was in fact due to

9        Heller, then HUD would require the loan to be

10       decreased.

11   Q   Do you remember what Mr. Corp said to you in response

12       to that?

13   A   He was aware of the program, it is a program

14       requirement, and he was also aware of the fact that

15       the loan would be reduced.

16   Q   Did he say this to you?

17   A   Yes.  I do remember having conversations with Bob

18       Corp like that, I just don't remember the specific

19       day or precisely what was discussed.

20   Q   Do you remember if Mr. Corp told you that he was

21       going to try and get Heller to advance more money to

22       Brylin?

23              MR. NUGENT:  Object to the form.

24   A   No, I don't remember that.

25   Q   Okay.  Do you know whether Mr. Corp. had any

```
 1              knowledge of Brylin's effort to obtain additional

 2              advances from Heller?

 3      A    I believe he took part in a conversation that I had

 4              with Karen Manny where Karen relayed the difficulties

 5              they had getting a payoff letter, and asking if they

 6              could draw down the remaining amount of their line of

 7              credit to support the $1,350,000.

 8      Q    Okay.  Do you remember when the conversation

 9              occurred?

10      A    It was within a week of the closing.

11      Q    Did we talk about this conversation earlier?

12      A    I think we did.

13      Q    Okay.  Do you remember who from -- did you say that

14              someone from Heller participated in the call?

15      A    I am not sure that was the same call, but I had many

16              conversations with Robert Goodrich from Heller

17              Healthcare, and I do recall that Bob Corp was on a

18              conference call with me, at least once with Robert

19              Goodrich.

20      Q    I am sorry, let's go back to the conversation between

21              you and Ms. Manny and Mr. Corp.  What was the topic

22              of that conversation again?

23                       MR. NUGENT:  Object to the form.

24      A    Trying to obtain a payoff letter from Heller.

25      Q    Okay.  Was it difficult because -- what was the
```

1          that the letter would not work.  Is that accurate?

2                    MR. NUGENT:  Object to the form.

3      A   No.  I said it wouldn't work for my purposes.  I

4          wanted to see something from Heller Healthcare on

5          their letterhead confirming that $1,350,000 was due

6          to them, and they would accept a payoff of $1,350,000

7          to release their security interest and other liens

8          that they had in the project.

9      Q   Do you remember what the person -- the Continental

10         person said in response to your statement?

11     A   No.

12     Q   Do you have any recollection of expressing a similar

13         sentiment to Mr. Corp?

14                   MR. NUGENT:  Object to the form.

15     Q   I will rephrase.  Expressing to Mr. Corp you wanted

16         the payoff letter from Heller representing the debt

17         is --

18     A   -- Not with respect to this particular letter, I

19         don't remember that.

20     Q   What about independent of this particular letter?

21     A   I told Mr. Corp we needed a payoff letter from Heller

22         on Heller letterhead confirming the $1,350,000

23         number, and that they would accept a payoff of that

24         amount and release all of their liens in connection

25         with that.

Q   Do you remember when you had that conversation with
    Mr. Corp?

A   Within a week of the closing.

Q   Have we talked about that conversation?

A   Yes.

Q   And do you remember what Mr. Corp said in response?

A   No.

Q   Do you know why this letter, HUD 0058, is addressed
    to Mr. Corp?

A   No.

Q   Do you know why Ms. Maroney transmitted this letter
    to HUD, as opposed to Mr. Corp transmitting the
    letter to HUD?

A   I am not sure Ms. Maroney did that.  I am not sure
    who submitted it.  I don't know the answer to your
    question.

Q   Okay.  Well, I am looking at the fax cover page.

A   Okay.  I see your point now, okay.  Repeat the
    question for me.

              (Court reporter reads the pending question)

A   I believe it was in connection with the Mortgagor's
    Certification of Actual Cost which HUD requires for
    purposes of closing.

Q   I am trying to get a sense of what Ms. Maroney's
    responsibilities were with respect this loan, with

1          Could you explain, is there a way you could

2      rephrase this language to me, or what the intent of

3      this was?

4               MR. NUGENT:  Object to the form.

5  A   Heller was going to send this advance under the line

6      of credit to the escrow agent, Monroe Title

7      Insurance, in this case.  And they were due under

8      their payoff letter, $1,350,000 once they did that.

9  Q   Uh-huh.

10  A   We could not release those funds until that

11      $1,350,000 was wired to Heller.

12  Q   Okay.

13  A   Once that was done, the borrower, being the

14      borrower's money, was free to apply those funds to

15      the costs that they had to cover for purposes of the

16      loan.  I don't remember the exact cash requirement

17      they had to come up with to close this loan, but I do

18      remember it was substantial.  And the balance, given

19      the fact that they would owe the money borrowed from

20      Heller, and the fact it was substantially their money

21      at that point in time, once Heller was paid off, any

22      balance could go and be released to them for their

23      own purposes.

24               MR. YOUNG:  All right.  I will show

25          you what's been designated HUD 00203.  It's

1           a Heller Financial letter dated June 4th,

2      2001.  And we will mark it as Exhibit 8.

3           (Exhibit 8 marked for identification)

4    BY MR. YOUNG:

5    Q   Mr. Brennan, do you recognize this?

6    A   Yes.

7    Q   All right.  What did you recognize it as?

8    A   A payoff letter from Heller, along with escrow

9        instructions from Heller.

10   Q   I would like to try and walk through the chronology

11       to make sure I understand it correctly.  The first

12       step in this arrangement is the HUD insured loan

13       closing; is that right?

14   A   I am not sure I understand the question.

15   Q   Okay.  Well, it says Heller will be wiring to the

16       title company the sum of $787,136,67.  What was going

17       to happen to that $787,000?  What was the plan for

18       that money?

19   A   It was going into the escrow and used with other

20       funds to close the loan.

21   Q   And to whom would that money go ultimately?

22   A   The title company.

23   Q   And then from the title company, would it go

24       somewhere else?

25   A   It would be used at the directions of the borrower to

```
 1           pay certain costs.

 2      Q    Would it go to Brylin ultimately?

 3      A    Once all of those costs were paid off, it was

 4           Brylin's money.

 5      Q    What had to happen, if anything, before this $787,000

 6           was released from the title company to Brylin?

 7      A    We had to have the HUD note endorsed.  All of those

 8           types of transactions are deemed to be simultaneous.

 9           So once the HUD note is endorsed for insurance, we

10           are deemed to be closed.  I could then give

11           directions to the title company to release the

12           escrow.  The $1,350,000 would be wired to Heller

13           Healthcare.  All of the other costs would be paid

14           from this escrow, deemed simultaneously paid from

15           this escrow.  And we would have closed the loan.

16      Q    Okay.  What would have happened if -- you said there

17           was a HUD endorsement?

18      A    That's correct.

19      Q    What would have happened if there was no HUD

20           endorsement?

21      A    We would not have closed.

22      Q    What would have happened to the $787,000?

23      A    It would have been returned to Heller Healthcare.

24      Q    So is it accurate to say that HUD had to endorse the

25           loan before Brylin would receive its payment from
```

1          Heller?

2                    MR. NUGENT:  Object to the form.

3     A    No.

4     Q    Why is that inaccurate?

5     A    We would not have presented anything to HUD to close

6          this loan unless Heller Healthcare Financial had

7          wired in the $787,000 advance into the title company.

8          We needed assurance that that money would be

9          available to pay all the costs of the transaction

10         before we would have ever presented or tried to close

11         this loan to HUD.

12    Q    All right.  And in fact, did Brylin receive this

13         $787,000, according to this escrow agreement?

14    A    It was wired to the title company, yes.

15    Q    So is it accurate to say that things actually

16         happened according to how this agreement is written?

17    A    Yes.  To my understanding, yes.

18    Q    In other words, this agreement actually came to pass?

19    A    That's correct.

20    Q    And when did this -- how was this executed?  How did

21         this agreement -- was there a separate closing, a

22         second closing?

23    A    There was a closing at HUD offices in Buffalo on

24         June 5th.

25    Q    And did you ever have any conversations with Mr. Corp

1          about this escrow plan as it's set forth in the June

2          4th, 2000 (sic) letter, Exhibit 8?

3                 MR. NUGENT:   Object to the form.

4   A   I advised him there would be an escrow established

5          for purposes of paying off all of the various

6          parties, including Heller.

7   Q   Did you advise him that Heller would be wiring,

8          putting funds into escrow to ultimately be released

9          to Brylin?

10   A   Yes.

11   Q   When did you tell him that?

12   A   Shortly before we closed.  Otherwise, we would not

13          have gone to the HUD closing.

14   Q   What did he say in response to that?

15   A   He was happy that we could close the loan.

16   Q   Why was it necessary for Heller to put money in

17          escrow?

18   A   I wanted assurance that there would be funds

19          available to pay the various costs that were

20          necessary to close the loan.  I did not want those

21          funds to be coming from the borrower, because I

22          wasn't sure that they would be readily available when

23          we needed them.

24   Q   Do you know why Heller didn't just increase its line

25          of credit or advance the money to Brylin up front,

1    just give them the money, rather than having them put

2    it in escrow?

3  A  Apart from my instructions that they had to do it

4    that way?

5  Q  Yes.

6  A  No, I don't.

7  Q  Did you ever ask anybody, why wouldn't Heller just

8    give Brylin the advance?

9  A  I don't know.

10  Q  Did you explain -- do you know if Mr. Corp ever saw

11    this document, Exhibit Number 8, specifically?

12              MR. NUGENT:  Object to the form.

13  A  I don't recall.

14  Q  Did you draft Exhibit Number 8 here?  Did you draft

15    this letter, or was this drafted by Heller?

16  A  This was drafted by Heller.

17  Q  Was there a negotiation between Brylin and Heller

18    concerning how this arrangement was going to work?

19  A  I don't know.  I know Karen Manny was discussing

20    matters with Robert Goodrich at Heller, and I was

21    discussing matters with Robert Goodrich at Heller.

22  Q  And when you had your conversation with Mr. Corp

23    about Heller wiring money into escrow, I think it's

24    the $787,000; is that correct?

25              MR. NUGENT:  Object to the form.

```
 1    Q    Is that correct, $787,000?

 2    A    I am not sure if I told him that specific amount, but

 3         I am sure that I told Mr. Corp that the money from

 4         Heller was being wired into escrow.

 5    Q    Okay.  I think -- did you say that Mr. Corp

 6         recognized that the loan would then close?

 7    A    Yes.

 8    Q    Okay.  Did you advise Mr. Corp or do you remember

 9         speaking to him -- give me just one second.  I am

10         trying not to bungle this.  Did you advise Mr. Corp

11         that Heller's advance, the money that Heller put in

12         escrow, would not be released to Brylin until Brylin

13         paid Heller the full $1,350,000?

14                   MR. NUGENT:  Object to the form.

15    A    I don't recall that conversation.

16    Q    Okay.  Do you know whether Mr. Crop had any knowledge

17         of that fact?

18                   MR. NUGENT:  Object to the form.

19    A    No.

20    Q    Okay.  And I think we talked for a second about the

21         closing.  I would like to ask you some questions

22         about the mechanism of how this wire transfer or this

23         escrow arrangement between Brylin and Heller was

24         consummated.  Did this happen at the closing, or how

25         did Heller know that the HUD insured loan had closed?
```